# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### (WESTERN DIVISION)

| | |
|---|---|
| ROBERT W. HUELLEMEIER, Derivatively on Behalf of Teva Pharmaceutical Industries Limited Employee Stock Purchase Plan,<br><br>Plaintiff,<br>vs.<br><br>TEVA PHARMACEUTICAL INDUSTRIES LIMITED, EREZ VIGODMAN, EYAL DESHEH, and SHLOMO YANAI,<br><br>Defendants. | Civil Action No.: 1:17-cv-485 |

Plaintiff Robert W. Huellemeier ("Plaintiff"), by his undersigned attorneys, for his derivative complaint against Defendants (defined below) alleges the following based upon personal knowledge as to his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendant's public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Teva Pharmaceutical Industries Limited ("Teva" or the "Company"), securities analysts' reports and advisories about the Company, information from the United States Department of Justice, and information readily obtainable from public sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiff, derivatively on behalf of the Company's Employee Stock Purchase Plan for U.S. Employees ("ESPP"), brings this action in a derivative capacity against the below-

named defendants on behalf of all persons who purchased or otherwise acquired Teva American Depository Shares ("ADSs") between February 9, 2015 and November 3, 2016 ("Relevant Period") in the ESPP.  Plaintiff seeks to recover compensable damages and pursue remedies against Defendants.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to § 11 of the Securities Act, 15 U.S.C. §§ 77k.

3.      The Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v.

4.      The Court has jurisdiction over the state law claim for breach of fiduciary duty under 28 U.S.C. § 1367.

5.      Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v(a), because Defendants conduct business and operate facilities in the District, and a significant portion of Defendants' actions, and resulting damages, occurred within this District. Plaintiff also resides in this District.

6.      In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

7.      ***Plaintiff Robert W. Huellemeier*** purchased Teva ADSs during the Relevant Period through the ESPP at artificially inflated prices and was damaged as more fully described hereunder.  Plaintiff is a citizen of the State of Ohio.

8.     **Defendant Teva Pharmaceutical Industries Limited** ("Teva") is a global pharmaceutical company.  Teva operates in pharmaceutical markets worldwide, with a significant presence in the United States, Europe and other markets.  Teva operations include facilities in Ohio.  The Company's ADSs are traded on the New York Stock Exchange ("NYSE") using the ticker symbol "TEVA".

9.     **Defendant Erez Vigodman** ("Vigodman") was, at all relevant times, a Director of the Company.  Defendant Vigodam was one of the signatories to the July 27, 2010 Registration Statement.

10.    **Defendant Eyal Desheh** ("Desheh") was, at all relevant times, Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer).  Defendant Desheh was one of the signatories to the July 27, 2010 Registration Statement.

11.    **Defendant Shlomo Yanai** ("Yanai") was, at all relevant times, President and Chief Executive Officer (CEO).  Defendant Yanai was one of the signatories to the July 27, 2010 Registration Statement.

## THE COMPANY'S ESPP

12.    The ESPP was designed to provide eligible employees of Teva with an opportunity to increase their proprietary interest in the success of the Company by purchasing Teva ADSs from the Company and to pay for such purchases through payroll deductions.

13.    On July 27, 2010, the Company filed with the SEC a Registration Statement registering 70,000,000 shares of Company ADSs at $ $50.10 for a total of $ 3,507,000,000.00.  Some of the above-referenced ADSs were for employees of the Company who wish to purchase Company stock through the Company's ESPP.

14.     The Registration Statement incorporates future financials of the Company and states in relevant part:

> This Registration Statement on Form S-8 (this "Registration Statement") incorporates by reference the Registrant's previous Registration Statements on Form S-8 (Nos. 333-96725, 333-112115, 333-112930, 333-118978, 333-126264, 333-131274, 333-153503, and 333-155926).  Any items included with these previous Registration Statements not expressly changed hereby shall be as set forth in such previous Registration Statements.
>
> *     *     *
>
> Item 3. INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE.
>
> The following documents, filed with the Commission by the Registrant, are incorporated by reference into the Registration Statement:
>
> (a)     The Registrant's Annual Report on Form 20-F for the year ended December 31, 2009 (the "2009 Form 20-F");
>
> (b)     The Registrant's Current Reports on Form 6-K filed with the Commission on May 4, 2010 (containing the Company's financial statements for the quarter ended March 31, 2010), May 18, 2010 (containing the Company's proxy statement with respect to its 2010 annual meeting of shareholders), June 15, 2010, June 18, 2010, June 30, 2010, and July 27, 2010 (containing the Company's financial statements for the quarter ended June 30, 2010); and
>
> (c)     The description of the Registrant's ordinary shares, par value NIS 0.1 per share and the American Depositary Shares representing the ordinary shares, contained in the Registration Statement on Form F-4, filed on September 16, 2008, as amended by the description thereof contained in the 2009 Form 20-F.
>
> In addition, ***all documents filed by the Registrant with the Commission pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") subsequent to the date of this Registration Statement and prior to the filing of a post-effective amendment to this Registration Statement which indicates that all the securities***

*offered hereby have been sold or which deregisters all securities then remaining unsold* <u>**shall be deemed to be incorporated by reference in this Registration Statement**</u> and to be a part hereof from the date of the filing of such documents with the Commission. Any statement contained in a document incorporated by reference herein shall be deemed to be modified or superseded for purposes hereof to the extent that a statement contained herein (or in any other subsequently filed document which also is incorporated by reference herein) modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed to constitute a part hereof except as so modified or superseded. [Emphasis added].

## <u>SUBSTANTIVE ALLEGATIONS</u>

15.     On July 27, 2010, Teva filed with the SEC its Form S-8 Registration Statement (the "Registration Statement") registering 70,000,000 ADSs pursuant to and including the Company's ESPP. According to the Registration Statement:

> All documents filed by the Registrant with the Commission pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") subsequent to the date of this Registration Statement and prior to the filing of a post-effective amendment to this Registration Statement which indicates that all the securities offered hereby have been sold or which deregisters all securities then remaining unsold ***shall be deemed to be incorporated by reference in this Registration Statement*** and to be a part hereof from the date of the filing of such documents with the Commission. Any statement contained in a document incorporated by reference herein shall be deemed to be modified or superseded for purposes hereof to the extent that a statement contained herein (or in any other subsequently filed document which also is incorporated by reference herein) modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed to constitute a part hereof except as so modified or superseded. [Emphasis added].

16.     During the Class Period, Plaintiff acquired Teva ADSs under ESPP.

17.     The Class Period starts on February 9, 2015. On that date, Teva filed with the SEC its Form 20-F for the fiscal year ended December 31, 2014 (the "2014 Form 20-F"). The

2014 Form 20-F was signed by Defendant Denesh, and Defendants Vigodman and Denesh signed Teva's consolidated balance sheet included with this 2014 Form 20-F. Defendants Vigodman and Denesh also signed the certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the financial condition and results of operations of the Company as contained in, and which was attached to, the 2014 Form 20-F.

18.     The Company's 2014 Form 20-F states that its management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2014 and concluded that its internal controls were effective.

19.     The Company's 2014 Form 20-F also states that Defendants Vigodman and Denesh evaluated the effectiveness of the Company's disclosure controls and procedures as of December 31, 2014 and concluded that its disclosure controls and procedures were effective.

20.     The Company's 2014 20-F included an overview of the Company and discussed its business strategy, stating in relevant part:

> **Strategy**
>
> In 2014, we began a process of re-defining and re-focusing our business strategy to better leverage our strengths and differentiate ourselves in the pharmaceutical market. We seek to capitalize on our advantages — including the largest generic medicines business in the world, a focused specialty business, a unique OTC business and our integrated R&D and API capabilities — to provide patients with integrated, outcome-focused solutions. Underlying our strategy is our heightened focus on profitable and sustainable business.
>
> The key elements of our strategy consist of the following:
>
> • Solidifying our foundation and driving organic growth….
> • Focusing on key growth markets….
> • Maintaining Copaxone® and other key specialty products…
> • Solidifying leadership positions in our core therapeutic areas….

- • Pursuing strategic business development initiatives….
- • Executing on our cost reduction program….

21. The Company's 2014 Form 20-F also discussed its strategy in the United States and other markets, including Russia, stating in relevant part:

**United States**

We are the leading generic drug company in the United States.  We market approximately 375 generic products in more than 1,100 dosage strengths and packaging sizes, including oral, injectables and inhaled products . . . .  Our growth strategy focuses on a carefully selected portfolio of products that will provide added value to our customers, payors and patients, utilizing new and advanced technologies.

In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs.  Price competition from additional generic versions of the same product typically results in margin pressures.  We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio.  We believe we have a focused and competitive pricing strategy.

A substantial majority of our U.S. generic sales are made to retail drug chains and wholesalers, which continue to undergo significant consolidation and globalization.  Our portfolio selection, breadth of products offerings and our global network capabilities, have provided mutual strategic advantages to our customers.  We are committed to the success of our customers and work closely with them as important business partners….

**Rest of the World Markets**

Our ROW markets include all countries other than the United States and those included under Europe.  Our key ROW markets are Russia, Japan and Canada….  Russia is characterized by rapid growth and relatively high sales of branded generics and OTC products….

7

> Our ROW strategy is to be selective as to where we do business, focusing on the countries and segments where we can achieve a significant position.  Over time and with the right opportunities, we intend to expand our presence in markets such as Russia, China, Brazil and India….
>
> **Key markets highlights**
>
> In Russia, which is primarily a branded generic market, we market a diverse portfolio of products.  We are currently one of the largest pharmaceutical companies in Russia, playing a role in the commercial, retail, hospital and state funded segments.
>
> The Russian government seeks to encourage the use of generic products in order to reduce the cost of pharmaceuticals and increase patient access, which is influencing our portfolio strategy.  The government is further seeking to encourage local pharmaceutical production by providing incentives, and we have recently established a manufacturing facility in Yaroslavl, Russia.

22.     On February 11, 2016, Teva filed with the SEC its Form 20-F for the fiscal year ended December 31, 2015 (the "2015 Form 20-F").  The 2015 Form 20-F was signed by Denesh, and Defendants Vigodman and Denesh signed Teva's consolidated balance sheet included with this Form 20-F.  Defendants Vigodman and Denesh also signed the SOX certifications attesting to the financial condition and results of operations of the Company as contained in, and which was attached to, the 2015 Form 20-F.

23.     The Company's 2015 Form 20-F states that its management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2015 and concluded that its internal controls were effective.

24.     The Company's 2015 Form 20-F also states that Defendants Vigodman and Denesh evaluated the effectiveness of the Company's disclosure controls and procedures as of December 31, 2015 and concluded that its disclosure controls and procedures were effective.

25.   The Company's 2015 Form 20-F discussed its business strategy, stating in relevant part:

> **Strategy**
>
> In 2014, we began a process of re-defining and re-focusing our business strategy to better leverage our strengths and differentiate ourselves in the pharmaceutical market. We seek to capitalize on our advantages — including the largest generic medicines business in the world, a focused specialty business, a unique OTC business and our robust R&D and API capabilities — to provide patients with integrated, outcome-focused solutions. Underlying our strategy is our heightened focus on profitable and sustainable business.
>
> The key elements of our strategy consist of the following:
>
> - Solidifying our foundation and driving organic growth….
> - Transforming our generics business….
> - Focusing on key growth markets….
> - Maintaining Copaxone® and other key specialty products….
> - Solidifying leadership positions in our core therapeutic areas….
> - Pursuing strategic business development initiatives….

26.   The Company's 2015 Form 20-F also discussed its strategy in the United States and other markets, including Russia, stating in relevant part:

> **United States**
>
> We are the leading generic drug company in the United States. We market approximately 370 generic products in more than 1,100 dosage strengths and packaging sizes, including oral, injectable and inhaled products. We believe that the breadth of our product portfolio provides us with a strategic advantage, particularly as consolidation continues among purchasers, including large drugstore chains, wholesaling organizations and buying groups. Our growth strategy focuses on a portfolio of products that will provide added value to our customers, payors and patients, utilizing new and advanced technologies.
>
> In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug

manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures.  We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio.  We believe we have a focused and competitive pricing strategy.

A substantial majority of our U.S. generic sales are made to retail drug chains and wholesalers, which continue to undergo significant consolidation and globalization.  Our portfolio selection, breadth of products offerings and our global network capabilities, have provided mutual strategic advantages to our customers.  We are committed to the success of our customers and work closely with them as important business partners….

**Rest of the World Markets**

Our ROW markets include all countries other than the United States and those included under Europe.  Our key ROW markets are Japan, Canada, Venezuela and Russia….   Russia is characterized by rapid growth and relatively high sales of branded generics and OTC products….

Our ROW strategy is to be selective as to where we do business, focusing on the countries and segments where we can achieve a significant position. Over time and with the right opportunities, we intend to expand our presence in markets such as China, Brazil and India and significantly enhance our existing presence in other high growth markets such as Russia, Mexico, South Korea, Australia and Turkey….

**Key market highlights**

In Russia, which is primarily a branded generic market, we market a diverse portfolio of products. We are currently one of the largest pharmaceutical companies in Russia, playing a role in the commercial, retail, hospital and state funded segments.

The Russian government seeks to increase the share of domestically produced pharmaceutical products by implementing a policy to encourage local production to meet state and local needs. We established a manufacturing facility in Yaroslavl, Russia in

2015 to take advantage of this policy, and we expect this facility to
become fully operational during 2016.

27.     The statements referenced in paragraphs 17-26 above were materially false and/or

misleading because they misrepresented and/or failed to disclose the following adverse facts

pertaining to Teva's business, and its operational and financial results which were known to

Defendants or recklessly disregarded by them.  Defendants false and/or misleading statements

and/or statements that they failed to disclose included:

(a)     Based upon its conduct, Teva was under an antitrust investigation by the

Department of Justice ("DOJ") for alleged price fixing;

(b)     Based upon its conduct, Teva was under an antitrust investigation by the

Attorney General's Office of the State of Connecticut ("AG") for alleged price fixing;

(c)     Based upon its conduct, Teva was under investigation for violations of the

Foreign Corrupt Practices Act ("FCPA") by the DOJ;

(d)     The DOJ and AG antitrust investigations could lead to criminal charges

being filed against Teva for price collusion;

(e)     The DOJ FCPA investigation could lead to criminal charges filed against

Teva for bribery of Russian government officials;

(f)     Based thereon, Teva lacked effective internal controls over its financial

reporting; and

(g)     As a result and at all relevant times, Teva's public statements were

materially false and misleading.

**THE TRUTH EMERGES**

**Antitrust Investigation Regarding Price Fixing**

11

28.     On August 4, 2016, Teva filed its Form 6-K with the SEC.  This Form 6-K was signed by Denesh.   Within its Contingencies Notes, Teva disclosed for the first time that it previously had received two separate subpoenas relating to its alleged participation in price fixing, stating:

> On June 21, 2015, Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products.   On July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations.   Teva is cooperating fully with these requests.

29.     Based on this partial disclosure, Plaintiff and other investors in the ESPP were damaged when the price of Teva ADSs fell $1.24 per share and closed at $54.21 per share on August 5, 2016.

30.     On November 3, 2016, *Bloomberg* published an article entitled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End."  That article disclosed that the DOJ investigation began sometime in 2014, involving price collusion between Teva and other pharmaceutical companies.  The article states in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices . . . .
>
> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under

> scrutiny, including a heart treatment and an antibiotic.  Among the
> drugmakers to have received subpoenas are industry giants Mylan
> NV and Teva Pharmaceutical Industries Ltd.  Other companies
> include Actavis, which Teva bought from Allergan Plc in August,
> Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings
> Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group
> Ltd., Endo International Plc's subsidiary Par Pharmaceutical
> Holdings and Taro Pharmaceutical Industries Ltd.

*   *   *

> Shares of all companies named in the investigation fell on the news
> . . . .  Teva slipped 9.5 percent to $39.20 . . . .

*   *   *

> Generic drug companies are also contending with a civil price-
> fixing investigation by Connecticut Attorney General George
> Jepsen. Jepsen is seeking to lead a group of states to probe the
> industry, which could result in cases seeking damages, according
> to people familiar with the matter.  A spokesman for the
> Connecticut Attorney General's office declined to comment.
>
> The first subpoenas in the generics investigation were issued by
> Connecticut in July 2014, while the Justice Department followed in
> November, according to regulatory filings by the companies. The
> investigations initially focused on mid-sized U.S. companies and
> have since extended to the biggest manufacturers and U.S.
> subsidiaries of overseas companies.

**<u>Bribery of Russian, Ukraine, and Mexico Government Officials</u>**

31.   On December 22, 2016, the DOJ issued a press release entitled "Teva Pharmaceutical Industries Ltd. Agrees to Pay More Than $283 Million to Resolve Foreign Corrupt Practices Act Charges."  This press release stated the payment was a criminal penalty in connection with schemes involving bribery of government officials in Russia, Ukraine, and Mexico.  The DOJ press release states in relevant part:

> Teva entered into a deferred prosecution agreement (DPA) in
> connection with a criminal information, filed today in the Southern
> District of Florida, charging the company with one count of
> conspiracy to violate the anti-bribery provisions of the FCPA and

one count of failing to implement adequate internal controls. Pursuant to its agreement with the department, Teva will pay a total criminal penalty of $283,177,348. Teva also agreed to continue to cooperate with the department's investigation, enhance its compliance program, implement rigorous internal controls and retain an independent corporate compliance monitor for a term of three years.

32.    From 2006 through at least 2012, Teva, through its employees and agents, together with others, agreed that Teva would make corrupt payments to Russian Official[1], intending that Russian Official would use his official position and ability to influence the Russian government to purchase brand name Copaxone (chemical name: glatiramer acetate) through tender offers. The payments were made through the high profit margins that Russian Company[2] earned as Teva's re-packager and distributor of Copaxone for sales to the Russian Ministry of Health pursuant to the central government's drug purchase program.

33.    In addition, between 2001 and 2011, Teva, through its employees and agents, together with others, agreed to pay and provide things of value to Ukrainian Official[3] to corruptly

---

[1]    According to the Statement of Facts attached as Exhibit 2 to the Plea Agreement entered into by the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), and Teva LLC (Russia) ("Teva Russia") (hereinafter, the "Plea Agreement"), the "Russian Official" is a citizen of the Russian Federation whose identity is known to the United States and the Company, was a high-ranking government official in the Russian Federation, who held official positions on government committees.

[2]    According to the Plea Agreement, the "Russian Company" was a group of companies incorporated in the Russian Federation, the identity of which is known to the United States and the Company. Russian Company was a distributor, manufacturer and re-packager of pharmaceutical products in the Russian Federation. Russian Company was owned, controlled and managed by Russian Official. From at least in or about 2003 until at least 2013, Russian Company's controlling shares were held in the name of Russian Official's spouse, who was not involved in Russian Company's business operations.

[3]    According to the Plea Agreement, the "Ukrainian Official" is a Ukrainian citizen whose identity is known to the United States and the Company, was a high-ranking official within the Ukrainian Ministry of Health, who held official positions at government agencies and on government committees from at least 2001 to 2011. By virtue of his of official positions, Ukrainian Official could take official action on, and exert official influence over, matters related to the registration and pricing of pharmaceutical products in Ukraine. Ukrainian Official was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, § 78dd-1(9(1)(A).

influence the Ukrainian government in approving the registration of Teva pharmaceutical products in Ukraine, which thereby allowed Teva to market and sell its products in the country.

34.     In furtherance of the schemes in Russia and Ukraine, employees and agents of Teva sent emails through the United States.  In furtherance of the improper payments in the Ukraine, Teva caused wire transfers to be made through U.S. financial institutions.

35.     Teva marketed and sold pharmaceutical products in countries with high corruption risks, including, among other places, Mexico.  Despite being aware of red flags and prior corruption-related misconduct at Teva's subsidiary in Mexico, Teva knowingly failed to implement an adequate system of internal accounting controls and failed to enforce the internal accounting controls it did have in place, including those requiring adequate due diligence of distributors and other third-party agents, which resulted in improper payments being made in Mexico.

36.     Teva's total profits from the conduct described above in Russia, Ukraine and Mexico, were approximately $221,232,303.

### **Russian Federation**

37.     The Russian Federation had a socialized public healthcare system that provided universal healthcare to Russian citizens, with the cost of medical care and drug treatments shared between the central, regional and local governments.  In or around late 2007, the Ministry of Health designated seven illnesses and conditions as rare and expensive to treat and created a program whereby the central government would procure and supply to patients the necessary medications for treating these illnesses and conditions.  Among the covered illnesses was multiple sclerosis and treatment by Copaxone.  Since in or around 2008, Russian government

purchases of Copaxone were primarily made by the Ministry of Health at usually bi-annual auctions.

38.     Employees of Teva, based in Israel, and employees of Teva Russia, at the direction of Teva Executive[4] and others, sought to increase sales of Copaxone to the Russian government, including by doing business with companies owned and controlled by Russian Official, knowing that he was a high-level Russian government official at the time.

39.     On or about October 26, 2006, Teva Russia Executive[5] emailed Teva Executive and another senior Teva International Group ("TIG") Manager about a recent meeting with Russian Official, providing them with "an idea of the caliber of the person [by] citing below just a few of his formal titles and personal achievements."  Teva Russia Executive described Russian Official's official position and explained that Russian Official was "the key lobbyist of pharma-related questions and issues" as well as a "key contact person for Knesset," the Israeli parliament.  Teva Russia Executive explained that Russian Official was the "owner of the local wholesaling company [Russian Company]" along with several other pharmaceutical companies. Teva Russia Executive's email further noted that Russian Official's "influence in the industry" could benefit Teva by, among other things, allowing Teva to obtain "more speedy and straightforward registration of products."  Teva Russia Executive cautioned, however, that "the

---

[4]     According to the Plea Agreement, the "Teva Executive" is an Israeli citizen whose identity is known to the United States and the Company, was the senior Teva executive responsible for overseeing TIG (defined above) between 2002 and 2010, and left the Company in 2014. Teva Executive was an "officer," "director," "employee," and "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

[5]     According to the Plea Agreement, the "Teva Russia Executive" is a citizen of the Russian Federation whose identity is known to the United States and the Company, was a high-level executive at Teva Russia from in or about January 2006 until he left Teva Russia in or about September 2012.  Teva Russia Executive was an "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

results [of Russia's] 2008 presidential elections can affect the status and scope of [Russian Official]'s influence."

40.     On or about October 26, 2006, Teva Executive replied to Teva Russia Executive that he "support[ed] exploring any kind of initiative which could strengthen our position in Russia."

41.     On or about February 8, 2008, Teva Russia Executive sent Teva Executive an email attaching a report about Russian Company.  In a section of the report detailing Russian Company's "management and corporate governance," Teva Russia Executive explained that "[t]ransparency of [Russian Company] should be considered low . . . .  Participation of [Russian Official] and probably some local government officials in the ownership structure is well known."

42.     In or about early October 2008, Teva managers, including Teva Executive, met with Russian Official and a Russian Company executive in Israel.  The meeting had been arranged by Russian Company's Director of Sales and Marketing.

43.     On or about October 7, 2008, Russian Company's Director of Sales and Marketing emailed Teva Executive to follow-up on matters discussed during the meeting.  The email reiterated that Russian Company was "interested to participate in the delivery and distribution of Copaxone," and explained that the Russian government had already "defined" the government's order for Copaxone for 2009.  The email also mentioned possible "future scenarios" that could affect the "decision making" related to Copaxone sales, reminded Teva Executive that Russian Official had had "personal involvement . . . in the introduction of Copaxone and other important healthcare initiatives in Russia," and explained that "it will be

beneficial for Teva to grant the distribution of Copaxone to [Russian Company] in full or partially."

44.     In or around October 2008 and January 2009, Teva employees, including Teva Executive, learned that the Russian Company executive was under investigation in Russia for corruption and that Teva's risk insurance provider had decided to stop insuring transactions with Russian Company.

45.     In or around late 2008 or early 2009, after the meeting and email described above, Teva Executive, Teva Russia Executive, and others agreed that Teva would grant Russian Company the right to distribute Copaxone in Russia, intending that Russian Official would use his official position and ability to influence the Russian government in order to increase sales of Copaxone to the Russian government. From early 2009 until in or about mid-2010, Teva employees explored various possibilities for Russian Company to sell Copaxone.

46.     On or about March 7, 2009, Russian Company's Director of Sales and Marketing emailed Teva Executive with information about a public tender for the purchase of Copaxone that had been announced by the Russian Academy of Medical Sciences ("RAMS").  The email explained that Russian Company's "top management has first-hand relations with RAMS" and that the tender offered "a very good chance to push further up Copaxone positioning in Russia, since RAMS and its President have [a] significant role in influencing the opinion of medical and political stratum in Russia."

47.     On or about March 10, 2009, the senior TIG executive forwarded Teva Executive's email to Teva Russia Executive, who confirmed that Russian Company had "a strong position in this establishment."  Teva Russia Executive explained that he was aware of the issue and was already dealing with a Russian Company employee who "reports directly to

[Russian Official]."  In or around mid-2009, the Russian government announced a new strategy for the Russian Federation's domestic pharmaceutical industry, known as "Pharma 2020."  The goals of the new strategy involved, among other things, an import phase-out and changes to the procurement of pharmaceutical products, primarily by establishing a preference for domestic products.  These changes started to apply in early 2009 and affected purchases made through the Russian government's annual procurement auction program.  Under the law, as announced, repackaging of a foreign pharmaceutical product inside the Russian Federation could qualify for the domestic preference under Pharma 2020.

48.     In or around mid-2010, Teva reorganized its business and eliminated the TIG business unit.  Teva Russia was put under the newly-created EMIA business unit.

49.     In or around mid-2010, Teva Russia employees, including Teva Russia Executive, agreed with Russian Official and others on a plan for Russian Company to be Teva's re-packager and distributor for Copaxone sales to the Russian government.  Russian Company would re-package and distribute Copaxone on behalf of Teva.  As set forth below, Teva hoped that Russian Official would use his political network and official influence to benefit Teva to support maintaining or increasing the amount of Copaxone sold to the Russian government.

50.     In or around early August 2010, a Russian Company employee emailed Teva Russia Executive to request that Russian Company receive a larger discount on sales to a Russian government customer.  On or about August 5, 2010, Teva Russia Executive forwarded the matter to the manager of Teva Russia's Innovative Business Unit, requesting that Russian Company be granted a larger discount. The Teva Russia manager opposed giving Russian Company "any additional concessions," but Teva Russia Executive wrote back, suggesting that Teva Russia should consider the request as "the cost of building a relationship with [Russian

Official]," as "this year, there was a substantial increase in the Copaxone requests from the [RAMS]," and Teva Russia "may benefit from [Russian Official's] support in other areas as well."

51.     In or around late August 2010, Teva Russia employees provided a draft of the proposed Copaxone repackaging and distribution agreement between Teva and Russian Company to Teva employees in Israel.

52.     On or about September 12, 2010, a Teva Russia executive emailed the Finance Director for Teva's Copaxone business unit and other Teva managers and executives in Israel to provide the "rationale for the new scheme of Copaxone business in Russia."   The email explained that "this year the Russian Government has been continuing to interfere into pharmaceutical market functioning.  Thus, it has been continuing its pressure on prices especially on those products that being of high price are paid by the state budget."   The email further explained that the focus of this price pressure had been "expensive imported products paid by the government," including Copaxone, and that the Russian government was seeking to "encourage[] competition intensification by both fast track registration of the new competing products (one was registered this summer for MS treatment and we expect it takes part in the MS tender this fall) and supporting fast development and introduction of the local glatiramoids (they call them, of course, 'Copaxone's generics')."   In the email, the Teva Russia executive stated that this "and some other new factors produced serious threats for the Copaxone business in 2011."  As a result, "partnership with a robust influential local player was identified as the proper solution to the above challenges."   The email stated that the partner was "supposed to lobby Copaxone in the state tender."   He explained that Russian Company "was found as the right

company capable to assure keeping Copaxone's share and its price and even r[a]ising them both up."

53.     In his email to Teva executives, the Teva Russia executive asked for their approval of the proposed Russian Company repackaging and distribution agreement "as soon as possible." The email explained that "if we do not have the supply agreement approved and signed by [the] mid[dle] of this week we will encounter very real threat of losing a 100 million USD Copaxone business in 2011."

54.     On or about September 12, 2010, a Teva Russia manager emailed Teva executives in Israel with additional information supporting Teva Russia's request.  The email noted that Russian Company was headed by Russian Official, listed Russian Official's official positions on various government committees, and explained that "the plan" was to use Russian Official's contacts, including at the Ministry of Health, to maintain Copaxone's share of the market, including by minimizing the risk that a generic version of Copaxone would be approved by the Russian government, thereby reducing Teva's market share.

55.     On or about September 12 and 13, 2010, Teva Russia Executive sent emails to senior Teva executives in Israel requesting them to sign off on the agreement with Russian Company immediately.

56.     On or about September 14, 2010, a Teva Russia senior manager emailed Teva Russia Executive and described a meeting he had just had with Russian Official.  The email said that Russian Official had told him that the Minister of Health "had returned from a vacation and asked in the morning if there was a confirmation that the entire project . . . would take place." The email explained that Russian Official was concerned that Teva would refuse to approve the agreement with Russian Company, and that Russian Official had threatened that "both the price

and the supply volumes would be purposefully 'lowered' if a partnership with him was not established."

57.     On or about September 15, 2010, Teva executives agreed to enter into the Copaxone re-packaging and distribution agreement with Russian Company.

58.     On or about October 7, 2010, Teva Russia's Legal Director initiated the internal process to formally enter into the agreement with Russian Company.  Consistent with Teva's anti-corruption policy as it related to third-party agreements, the Legal Director submitted a completed questionnaire about the Russian Company agreement to Teva for review and approval.  In transmitting the materials, the Legal Director stated that the "deal value is about US $100 million for 2011 sales" and asked for immediate review, calling the deal "rather urgent." The email and supporting information stated that Russian Official's wife was the owner of the company but did not include the fact that Russian Official ran the business. The email also omitted facts known to Teva Russia Executive and other Teva Russia employees, including details about the corruption investigation by Russian authorities against the Russian Company executive and information from Russian news media reports on Russian Official's alleged involvement in corruption related to Russian government drug procurement auctions going back to 2006.

59.     On or about October 8, 2010, a Teva Finance Department manager with responsibility for approving compliance-related requests for the EMIA region directed a Finance employee to forward the compliance questionnaire concerning the Russian Company agreement to the Regional Compliance Officer and to Teva Russia's CFO for, among other things, due diligence to be conducted.

60.     On or about October 9, 2010, in response to an inquiry about the status of due diligence on Russian Company, a senior EMIA executive sent an email to another high-ranking EMIA executive explaining that Teva Russia Executive would be leading the due diligence process.     As set forth above, at the time, Teva Russia Executive had been pushing for the agreement between Teva Russia and Russian Company.

61.     On or about October 21, 2010, the EMIA Regional Compliance Officer approved the agreement between Teva and Russian Company.

62.     On or about October 28, 2010, Teva executed the framework agreement with Russian Company, which included granting Russian Company the right to repackage and distribute Copaxone in the Russian Federation as well as an incentive agreement with payments tied to increasing sales targets.  At the same time, Teva entered into the distribution agreement with Russian Company, Teva terminated an agreement with the Russian Company that had distributed Copaxone at several prior Ministry of Health auctions and agreed to pay that company a substantial "bonus" payment as part of the termination.

63.     On or about November 12, 2010, the Russian Ministry of Health awarded Russian Company the contract to supply the Russian government with glatiramer acetate for its tender.

64.     On or about December 13, 2010, a Teva Russia executive communicated via email with a senior manager at Russian Company regarding matters related to the recently awarded contract to supply glatiramer acetate (Copaxone) to the Russian government.

65.     On or about December 30, 2010, Teva Russia Executive emailed a senior EMIA executive about a meeting the executive was scheduled to have with Russian Official.  In preparing the executive for the meeting, Teva Russia Executive explained Russian Official's position and influence in the Russian government and stated that the "state channel is a key one

for his businesses." Teva Russia Executive explained that "the dilemma [Russian Official] faces is how to protect his positions under conditions when state funded business in Russia is becoming transparent." Among other things, Teva Russia Executive asked the senior EMIA executive to "push [Russian Official] to demand more funding for Copaxone [] in early 2011" and to "obtain his commitment in protecting Copaxone (access to the Minister [of Health] and [Ministry of Health] decision makers, leveraging Senate capabilities)."

66.    On or about January 2, 2011, the senior EMIA executive emailed Teva Russia Executive about his meeting with Russian Official, stating that Russian Official "strongly encourages us to strengthen our influence with Regional Government Neurologist Representatives, to ensure in the future Copaxone volumes are protected."

67.    On or about January 24, 2012, Russian Company was awarded another contract by the Russian Ministry of Health to supply the government with Copaxone. Teva terminated its repackaging and distribution relationship with Russian Official and Russian Company in the middle of 2013 as a result of Russian Company's refusal to follow Teva's due diligence procedures.

68.    During the time that Russian Company was Teva's re-packager and distributor for Copaxone, Teva earned profits of approximately $204,167,303 on sales made by Russian Company to the Russian government.

### Ukraine

69.    Ukraine had a socialized healthcare system, with the national Ministry of Health coordinating the provision of healthcare to its citizens with regional and local counterparts. Most healthcare services were provided through government-owned healthcare facilities. Pharmaceutical products were regulated by agencies under the Ukrainian Ministry of Health. In

Ukraine, drugs were permitted for marketing and sale in Ukraine only after registration by the state, which included clinical testing and examination as part of the approval process. In Ukraine, medications for certain socially significant or especially serious illnesses, including multiple sclerosis, were dispensed free by the government.

70.     Ukrainian Official[6] held senior positions within the agencies under the Ukrainian Ministry of Health responsible for registering and approving drugs for marketing and sale in Ukraine. In those official positions, Ukrainian Official had the ability to influence the Ukrainian government's decision to approve the registration of pharmaceutical products.

71.     Teva operated directly in Ukraine until in or around 2007, at which time Teva began operating through subsidiaries, including Teva Ukraine[7] in 2010.

72.     In or around August 2001, Teva, through its employees and agents, engaged Ukrainian Official as a third-party "registration consultant" and entered into consulting agreements to pay Ukrainian Official a monthly "consultancy fee." In addition to the monthly payments, Teva, through its employees and agents, provided Ukrainian Official with cash bonuses, travel expenses and other things of value. The consulting agreement between Teva and Ukrainian Official was renewed annually, on the same terms, until in or around late 2011.

---

[6]     According to the Criminal Complaint filed in the action *United States of America v. Teva Pharmaceutical Industries, Ltd.*, Case 1:16-cr-20968-FAM (S.D. Fla.) ("Criminal Complaint"), the "Ukrainian Official" is a Ukrainian citizen whose identity is known to the United States and the Company, was a high-ranking official within the Ukrainian Ministry of Health, who held official positions at government agencies and on government committees from at least 2001 to 2011. By virtue of his official positions, Ukrainian Official could take official action on, and exert official influence over, matters related to the registration and pricing of pharmaceutical products in Ukraine. Ukrainian Official was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, 78dd-1(f)(1)(A).

[7]     According to the Criminal Complaint, Teva Ukraine LLC ("Teva Ukraine") was a limited liability company incorporated in Ukraine and was a wholly-owned subsidiary of Teva. Teva Ukraine operated on behalf, for the benefit, and under the control of Teva, and was principally responsible for the sale and marketing of Teva pharmaceutical products in Ukraine. Teva Ukraine was an "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

73.     The payments under the agreements between Teva and Ukrainian Official were made for the purpose of inducing Ukrainian Official to use his official position within the Ukrainian government to improperly influence the registration of Teva pharmaceutical products in Ukraine.

74.     On or about May 26, 2003, an invoice prepared at Ukrainian Official's direction asked Teva "to transfer to me by cash $15,000 as the follow-up fee payment for registration of Insulins in Ukraine."

75.     On or about June 8, 2003, Teva entered into an agreement extending Ukrainian Official's engagement.  The agreement was signed by Teva Executive on behalf of Teva.

76.     On or about May 24, 2004, an invoice prepared at Ukrainian Official's direction asked Teva "to transfer to me by cash $20,000 as the last follow-up payment for registration of Insulins in Ukraine after reception of Registration certificate."

77.     On or about March 26, 2006, the TIG manager responsible for approving expenses related to the agreement between Teva and Ukrainian Official approved a request that Teva pay for Ukrainian Official's travel expenses to Israel.  The request stated that Ukrainian Official "is a great help to us in the promotion of Copaxone and insulins in the Ukrainian market. One way we can repay him is by financing his visits to Israel once a year."  The approved request included approximately $4,400 worth of travel expenses for Ukrainian Official and his wife.

78.     On or about October 5, 2006, an invoice prepared at Ukrainian Official's direction asked Teva to "transfer to my [] account $10,000 for the expenses of Copaxone registration in Ukraine."  The Teva employee responsible for making the payment identified the amount as a "Bonus for Copaxone registration."

79.     In or around January 2008, Teva, through Teva Ukraine, sought registration of one of its products from the Ukrainian governmental authority responsible for the registration of pharmaceutical products.  Teva Ukraine's submission was addressed and sent to Ukrainian Official, who was then a high-level official at the governmental authority.

80.     On or about April 24, 2008, Ukrainian Official was appointed by the President of Ukraine to become the Deputy Chairman of a Ukrainian government committee responsible for issues of "price-formation for drugs and other medicinal products, public purchases and drugs registration."

81.     On or about June 29, 2008, an invoice prepared at Ukrainian Official's direction asked Teva to "transfer to my [] account $10,000 for the expenses of Copaxone promotion in the Ukraine."

82.     On or about July 21, 2008, Teva sent a wire transfer totaling $10,000 through an intermediary bank account in New York, which was subsequently paid onward to a bank account in Ukraine held by Ukrainian Official.

83.     On or about May 20, 2009, an invoice prepared at Ukrainian Official's direction requested payment for $16,500 as a "consultancy fee" from Teva for September 2008 through June 2009.

84.     On or about June 25, 2009, Teva sent a wire transfer totaling $16,500 through an intermediary bank account in New York which was subsequently paid onward to an account in Ukraine held by Ukrainian Official.

85.     Teva stopped paying Ukrainian Official at the end of 2009. Thereafter, Teva Ukraine took over payments to Ukrainian Official under the agreement until the expiration of the agreement in approximately March 2011.

86.     From in or around June 2002 through approximately March 2011, Teva and Teva Ukraine paid cash and provided other things of value to Ukrainian Official worth a total of approximately $200,000.

**Teva's Failure to Implement Adequate Internal Accounting Controls in Mexico**

87.     Teva marketed and sold pharmaceutical products in countries with high corruption risks, including, among other places, Mexico.  Despite understanding the nature of the corruption risks presented by doing business in Mexico and awareness of red flags and prior corruption-related misconduct at Teva's subsidiary in Mexico, Teva knowingly and willfully failed to implement an adequate system of internal accounting controls and failed to enforce the internal accounting controls it did have in place, which in turn failed to prevent improper payments from being made in Mexico.

88.     For example, in or around 2011 and 2012, Teva Mexico[8], through its executives, employees and agents, used its third-party distributor, Mexican Company[9], to make payments to physicians and other healthcare providers (collectively, "HCPs").  Some of the HCPs paid by Mexican Company had received payments from Teva Mexico and its predecessor entities in exchange for prescribing Copaxone since at least 2005.  The existence and improper nature of

---

[8]     According to the Criminal Complaint, Lemery S.A. de C.V., Sicor de Mexico S.A., Teva Pharmaceutical Mexico S.A. de C.V., Lemery Desarrolo y Control S.A. de C.V., Immobiliaria Lemery S.A. de C.V., IVAX Pharmaceuticals Mexico S.A. de C.V., and Vitrium Division Farmaceutica S.A. de C.V. (collectively, "Teva Mexico") were companies incorporated in Mexico and wholly-owned subsidiaries of Teva.  Teva Mexico was principally responsible for the sale and marketing of Teva pharmaceutical products in Mexico.

[9]     According to the Criminal Complaint, "Mexican Company" is a limited liability company incorporated in Mexico whose identity is known to the United States and the Company, was a distributor of pharmaceutical products in Mexico.  In 2011 and 2012, Mexican Company was retained by Teva Mexico to distribute Copaxone to state-owned and state-managed hospitals and healthcare facilities in Mexico.

these payments was known to Teva executives who were responsible for developing and approving the Company's anti-corruption internal controls in 2009.

89.     On or about November 6, 2008, Mexican Official[10] emailed a Teva employee responsible for the Copaxone business to complain about Teva Mexico's failure to make certain payments.  Mexican Official wrote, "TEVA Mexico was promises promises & promises and there was never any interest in order to improve our relationship."  Mexican Official said the lack of payment was "really strange when I'm your best client in Mexico."  In the email, Mexican Official noted that he was prescribing Copaxone to approximately 170 patients, making him one of the largest prescribers in the region.  On or about November 12, 2008, the email was forwarded to Teva Executive, who then emailed a senior Teva Mexico executive, "I'd appreciate having your good inputs and trust that [Mexican Official's] problem can be resolved.   After all, [it's] not every day we get a complaint from a professor that has 170 Copaxone patients."

90.     In or around December 30, 2008, the senior Teva Mexico executive emailed Teva Executive and explained, "[t]he growth of Copaxone in this market, until very recently, was not due to scientific/academic support but mostly to other incentives."  These "other incentives," which included payments in exchange for prescribing Copaxone, were paid out of Teva Mexico's Copaxone marketing and promotions budget.

91.     Numerous Teva executives involved in developing, approving and implementing the Company's anti-corruption program, including Teva Executive, were aware that the policies and procedures they approved were not adequate to prevent or detect improper payments to

---

[10]     According to the Criminal Complaint, "Mexican Official" is a Mexican citizen whose identity is known to the United States and the Company, from at least 2005 to 2012 was a well-known and influential neurologist in Mexico who treated patients suffering from multiple sclerosis.  Mexican Official was employed by an instrumentality of the Mexican government and held senior positions at hospitals and other healthcare facilities owned and controlled by that instrumentality.  Mexican Official was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, § 78dd-l(f)(1)(A).

foreign officials.  These executives also understood that the internal controls were not adequate to meet the risks posed by Teva's business and, indeed, had intended such a result.

92.     Teva executives also put in place managers to oversee the compliance function who were unable or unwilling to enforce the Company's anti-corruption policies.  For example, on or about January 17, 2011, at a meeting of the Company's compliance team that oversaw Teva Mexico, while discussing whether the compliance department would approve certain payments, the Regional Compliance Officer expressed an opinion that "Compliance['s] role will be [to] not interfere with the ultimate decision made by Business Heads."  During this same time period, the Regional Compliance Officer also "emphasized that the compliance program, current local policy and Sales and Marketing guidelines were not relevant for the [Latin America] region and were to be ignored."

93.     On or about April 12, 2011, a Teva employee responsible for overseeing the implementation of the anti-corruption controls emailed a senior executive responsible for overseeing compliance in Latin America.  The email explained that a senior Teva executive had "specifically instructed not to implement a robust system that will enable us to monitor and assure that the same doctor wasn't invited to a meal more than three times (for example)" and that the purpose of a system to track payments was "mainly to automate the manual forms."

94.     In or around early 2011, Teva reduced the budget for marketing and promotion of Copaxone in various countries, including Mexico.  As a result, Teva Mexico no longer had sufficient funds to pay the government healthcare providers ("HCPs") to whom it had been making payments.  In or around early 2011, after the reduction in their marketing and promotions budget, employees in the Teva Mexico group responsible for sales of Copaxone agreed to continue the payments to the government HCPs in the form of cash payments made by

Mexican Company, which was a Teva Mexico distributor for sales of Copaxone to government institutions.

95.     On or about November 15, 2011, a Teva employee with responsibility for financial controls over Teva Mexico prepared a memorandum detailing perceived deficiencies in the internal accounting controls for Teva operations in Latin America.  The memorandum concluded: "[w]e cannot guarantee that we are not (1) executing payments that would violate FCPA anti-bribery provisions and (2) properly accounting for any such payments under the books and records provision of the FCPA."

96.     In or around January 2012, employees of Teva Mexico met with employees of Mexican Company, and agreed to provide Mexican Company with an additional margin of 2% on sales by Mexican Company to its government customers.  The purpose of the 2% margin was to pay the government physicians and other healthcare providers ("HCPs") in exchange for their writing prescriptions of Copaxone.

97.     Between on or about February 16, 2012 and March 6, 2012, using the additional margins provided under the agreement with Teva Mexico, a Mexican Company employee delivered cash payments to at least seven HCPs employed by Mexican state-owned or state managed hospitals and healthcare facilities.

98.     On or about March 15, 2012, a Mexican Company employee emailed a Teva Mexico employee with "a report as to how the delivery to the physicians was made."  In the email, the Mexican Company employee detailed the time and place of the improper payments, including approximately $30,000 paid to Mexican Official at Mexican Official's office on or about the morning of February 17, 2012.  In total, the Mexican Company employee's email detailed approximately $159,000 in cash payments to the government HCPs.  Teva Mexico

described these improper payments, funded through the provision of the additional 2% margin to Mexican Company, as legitimate reductions of revenue in its books and records.

99.     Prior to engaging Mexican Company as a distributor, Teva Mexico conducted no due diligence on Mexican Company, did not have a written distribution agreement in place, did not require Mexican Company to certify its compliance with Teva's anti-corruption policies, and knew there was no legitimate purpose for the increased margin Mexican Company had received on sales to Mexican government customers.

### Plea Agreement With The DOJ

100.     On December 22, 2016, Teva entered into a Plea Agreement with the DOJ, Criminal Division, Fraud Section on behalf of the United States of America, and based upon its violation of 18 U.S.C. § 371 (Conspiracy to Defraud the United States).  In this Plea Agreement, Teva pled guilty to conspiracy to violate the FCPA.  The unlawful schemes included:

> From 2006 through at least 2012, Teva, through its employees and agents, together with others, agreed that Teva would make corrupt payments to Russian Official, intending that Russian Official would use his official position and ability to influence the Russian government to purchase Copaxone through tender offers. The payments were made through the high profit margins that Russian Company earned as Teva's repackager and distributor of Copaxone for sales to the Russian Ministry of Health pursuant to the central government's drug purchase program.

101.     This Plea Agreement included the admission that Teva did not timely and voluntarily self-disclose the FCPA violations to the DOJ.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS IN THE ALTERNATIVE

102.     In the alternative, Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all individuals who purchased or otherwise acquired Teva ADSs pursuant to the Company's ESPP during the Class

Period.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

103.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

104.    Record owners and other members of the Class may be identified from records maintained by Teva or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customary used in securities class actions.

105.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

106.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

107.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether Defendants' breached their fiduciary duty to the ESPP;

(c)       whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(d)       whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)       whether Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(f)       whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(g)       whether the prices of Teva ADSs during period set forth herein were artificially inflated because of the Defendants' conduct complained of herein; and

(h)       whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

108.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Violation of Section 11 of The Securities Act Against All Defendants)

109.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

110.    The Registration Statement, along with other documents it incorporates by reference was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

111.    Teva is the registrant of the Registration Statement.  The Individual Defendants are responsible for the contents of the Registration Statement based upon their status as directors and/or officers of the Company and because they signed or authorized the signing of the Registration Statement on their behalf pursuant to Sections 11(a)(1)-(3) of the Securities Act.

112.    As issuer of the ADSs, Teva is strictly liable to Plaintiff and members of the ESPP (and the ESPP itself) for the misstatements and omissions.

113.    Teva is strictly liable for the contents of the Registration Statement, and for the documents it incorporates by reference.  Defendants failed to make a reasonable investigation or to possess reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

114.    By reasons of the conduct herein alleged, each Defendant named in this Count violated Section 11 of the Securities Act.

115.    Plaintiff and the ESPP have sustained damages.  The value of Teva ADSs has declined substantially subsequent to and due to Defendants' violations.

## COUNT II

### (Breach of Fiduciary Duty)

116.    Plaintiff realleges each and every allegation set forth above as if each was set forth in full here.

117.    A fiduciary who breaches any of his or her responsibilities, obligations or duties shall be personally liable to make good to his wards resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

118.    Defendants had a duty to discharge their duties with respect to the Plaintiff and the members of the ESPP (and the ESPP itself) solely in the interests of the participants.

119.    Defendants had the power to control the ESPP.  Defendants oversee the ESPP and are empowered to appoint administrators or to administer the ESPP itself at its option.

120.    By virtue of their position, Defendants were in a superior position vis-à-vis Plaintiff and members of the ESPP to determine the prudence in continued investment in Teva ADSs.  Further, Defendants possessed special knowledge and expertise about the Company such that Plaintiff and members of ESPP reposed confidence in their offer of Teva ADSs as part of the Company's overall compensation package.

121.    The wages that Plaintiff and members of the ESPP diverted into the ESPP were the property of Plaintiff and members of the ESPP.  By accepting and maintaining the property of Plaintiff and members of the ESPP, Defendants assumed a fiduciary duty to preserve that property and to keep Plaintiff and members of the ESPP reasonably informed about all facts relevant to their participation in the ESPP.

122.    In breach of the fiduciary duty owed to Teva employees, Defendants failed to inform Plaintiff and members of the ESPP of all of the relevant facts surrounding their investment in Teva ADSs through the ESPP.  Further, Defendants breached their fiduciary duty by allowing investment in Teva ADSs through the ESPP to continue, even though they knew or

should have known that the investment was imprudent and likely to result in significant losses for Plaintiff and members of the ESPP.

123.    Defendants' breaches exceeded the scope of their authority as corporate officers and directors.

124.    As a consequence of Defendants' breaches, Plaintiff and the members of the ESPP (and the ESPP itself) suffered enormous losses.

125.    Defendants are individually liable to make good to Plaintiff and the members of the ESPP any losses suffered resulting from each breach.

## COUNT III

### (Misrepresentation and Non-Disclosure)

126.    Plaintiff realleges each and every allegation set forth above as if each was set forth in full here.

127.    A fiduciary who breaches any of his or her responsibilities, obligations or duties shall be personally liable to make good to his or her wards any losses resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

128.    Defendants had a duty to discharge their duties with respect to the ESPP solely in the interests of the members.

129.    Defendants breached their fiduciary duties in that they made material misrepresentations and nondisclosures to their wards as alleged above.

130.    As a consequence of Defendants' material misrepresentations and misleading omissions, Plaintiff and the members of the ESPP suffered losses.

131.   Defendants are individually liable to make good to Plaintiff and the members of the ESPP any losses suffered as a result of their breaches.

## COUNT IV

### (Breach of Contract)

132.   Plaintiff realleges each and every allegation set forth above as if each was set forth in full here.

133.   Plaintiff entered into an agreement with Defendants that Defendants would properly manage and monitor the ESPP and safeguard the investments made by Plaintiff and the members of the ESPP and offer the ADSs to the ESPP at their correct and appropriate price.

134.   Plaintiff performed his obligations under the agreement by investing part of his salaries owed by Teva into Teva ADSs.

135.   Defendants breached the agreement by failing to properly manage and monitor the ESPP investments in Teva ADSs and by offering the ADSs to the ESPP when Defendants knew or should have known that the price assigned to the ADSs was inflated beyond its true value because of Defendants' wrongful acts as set forth herein.

136.   Defendants are individually liable to make good to the ESPP any losses suffered as a result of their breaches.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

(A)   A judgment awarding compensatory damages in favor of Plaintiff and the other members of the ESPP against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, plus pre-judgment and post-judgment interest thereon at the highest rates permissible at law or in equity;

(B)     A judgment awarding Plaintiff and the members of the ESPP their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(C)     In the alternative, an order under Rule 23 of the Federal Rules of Civil Procedure determining that this action is a proper class action, designating Plaintiff as class representative and designating Plaintiff's counsel as Class Counsel; and

(D)     A judgment awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: July 17, 2017

**STRAUSS TROY CO., LPA**

By: */s/ Ron R. Parry*
    Ron R. Parry
The Federal Reserve Building
150 East Fourth Street
Cincinnati, OH 45202
Telephone: (513) 621-2120
Facsimile: (513) 241-8259
Email: rrparry@strausstroy.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF

I, _Robert Huelmeier_ ("Plaintiff") hereby retain Gainey McKenna & Egleston and such co-counsel as appropriate, subject to their investigation, to pursue my claims on a contingent fee basis and for counsel to advance the costs of the case, with no attorneys fee owing except as may be awarded by the court at the conclusion of the matter and paid out of any recovery obtained and I also hereby declare the following as to the claims asserted under the law that:

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff reviewed a copy of the complaint and is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in **Teva Pharmaceutical Industries Limited** security that is subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 115,967 | TEVA | SELL | FEB. 23, 2015 | 57,000 |
| 2,562 | TEVA | BUY | MAR. 4, 2015 | 56.427 |
| 33,855 | TEVA | BUY | MAR. 31, 2015 | 53,300 |
| 1,962 | TEVA | BUY | JUN. 5, 2015 | 60,803 |
| 32,733 | TEVA | BUY | JUN. 30, 2015 | 50.40 |

**Please list other transactions on a separate sheet of paper, if necessary.**

Plaintiff has sought to serve as a class representative in the following cases within the last three years:

None.

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _30_ day of _MARCH_, 2017

_Robert Huellemeier_
Signature

_ROBERT HUELLEMEIER_
Print Name (& Title if applicable)

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 2.055 | Teva | Buy | Sep. 4, 2015 | 62.928 |
| 29.798 | Teva | Buy | Sep. 30, 2015 | 47.450 |
| 2.132 | Teva | Buy | Dec. 4, 2015 | 64.985 |
| 30.713 | Teva | Buy | Dec. 31, 2015 | 55.730 |
| 2.637 | Teva | Buy | Mar. 15, 2016 | 56.144 |
| 37.859 | Teva | Buy | Mar. 31, 2016 | 51.110 |
| 2.975 | Teva | Buy | Jun. 8, 2016 | 53.693 |
| 0.803 | Teva | Sell | Aug. 3, 2016 | 53.590 |
| | | | | |