## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT W. HUELLEMEIER, on Behalf of All Person in Teva Pharmaceutical Industries Limited Employee Stock Purchase Plan,<br><br>    Plaintiff,<br>  vs.<br><br>TEVA PHARMACEUTICAL INDUSTRIES LIMITED, EREZ VIGODMAN, EYAL DESHEH, and SHLOMO YANAI,<br><br>    Defendants. | No. 3:17-cv-01938 (SRU)<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiff Robert W. Huellemeier ("Plaintiff"), by his undersigned attorneys, for his First Amended Complaint against Defendants (defined below) alleges the following based upon personal knowledge as to his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendant's public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Teva Pharmaceutical Industries Limited ("Teva" or the "Company"), securities analysts' reports and advisories about the Company, information from the United States Department of Justice, pleadings filed in related actions, and information readily obtainable from public sources.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiff, on behalf of the Company's Employee Stock Purchase Plan for U.S. Employees ("ESPP"), brings this action against the below-named defendants on behalf of all persons who purchased or otherwise acquired Teva American Depository Shares ("ADSs") between February 9, 2015 and November 3, 2016 (the "Class Period") in the ESPP.  Plaintiff seeks to recover compensable damages and pursue remedies against Defendants.

2.      Plaintiff's First Amended Complaint relies heavily on the Amended Consolidated Class Action Complaint filed on June 22, 2018 and commonly known as *Ontario Teachers' Pension Plan Board, etc., et al. v. Teva Pharmaceutical Industries Ltd, et al*., Case No. 3:17-cv-00558 (SRU) (CT Dist. Ct.) (the "Securities Class Action")[1], the Complaint filed by 20 states on December 15, 2016 commonly known as *The State of Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al*., Case No. 3:16-cv-0056-VLB (CT Dist. Ct.) (the "States AG Action 1"), the Complaint filed by 44 states on May 10, 2019 commonly known as *The State of Connecticut, et al. v. Teva Pharmaceuticals USA Inc., et al*., Case No. 3:19-cv-00710 (CT Dist. Ct.) (the "States AG Action 2"), and the Consolidated Amended Complaint filed by 48 states on June 18, 2018 commonly known as *The State of Connecticut , et al. v. Actavis Holdco U.S., Inc.*, Case No. 17-3768 (E.D. PA) (and is part of *In Re: Generic Pharmaceuticals Pricing Antitrust Litigation*, Case No. MDL 2724) (the "CAC").

3.      As stated therein and recounted here, the Securities Class Action allegations are based on its investigation, which included interviews with numerous former employees of Teva conducted by attorneys and/or investigators retained by its Lead Counsel. Several former Teva employees provided information demonstrating that Defendants' Class Period statements were

---

[1]      All charts, tables, and appendices herein are from the Securities Class Action.

false and misleading. The former employees identified herein provided information to Lead Counsel in the Securities Class Action on a confidential basis and are specifically described herein by job description and responsibility, and duration of employment, thereby providing sufficient details to establish their reliability and personal knowledge (the "Former Employees" or "FEs") Allegations attributed to a particular Former Employee are designated as such by reference to their "FE- " designation or job description.

## SUMMARY OF THE ACTION

4.      This action is based on two categories of wrongful conduct by Defendants; (1) the Price Fixing Effort (defined herein) and (2) Teva's international wrongful conduct (relating to its actions in Russia, Ukraine, and Mexico).  This action arises from the difference between what the Defendants told investors was driving Teva's financial success and the truth behind Teva's performance. Defendants consistently attributed Teva's seemingly remarkable turnaround to fundamental business strategies, like cost cutting and good product management during the Class Period.  In truth, however, Teva's quarter-after-quarter financial growth was primarily the result of Defendants' implementation of a strategy to systematically raise generic drug prices across a large swath of Teva's generic drug portfolio in coordination with Teva's "competitors"/other generic drug manufacturers (the "Price Fixing Effort").[2] The strategy was initiated in early 2013 and rolled out with a first batch of price increases in July and August 2013.

5.      All told, Teva imposed price increases that impacted at least 107 drugs during the Class Period.  Teva's senior officers considered and approved each increase, and then carefully tracked the profits generated on a daily, weekly, and quarterly basis.  Over the Class Period, the

---

[2]      The Securities Class Action separately refers to this and defines it as Teva's "Price-Hike Strategy".  Herein, Plaintiff includes the Securities Class Action Price-Hike Strategy as part of Teva's Price Fixing Effort.

financial impact of the strategy was staggering, totaling over $2.3 billion in profits attributable solely to the price increases (the "Inflated Profit[3]," as further explained below).

6.      Defendants were highly effective at concealing that the Price Fixing Effort was driving Teva's rapid growth. They invariably attributed the improved profits to legitimate sources. Neither Teva, nor any of its peers, disclosed to the investing public any information concerning individual drug prices, changes in price, or revenues per drug, let alone profits. Wall Street analysts, intimately familiar with Teva's business and disclosures, had no way to know if Teva was profiting from systematic price increases, except to ask Defendants.

7.      When analysts asked whether Teva's profits and performance were at all connected to price increases, Defendants (and Teva non-party officers) answered with explicit denials, stating for example:

- "[A]ll the improvement you see in our … margins is *not driven by price*. It is driven by quantities and by mix and by efficiency measures. *Not by price, 2014, 2015, and that's a very important message*." (CEO Vigodman, Oct. 29, 2015);

- "So how did we" achieve $1 billion in increased profit margin?" *"Not by pricing* but by portfolio mix, new products, and efficiency measures." (Head of Global Generics, Olafsson, Feb. 11, 2016);

- "Now there's a lot of *noise around pricing issues*….Our exposure to all these things is very minimal.…*Teva was not associated with any of that*." (CFO Desheh, Nov. 19, 2015).  [Emphasis added].

8.      Contrary to these false statements, as soon as the Price Fixing Effort was implemented, it yielded hundreds of millions of dollars of Inflated Profit quarter-over-quarter through the second quarter of 2015, as illustrated in the chart below:

**Figure 1**

---

[3]      Inflated Profits means and refers to the amount of profit Teva generated solely as a result of its price increases which was quantified through Lead Counsel's and Lead Counsel's expert's analysis in the Securities Class Action.



9.      Defendants had to conceal that the Price Fixing Effort was the primary contributor of this massive boost in profits. The strategy was inherently risky and unsustainable for a variety of reasons, including that at least two-thirds of the increases were done in tandem with other drug manufacturers. Wholesale purchasers of generic drugs routinely set pricing through competitive RFP bidding. Thus, when Teva raised prices, any manufacturer in the generic drug market could underbid Teva and wipe out Teva's market share. Additionally, the appearance of price gouging or collusion could draw public outrage, law enforcement scrutiny, and civil and criminal liability. The Inflated Profits could vanish as quickly as they appeared.

10.     Defendants' motive was to inflate the share price in order to make a large acquisition that Teva otherwise could not afford. As Teva's CFO Desheh predicted in January 2014, within 12 to 24 months, Teva's "stock price will go up and we'll be able to use our share as a currency … to fund transactions" that could transform Teva into an even larger, more dominant force in generics. Newly hired CEO Vigodman was reported to also want to undertake a significant acquisition as he took the helm in February 2014, shortly before the start of the Class Period.

11.     Just as Desheh predicted, within 18 months, Teva's ADS price shot up along with the increasing profits. Indeed, the share price hit an all-time high of $72 on July 27, 2015, the day Teva announced it was acquiring Actavis for $40 billion.  Of course, Teva did not have the cash; the price tag equaled roughly 20 years of Teva's recent average profits. As Defendants intended all along, they would use Teva's securities as "currency" and raise $27 billion from investors, including Plaintiff and the members of the Class.

12.     In mid-2015, however, generic drug pricing had come under even more intense focus from law enforcement, and Congress was calling for legislation to regulate pricing. Analysts grew concerned, but CFO Desheh deflected: "there's a lot of noise around pricing issues.  Some of it's coming from politicians . . . .  Our exposure to all these things is very minimal."

13.     As 2016 began, other pharmaceutical companies reported disappointing earnings, attributed to increased pressure to reduce prices. This pricing pressure was a byproduct of heightened government scrutiny and public outcry. When asked whether Teva faced the same risks, Olafsson[4] falsely claimed that Teva was not exposed: "Teva has not seen any fundamental change or worsening in the pricing environment." Vigodman claimed "[w]hat we see is a 4% to 5% erosion [in pricing] … That's not something which is different from what we said during 2015."  In reality, the denied pricing pressure was eating into Teva's Inflated Profits; in the first quarter of 2016, Inflated Profits were 45% lower than they were a year earlier.

14.     On July 12, 2016, the Connecticut Attorney General served Teva with a subpoena concerning its pricing for generic drugs. The receipt of the State AGs' subpoena marked the full-stop in Teva's ability to raise prices under the strategy; Teva did not make any price hikes past this

---

[4]     Sigurdur Olafsson ("Olafsson") served as President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016.

point. Though Teva had set a date in the fall of 2016 for the $20 billion debt offering, on July 13, 2016, Defendants announced that the debt offering was being immediately accelerated and they filed the Notes Registration Statement the same day. Despite dozens of pages disclosing other investigations and legal matters, the filings were silent as to the State AGs' subpoena, and as to a similar one served by the DOJ. Teva raised the cash and closed the deal on August 2, 2016. The next day, with Inflated Profits further declining since 2015, Teva reported disappointing earnings and disclosed the subpoenas. Though the truth was beginning to surface, Defendants continued to deny that price increases ever occurred: "people that say that . . . there's a big generic price inflation, are simply wrong." (Olafsson, Sept. 8, 2016)

15.     Reality, however, overtook the Defendants. In November 2016, *Bloomberg* reported that Teva was a target of the DOJ and State AGs' investigations and looming charges. The end of the Price Fixing Effort brought further declines in profits. Olafsson, an architect of the strategy and the driving force of the Actavis transaction, was fired on December 5, 2016. A week later, the State AGs sued Teva for violations of the Sherman Act. In short order, CEO Vigodman was terminated in February 2017, and CFO Desheh was also out by May 2017. On August 3, 2017, the very first investor call after their terminations, Teva announced it was required to take a $6.1 billion write-down of its entire generics business because its fundamental value had been "permanently impaired."

16.     Without the Price Fixing Effort driving Inflated Profits, Teva's ability to service its over $30 billion in debt also raised fears; the credit-rating agencies immediately downgraded the Company's debt to just above "junk." And after 30 years of maintaining or increasing its dividend, the new Board and management of Teva were forced to cut the dividend by 75%. In reality, without

the Price Fixing Effort, Teva was a fundamentally weaker company than investors were led to believe. The share price plummeted in reaction to this news.

17.     Defendants carried out this misconduct through three interrelated categories of misstatements and omissions, alleged particularly below.  First, Defendants explicitly attributed Teva's financial performance to legitimate and benign business strategies, including cost cutting and product selection. Having attributed the source of Teva's revenues, Defendants were required to disclose the reality that Teva's performance was driven by the undisclosed Price Fixing Effort. Second, under Item 5 of Form 20-F, Defendants were obligated to disclose that the Price Fixing Effort was impacting Teva's profits, both as they dramatically increased, and later as they evaporated, a trend that Figure 1 illustrates. Third, Defendants repeatedly stated that Teva was excelling in a highly competitive environment. That was far from the truth, as Teva was only able to sustain the Inflated Profits because of a lack of competition. Whether illegal or not, this was a precarious reality, which could be, and ultimately was, undercut.

18.     As more fully described herein, Defendants colluded with other manufacturers to fix prices for many drugs, which exhibited both parallel price increases with Teva's competitors and other indicia of collusion. Investigation completed in the Securities Class Action and recounted here independently identified facts indicating this collusion. These allegations are corroborated by the facts identified through the State AGs' allegations that Teva engaged in a vast industry-wide price-fixing conspiracy. Additionally, the allegations herein, on information and belief, identify the Teva employee who the State AGs allege was central in the price-fixing; this employee, however, was not in a position to agree to or approve any pricing changes. Instead, Griffin, Chief Accounting Officer of Teva and CFO of Teva USA, and Cavanaugh, COO of Teva USA, made those decisions, approving all the price increases alleged herein.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to § 11 of the Securities Act, 15 U.S.C. §§ 77k.

20.     The Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v.

21.     The Court has jurisdiction over the state law claim for breach of fiduciary duty under 28 U.S.C. § 1367.

22.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v(a), because Defendants conduct business and operate facilities in the District, and a significant portion of Defendants' actions, and resulting damages, occurred within this District. Plaintiff also resides in this District.

23.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

**Plaintiff**

24.     ***Plaintiff Robert W. Huellemeier*** purchased Teva ADSs during the Class Period through the ESPP at artificially inflated prices and was damaged as more fully described hereunder.

**Defendants**

25.     ***Defendant Teva Pharmaceutical Industries Limited*** ("Teva") is a global pharmaceutical company.  Teva operates in pharmaceutical markets worldwide, with a significant

presence in the United States, Europe and other markets.  Teva operations include facilities in Ohio.  The Company's ADSs are traded on the New York Stock Exchange ("NYSE") using the ticker symbol "TEVA".

26.     *Defendant Erez Vigodman* ("Vigodman") served as Teva's President and CEO from February 11, 2014 to February 6, 2017 and as a Teva Director from June 22, 2009 to February 6, 2017.  Defendant Vigodman signed and certified certain of Teva's alleged false and misleading reports on Forms 20-F and Forms 6-K filed with the SEC during the Class Period, as well as the ADS/Preferred and Notes Registration Statements. Defendant Vigodman also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein. During his tenure at Teva, Defendant Vigodman possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.  He is also a defendant in the Securities Class Action.

27.     *Defendant Eyal Desheh* ("Desheh") served as Teva's Chief Financial Officer ("CFO") from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, a period during which he served as Teva's Interim CEO and Interim President.  Defendant Desheh signed and certified certain of Teva's false and misleading reports on Forms 20-F and 6-K filed with the SEC during the Class Period, as well as the ADS/Preferred and Notes Registration Statements filed with the SEC. Defendant Desheh also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein.  He is also a defendant in the Securities Class Action.

28.     *Defendant Shlomo Yanai* ("Yanai") was President and Chief Executive Officer (CEO) until he resigned effective May 2012.  Defendant Yanai was one of the signatories to the July 27, 2010 Registration Statement.

**Non-Party Teva Officers and Employees**

29.    ***Allan Oberman*** ("Oberman") served as President and CEO of Teva Americas Generics from November 5, 2012 to December 31, 2014. Oberman made false and misleading statements as alleged herein. During his tenure at Teva, Oberman possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.  He is also a defendant in the Securities Class Action

30.    ***Sigurdur Olafsson*** ("Olafsson") served as President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016. Olafsson made false and misleading statements on numerous conference calls with investors and analysts, as alleged herein. During his tenure at Teva, Olafsson possessed the power and authority, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading. He is also a defendant in the Securities Class Action.

31.    ***Deborah Griffin*** ("Griffin") serves as Teva's SVP and Chief Accounting Officer (Principal Accounting Officer), and served as the Authorized U.S. Representative of Teva, and the Authorized U.S. Representative of Teva Finance during the Class Period.  She was also VP and CFO of Teva USA during the Class Period.   Griffin signed the ADS/Preferred and Notes Registration Statements.  While at Teva, Griffin possessed the power and authority, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading, as they pertained to Teva USA's financial reporting.  She is also a defendant in the Securities Class Action.

32.    ***Maureen Cavanaugh*** ("Cavanaugh") during the Class Period served as Teva USA's SVP and Chief Operating Officer, North America Generics. During her tenure at Teva, Cavanaugh possessed the power and authority to, and in fact did approve and control the contents

of the Company's SEC filings alleged herein to be false and misleading, as they pertained to Teva USA's financial reporting.  Cavanaugh is a defendant and alleged central co-conspirator in the States AG Action 2.  She is also a defendant in the Securities Class Action.

33.     **Nisha Patel** ("Patel") worked as a Teva Director of Strategic Customer Marketing and as a Director of National Accounts and is a defendant in the States AG Action 2.

34.     **David Rekenthaler** ("Rekenthaler") was Teva's Vice President, Sales US Generics and is a defendant in the States AG Action 2.

35.     **Kevin Green** ("Green") was a former Director of National Accounts at Teva from January 2006 through October 2013. Since November 2013, Green has worked at Zydus Pharmaceuticals (USA) Inc. as the Vice President of Sales and is a defendant in the States AG Action 2.

## THE COMPANY'S ESPP AND REGISTRATION STATEMENT

36.     The ESPP was designed to provide eligible employees of Teva with an opportunity to increase their proprietary interest in the success of the Company by purchasing Teva ADSs from the Company and to pay for such purchases through payroll deductions.

37.     On July 27, 2010, the Company filed with the SEC a Registration Statement registering 70,000,000 shares of Company ADSs at $50.10 for a total of $ 3,507,000,000.00.

38.     The Registration Statement incorporates future financials of the Company and states in relevant part:

> This Registration Statement on Form S-8 (this "Registration Statement") incorporates by reference the Registrant's previous Registration Statements on Form S-8 (Nos. 333-96725, 333-112115, 333-112930, 333-118978, 333-126264, 333-131274, 333-153503, and 333-155926).   Any items included with these previous Registration Statements not expressly changed hereby shall be as set forth in such previous Registration Statements.

*      *      *

Item 3. INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE.

The following documents, filed with the Commission by the Registrant, are incorporated by reference into the Registration Statement:

(a)     The Registrant's Annual Report on Form 20-F for the year ended December 31, 2009 (the "2009 Form 20-F");

(b)     The Registrant's Current Reports on Form 6-K filed with the Commission on May 4, 2010 (containing the Company's financial statements for the quarter ended March 31, 2010), May 18, 2010 (containing the Company's proxy statement with respect to its 2010 annual meeting of shareholders), June 15, 2010, June 18, 2010, June 30, 2010, and July 27, 2010 (containing the Company's financial statements for the quarter ended June 30, 2010); and

(c)     The description of the Registrant's ordinary shares, par value NIS 0.1 per share and the American Depositary Shares representing the ordinary shares, contained in the Registration Statement on Form F-4, filed on September 16, 2008, as amended by the description thereof contained in the 2009 Form 20-F.

In addition, ***all documents filed by the Registrant with the Commission pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") subsequent to the date of this Registration Statement and prior to the filing of a post-effective amendment to this Registration Statement which indicates that all the securities offered hereby have been sold or which deregisters all securities then remaining unsold <u>shall be deemed to be incorporated by reference in this Registration Statement</u>*** and to be a part hereof from the date of the filing of such documents with the Commission. Any statement contained in a document incorporated by reference herein shall be deemed to be modified or superseded for purposes hereof to the extent that a statement contained herein (or in any other subsequently filed document which also is incorporated by reference herein) modifies or supersedes such statement.  Any statement so modified or superseded shall not be deemed to constitute a part hereof except as so modified or superseded.  [Emphasis added].

## <u>SUBSTANTIVE ALLEGATIONS – THE PRICE FIXING EFFORT</u>

### <u>Background/Pre-Class Period Allegations</u>

39.     Before the Class Period, Teva's generics segment was struggling and Teva's share

price had dropped from the $60s in 2010 into the $30s by 2013. Then-CEO Jeremy Levin ("Levin")

acknowledged that the U.S. generics business had been "slowing fundamentally" for years and had announced a strategy to focus on Teva's other business segment, branded drugs. Abruptly, Levin was fired on October 30, 2013, after just 18 months as CEO, and was immediately replaced by CFO Defendant Desheh.  As he stepped into the role of interim-CEO, Desheh was enthusiastic about Teva's prospects, as was Chairman Peter Frost, who told analysts that his friends were buying "hundreds of millions of dollars" of Teva shares.

40.     By the beginning of 2014, Desheh's optimism became more strident as he announced Teva's motivation to make a major acquisition, predicting that within 12 to 24 months Teva's "stock price will go up and we'll be able to use our share as a currency … to fund transactions." As Defendant Vigodman took the helm as new CEO in February 2014, analysts reported that he also supported engaging in a significant acquisition.

**Teva Adopted Undisclosed Price Fixing Effort**

41.     Defendants concealed, however, that by early 2013 Teva had adopted a non-public strategy to systematically increase prices across dozens of drugs in its generics drug portfolio which also included and was part of a price fixing conspiracy with other generic drug manufacturers (the "Price Fixing Effort"). Teva's decisions to increase prices came from the top down. Up to 2012, using an established review and approval procedure, price increases required the Chief Accounting Officer of Teva and Teva USA CFO, Griffin, and Teva USA COO, Cavanaugh to undertake and document a careful cost-benefit-analysis to determine whether to make a price increase; they would personally approve the increases. (FE-1, FE-2).[5] Griffin and Cavanaugh would then decide when the increases would become effective, often implementing

---

[5]     For a description of the FEs, please see paragraphs 192 through 196.

them in batches. (FE-1, FE-2). As alleged in the States AG Action 2, Cavanaugh was intimately involved in the Price Fixing Effort.

42. Starting around 2013, members of the Pricing Group, who would have to provide detailed reviews and documentation of price reductions, were simply "told" via emails or in meetings to implement a price increase with little or no justification. (FE-3). While the directions often came from the head of Teva USA's Pricing Group, Kevin Galownia, he did not. have the authority to make price-increase decisions himself; those decisions came from above. (FE-3, FE-1, FE-2, FE-4). Once implemented, Teva notified its customers via a letter, and would circulate a copy to employees whose work would be impacted by the increase (e.g., customer service employees who would need to field consumer complaints following the hikes). (FE-2, FE-4). The expected profits from the price increases were then incorporated into the Company-wide Oracle database (described below), (FE-2, FE-1, FE-3), to which Oberman, Olafsson (who joined Teva in July 2014), Cavanaugh, and Griffin each had access. (FE-1, FE-3).

43. As stated above, in early 2013, Teva adopted the Price Fixing Effort as a means to turn the Company around by revitalizing its dwindling generics business. This deliberate strategy was announced by Kevin Galownia, then-Senior Director of Marketing, at a quarterly "all-hands" meeting at Teva's U.S. headquarters that was attended by members of the sales, customer service, finance, and pricing groups. (FE-4). At that meeting, Galownia, a frequent presenter at these quarterly meetings, explained that Teva would raise prices on its generic drugs in a systematic manner. (FE-4). This marked a sharp break from the Company's prior strategy of focusing on branded drugs, set by then-CEO Levin in 2012. This significant change in direction necessarily came only from Teva's highest executives, (FE-4) and could not have been decided by Galownia alone. (FE-4, FE-3, FE-2, FE-1).

44.     Carrying out the price increases required the explicit approval of the senior executives at the U.S. headquarters. The Inflated Profits would be captured by the daily and weekly reports (described below) circulated to Cavanaugh, Griffin, Oberman and later Olafsson. (FE-1). They were also reflected in the intra-quarter reports that these Teva executives assembled and sent to Teva's senior executives in Israel (also described below). (FE-1, FE-2).  Consistent with this, according to FE-2, "everyone would have known" and had a duty to know of large price increases that had a significant financial impact, especially if it was used to fill a "hole" between revenues and forecasts.

45.     Execution of the Price Fixing Effort required that senior executives personally analyzed and approved each price increase, pursuant to an established and formalized process that was in place by 2012 when FE-2 was employed at Teva. (FE-2).  At that time, Galownia and the Pricing Group would initiate the process. (FE-2, FE-4).  Galownia would analyze Teva's portfolio of established generic drugs on a "constant and ongoing basis," and would produce a "list of opportunities" and recommendations of potential price increases to Teva USA COO Maureen Cavanaugh and Deborah Griffin, who was Chief Accounting Officer of Teva and the CFO of Teva USA.  (FE-2).

46.     However, Galownia was "just the guy doing the evaluation," (FE-2), as his superiors made the actual decision to increase the price of a generic drug. (FE-2, FE-3, FE-1). Accordingly and in or around 2012, Cavanaugh and Griffin would each separately evaluate whether Teva would make a price increase, and if so, when. (FE-2).  Cavanaugh would review the price increases from the operational perspective, while Griffin would undertake a financial cost-benefit analysis that would evaluate both whether and when to implement the price increases. (FE-2).  In particular, Griffin would have to factor in specific contract terms and costs associated with

increasing pricing and determine the right timing for the increase. (FE-2). Sometimes, Griffin's decision was to raise a price, but wait until the next quarter when the contractual implications would be more favorable. (FE-2). This recommendation and evaluation process could be quick, but could also span weeks, with the implemented price hike following as many as 60 days after Galownia's initial recommendation. (FE-2).

47. The members of the Pricing Group would routinely engage in a bottom-up analysis in deciding to lower prices. This required them to conduct and provide senior executives with detailed analysis and documentation justifying their decisions to reduce prices. (FE-3). Price increases, in contrast, came from the top down. Starting not later than 2014, when prices were increased, the Pricing Group was simply "told," by email or in a meeting, to raise the prices of certain drugs, without conducting any analysis justifying the increase. (FE-3). Members of the Pricing Group did not have authority to implement price increases. (FE-3). Defendants became "more aggressive with pricing" by frequently increasing prices from 2013 onward. (FE-4). Empirical evidence confirms this observation. Appendix A.

48. As was the case during the Class Period, and as the empirical evidence confirms, approved price increases would often be batched together and announced on the same day. (FE-2). Once a price increase was made, Teva would send letters to affected customers informing them of the price increase. (FE-2, FE-4). Galownia or his team would also email these letters to all Teva employees whose work would have been impacted by price increases. (FE-4).

49. Because of this formalized process involving the Griffin and Cavanaugh, Defendants had a duty to remain involved and be aware of the (at least) 76 price increases, ranging from 50% to 1500%, over the course of over three years, that generated over $2 billion in Inflated Profit.

**Defendants Access to Documents and Information Tracking Profits from Price Increases**

50.     Defendants were given documents that tracked the financial impact of the Price Fixing Effort against the detailed revenue goals for Teva's U.S. generics business, as often as on a daily basis. (FE-1).  They also had access to Company-wide databases with detailed drug-by-drug information about the price, sales, and profits of each drug on a real-time basis. (FE-1, FE-3).

51.     Teva housed its pricing, revenue and sales data of its generic drugs on its Oracle ERP system, a Company-wide database. (FE-1, FE-3).  Through this system, pricing, sales and revenue information for each generic drug was readily and easily available at the granular level, "down to the NDC code." (FE-3).  Teva executives, including Griffin, Cavanaugh, Oberman, and Olafsson all had access to Oracle. (FE-1, FE-3).  Oracle was the source for the data used for the Scorecards, Work Plan and the LBEs. (FE-1).

52.     Oracle generated daily or weekly "Scorecards" that Oberman (and later Olafsson), Griffin, and Cavanaugh would receive that reported generic drug revenues, which included the Inflated Profit, and tracked whether Teva was on schedule to meet forecasts. (FE-1, FE-2, FE-3). These Scorecards provided these executives with regular access to U.S. sales and revenue data for generic drugs. (FE-1).  The Scorecards also compared Teva's actual revenue figures to longer-term revenue goals. (FE-1).  The executives used the Scorecards to track "holes" between the actual revenues and forecasts, including the Work Plan, discussed below. (FE-1, FE-2). The price increases were used to "fill" the holes. (FE-2)

53.     The Scorecards tracked profits against financial budgets and a long range "Work Plan" which was prepared annually that included generic revenue forecasts for three to five years, and that contained granular pricing details down to the NDC level. (FE-1).  The employees

preparing the Work Plan would receive feedback from executives over the course of a pre-established schedule. (FE-1).   The process began around March each year, with the U.S.-based executives, including Oberman and Olafsson reviewing and approving the Work Plan over the late summer. (FE-1).

54.    As to the generics segment, Oberman (and later Olafsson), Cavanaugh, and Griffin were responsible for assembling the Work Plan, and Oberman and Olafsson were responsible for presenting it to Teva's executive committee in Israel, which included Vigodman and Desheh.  (FE-2; FE-1).

55.    During each quarter, a document called a Latest Best Estimate ("LBE") was prepared, with the involvement of Oberman (and later Olafsson), Cavanaugh, and Griffin, which showed how a current financial quarter compared to long term forecasts. (FE-1).   The LBEs detailed whether forecasts were met, or whether there was a "hole" between the forecasted profits and reality. (FE-1; FE-2).   The LBE reports were sent to Teva's executive committee in Israel (FE-1; FE-2).

**The Price Fixing Effort, Continued**

56.    Throughout the Class Period, Defendants told investors that Teva's increased profits came from ordinary business strategies, like cost cutting and new product launches. At every opportunity, in Teva's financial disclosures filed with the SEC and on conference calls, Defendants (and other non-party Teva executives) denied that Teva was engaged in price increases, let alone that those increases were driving profits.

57.    They concealed this because the Price Fixing Effort was inherently risky, unsustainable, and could subject Teva to government and law enforcement scrutiny, if not prosecution.  Specifically, the strategy was unsustainable and risky because the U.S. generic drug

market was designed to be extremely competitive; generic drugs are effectively a commodity, fully interchangeable and identical in every respect, except for price.   Wholesale customers solicit pricing though a "blind" RFP bidding process. Thus, even if Teva increased its prices, the profits could be short lived if other manufacturers undercut Teva's price to secure more market share. Moreover, generic drugs are an essential part of the lives of millions of Americans. Dramatic increases in prices would, and in fact did, garner public criticism and Congressional action that further undercut the sustainability of the strategy.   Additionally, many (if not most) of Teva's price increases occurred in tandem with competitors.   Whether illegal or not, such pricing behavior is indicative of a lack of competition, if not collusion, and could, and again did, come under intense civil and criminal law enforcement investigations.   Had Teva disclosed that its core business strategy was to aggressively increase prices on generic drugs, investors would have valued the Company very differently from one with a strategy driven by fundamental growth and cost cutting, as Defendants falsely proclaimed.

58.    Teva's Price Fixing Effort was particularly well-suited for concealment. The generics industry is highly opaque; Teva, nor any of its peers, disclosed to the investing public any information concerning individual drug prices, changes or amounts of revenues per drug, let alone the profits from any particular drug.  As explained herein, to determine that the Price Fixing Effort was actually the driver of Teva's success, Lead Counsel and its experts in the Securities Class Action undertook an econometric analysis of thousands of data points from various non-public, subscription-based data services, including multiple regression analyses, to identify and quantify Teva's very large price increases that greatly exceeded general pricing trends and inflation. The analysis then isolated the amount of profit Teva generated solely as a result of the increases. This analysis yielded the Inflated Profits measure alleged herein.

**Teva Began to Implement the Price Fixing Effort**

59.     On July 3, 2013 and August 9, 2013, Defendants began to implement the Price Fixing Effort by raising the prices of 18 drugs.  Fifteen of the increases were implemented together with Teva's competitors who also made price increases on the same drugs. The increases were as high as 812% of the original price.  *See* Appendix A.

60.     In just the last two quarters of 2013, these price increases generated as much as $250 million in Inflated Profit. The profit from the increases fell directly to Teva's bottom line because they required no additional research and development ("R&D") or sales and marketing ("S&M") expenses.  These 2013 price-hiked drugs would contribute as much as $875 million in Inflated Profit to Teva's bottom line by the end of the Class Period.

61.     As detailed above, from the Scorecards, LBE reports, and Work Plan, Defendants and Teva executives closely tracked the impact of this Inflated Profit. This reporting structure ensured that "everyone would have known" if there were significant price increases that generated large profits.  (FE-2).

62.     Entering 2014, price increases by generic drug companies had caused public concern. For example, on January 8, 2014, the National Community Pharmacists Association, based on a proprietary survey of its members, wrote to Congress stating that "[o]ver the last six months … many of our members across the U.S. [] have seen huge upswings in generic drug prices," and requested an investigation. As the fact of large price increases on certain drugs trickled out to the public, Defendants made increasingly misleading statements to cover their tracks and falsely disassociate themselves from price increases by attributing profit to other sources.

63.     On February 6, 2014, Teva announced its fourth quarter 2013 and full year 2013 financial results in a press release. Those results improved as compared to performance prior to

the Price Fixing Effort. The financial disclosures, however, made no mention of the fact that this newfound success was driven by Inflated Profits.

64.     Specifically, Teva's financial disclosures touted a 14% increase in U.S. generics revenue for the fourth quarter, attributing it to "higher sales" volume, reduced expenses, and "exclusive launches" of new generic drugs. While the attributed reasons for improvement may have had some minor influence on the profits, all the year over year ("YOY") improvement was driven by the Inflated Profit from price increases, which Defendants had a duty to disclose. The omission of this fact when listing the causes for the YOY profit growth was misleading. This pattern would repeat throughout the Class Period.

65.     During the February 6, 2014 earnings call, Desheh announced that Teva would increase its quarterly dividend by 5%, that the "U.S. generic business is highly profitable," and that "[w]e had a pretty good even excellent second half [of 2013] in the United States [generic] business."  Oberman, CEO of U.S. generics followed and explained that "at the gross profit levels that [Desheh] was talking about, [the U.S. generics business] is a very valuable business to Teva, and we see it continuing to be on a go-forward basis"; a stark contrast from Levin's assessment just months earlier that the generics business was "slowing fundamentally."

66.     The improved financial results were well received by investors and analysts. On February 6, 2014, a BMO Capital Markets analyst wrote that generic sales "came in above … our expectations and consensus"; "we think 4Q results are a high-quality beat with revenue and EPS coupled with an improvement in margins year over year…. Teva shares should be bolstered by today's positive earnings announcement."

67.     The encouraging news triggered the beginning of a long and steep increase in Teva's ADS price that would last throughout 2014 and 2015 (*see* Figure 1 at ¶ 8). By early March

2014, the ADS had risen from the $30s to trade at $48. The increased price of the ADS was critical to achieving Defendants' stated motivation to use the ADS as "currency" to make a major acquisition. Desheh, on a March 4 investor conference call, explained that with "the stock price under $40 … we can't use [Teva Securities as] currency," but that, with "change[s] over the past few months," Teva was extracting "itself [from] … a corner that was difficult to come out of," bringing Teva closer to a large acquisition.

68.     What investors and analysts did not, and could not, know was that Desheh, Oberman, and the Company's SEC filings had concealed the Price Fixing Effort, and that, in the fourth quarter of 2013, the 18 price increases made pursuant to the strategy generated the entirety of Teva's year over year ("YOY") gain in U.S. generics revenue.

**First Quarter 2014 Results; Analysts Take Note**

69.     By the beginning of April 2014, Teva's ADS price had increased to $54.06, or 19%. As a National Alliance Securities analyst concluded, Teva's ADS had "the Best YTD" 2014 performance relative to its peers, a stark contrast to how Teva had "dramatically underperformed in 2013."

70.     The series of positive financial disclosures, fueled by undisclosed Inflated Profit from the concealed Price Fixing Effort, continued.  On May 1, 2014, Teva reported surprisingly positive results driven by its generics segment, which reported a YOY increase of $117 million from Q1 2013 profits.  Defendants falsely explained that lower expenses, a changed composition of revenues, and "new product launches" were the cause of the increase in profits. In reality, the Price Fixing Effort had generated $120 million that quarter.

71.     The 2014 Work Plan, which was being reviewed by the executive committee in August 2013, would have included the expected profits from the July and August 2013 price

increases. Cavanaugh, Griffin, and Oberman were each provided on a daily or weekly basis Scorecards that tracked whether Teva's actual results met or exceeded the Work Plan forecasts. Vigodman and Desheh similarly were provided documents reflecting the impact of the Inflated Profits as they compared actual revenues versus the Work Plan through the LBE reports disseminated throughout the quarter.

72.     Analysts reacted positively to Teva's surprising and rapid turn-around. Cowen and Company analysts wrote: "The bottom line is that this story is reversing (for the positive) much faster than previously anticipated, and the belief that 'growth' could reemerge is very real." J.P. Morgan predicted an "upside to near/longer term EPS" because of Teva "taking several steps to regain its generic leadership including … focusing more heavily on portfolio selection and management." Jefferies analysts noted that Vigodman "Impresses in His Wall Street Debut" due to his determination to reestablish "Teva's dominance in its core generic business."

**Second Quarter 2014 Results, Further Price Increases, and Law Enforcement Scrutiny**

73.     In April 2014, Teva increased the prices of another 12 generic drugs pursuant to the Price Fixing Effort; eight of the increases were carried out together with Teva's competitors. Following the established process for implementing price increases, Cavanaugh and Griffin would have approved these price increases, and would have tracked the Inflated Profits generated through the Scorecards. By the end of the second quarter, these new price hikes alone would generate as much as $50 million in Inflated Profit; and as much as $395 million by the end of the Class Period.

74.     On July 1, 2014, Olafsson was hired from Actavis as President and CEO of Teva's Global Generic Medicines Group.

75.     By the Summer of 2014, public attention to generic pricing had increased. On July 8, 2014, *The New York Times* published an article titled, "Rapid Price Increases for Some Generic

Drugs Catch Users by Surprise," highlighting that the price of digoxin, a decades-old drug that Teva did not produce, had nearly doubled since late 2013. Within days, and as a result of this article, the Connecticut Attorney General ("AG") began a non-public investigation into the companies that manufactured digoxin. The Connecticut AG issued subpoenas to Teva's competitors Impax, on July 14, 2014, and Lannett, on July 15, 2014; each company disclosed its subpoena in an SEC filing the very next day.

76.     In this context, on July 31, 2014, Teva announced its Q2 2014 financial results, once again boasting an excellent outcome from its generics division. Profitability of the generic segment increased by $156 million from 2013, again attributed to legitimate business strategies. During the earnings call, Desheh stressed that Teva's "improvement in sales this quarter was driven by the growth of our global generic business, primarily in the U.S."

77.     Analysts echoed Defendants' explanations. Jefferies analysts observed: "we continue to see signs of recovery for Teva's US generic business, which posted a strong 10% Y/Y gain," "Solid Q2." Piper Jaffray increased its price target for Teva from $48 to $55 because of "meaningful growth drivers for … [the] generics businesses," and the "[s]teady performance for U.S. generics."

78.     In truth, the Price Fixing Effort had generated as much as $160 million in Inflated Profit, accounting for all of the YOY increase in profit reported for Teva's global generics division.

**Third and Fourth Quarter 2014 – Direct Questions and Explicit Denials of Price Hikes**

79.     Teva continued to report increasingly positive results driven by its U.S. generics business, even as scrutiny of certain price increases in the industry continued. The State AGs served Par Pharmaceuticals with a subpoena on August 6, 2014, which Par disclosed on August 11, 2014. Then, on October 2, 2014, Congress sent letters to Teva and 16 of its peers. The letter

addressed personally to Vigodman, sought information on "the underlying causes of recent increases in the price of [Teva's] drugs."  Vigodman never responded.  Any truthful answer would have required him to reveal the Price Fixing Effort.

80.    Griffin and Cavanaugh implemented another 20 price increases on July 1 and August 28, 2014, pursuant to the Price Fixing Effort (Appendix A), at least 12 of which Teva made together with other manufacturers.  The increases would have been recorded in the Oracle database and reflected in the daily Scorecards and LBE reports.  These 12 price increases would generate as much as $50 million in Inflated Profit.

81.    Significantly, the expected Inflated Profits from the July and August 2014 price hikes, along with all the earlier increases, would have made their way into the Oracle database and been reflected in the report to Defendants and other Teva executives.  The price hikes implemented through August 2014 generated as much as $193 million in Inflated Profits in the third quarter of 2014.

**Third Quarter 2014 Results**

82.    On October 30, 2014, Teva released positive third quarter results, driven by an increase in generic segments profits of $160 million, or 40%, as compared to the third quarter of 2013.  As was routine by this point, Defendants (and other Teva executives) attributed this increase to a reduction in expenses.

83.    With Congressional hearings looming, on the October 30, Q3 2014 earnings call, a UBS analyst asked Vigodman: "could you talk about Generics a little bit in the U.S.? … whether there were price increases in some of your base business and whether that impacted" profit.  Vigodman explained that the market was functioning normally and that prices were decreasing:

When there's an opportunity, when there is a shortage in the market, we obviously look for pricing like any other business. But overall, as I've said many times before, the base business itself is slowly eroding, the overall of the base business.

84.     Increases in prices due to shortages is a normal market dynamic. Thus, Vigodman's statement misled investors as to the fact that Teva had, by this time, implemented the strategy by effectuating price increases on 46 drugs since July 2013 (some more than once), while not one of these 46 drugs were subject to shortages or other reported market anomalies.   In total, the systematic Price Fixing Effort had yielded as much as $193 million in Inflated Profit in the third quarter of 2014.  The profits from all these price increases would have been reflected in the Work Plan and LBEs that Vigodman and Desheh received.

85.     Unaware of the true facts, analysts reacted positively to Teva's financial results, and Teva's ADS price continued to climb.   A Cowen and Company analyst noted, Teva's "Operations Are Improving, Cash Flows Are Accelerating." Piper Jaffray wrote, "Importantly, operating profit … for the generics segment during the quarter was up 40% versus the same period a year ago."  Morgan Stanley increased its price target for Teva from $57 to $61, stating, "We are encouraged by progress that Teva is making on global generics under Siggi Olafsson."

**December 11, 2014 Guidance Call**

86.     By November 2014, the DOJ initiated its own investigation into generic drug pricing and impaneled a grand jury in Philadelphia, Pennsylvania.  The grand jury began issuing subpoenas to generic drug makers, the first on November 3, 2014 to Lannett and Impax relating to a drug Teva did not make.  The companies disclosed these subpoenas days later in SEC filings, on November 6 and 7, respectively.

87.     On November 20, 2014, the Senate Subcommittee on Primary Health and Aging held a hearing to explore "if there was a rational economic reason as to why patients saw [] huge

price increases [in generic drugs] or whether it was simply a question of greed of companies who were able to raise prices to whatever level they wanted."  Teva was invited but refused to testify.

88.     It was against this backdrop that, on December 11, 2014, the Company held a guidance call with analysts.  On the call, a Morgan Stanley analyst focused on the issue of risky price increases, asking: for "generic manufacturers, I'm assuming that wholesalers have been seeing extraordinary price increases in recent years and has been buying inventory ahead of tremendous price increases.… Are you able to control it?"

89.     In response, Olafsson flatly denied that prices had increased at all: "So first let me correct. I have to disagree that they have experienced tremendous price increase." Olafsson dismissed the matter further: "There has been a lot of press about price increases on individual molecules and this has been a hot political issue selecting a few products."

90.     These statements were flatly belied by the facts, to which Olafsson had direct access.  Teva by then had implemented 50 price increases on 46 drugs, each from 50% to as much as 1,500%; each increase was part of a concealed internal strategy and implemented pursuant to Teva's established internal practices.

**Class Period Allegations**

91.     The Class Period starts on February 9, 2015.  On that date, Teva filed with the SEC its Form 20-F for the fiscal year ended December 31, 2014 (the "2014 Form 20-F").  The 2014 Form 20-F was signed by Defendant Desheh, and Defendants Vigodman and Desheh signed Teva's consolidated balance sheet included with this 2014 Form 20-F.  Defendants Vigodman and Desheh also signed the certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the financial condition and results of operations of the Company as contained in, and which was attached to, the 2014 Form 20-F.

92.     The Company's 2014 Form 20-F states that its management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2014 and concluded that its internal controls were effective.

93.     The Company's 2014 Form 20-F also states that Defendants Vigodman and Desheh evaluated the effectiveness of the Company's disclosure controls and procedures as of December 31, 2014 and concluded that its disclosure controls and procedures were effective.

94.     The Company's 2014 20-F included an overview of the Company and discussed its business strategy, stating in relevant part:

**Strategy**

In 2014, we began a process of re-defining and re-focusing our business strategy to better leverage our strengths and differentiate ourselves in the pharmaceutical market.  We seek to capitalize on our advantages — including the largest generic medicines business in the world, a focused specialty business, a unique OTC business and our integrated R&D and API capabilities — to provide patients with integrated, outcome-focused solutions.  Underlying our strategy is our heightened focus on profitable and sustainable business.

The key elements of our strategy consist of the following:

- Solidifying our foundation and driving organic growth….
- Focusing on key growth markets….
- Maintaining Copaxone® and other key specialty products…
- Solidifying leadership positions in our core therapeutic areas….
- Pursuing strategic business development initiatives….
- Executing on our cost reduction program….

95.     The Company's 2014 Form 20-F also discussed its strategy in the United States and other markets, including Russia, stating in relevant part:

**United States**

We are the leading generic drug company in the United States.  We market approximately 375 generic products in more than 1,100 dosage strengths and packaging sizes, including oral, injectables and inhaled products . . . .  Our growth strategy focuses on a carefully selected portfolio of products that will provide added

29

value to our customers, payors and patients, utilizing new and advanced technologies.

In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs.  Price competition from additional generic versions of the same product typically results in margin pressures.  We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio.  We believe we have a focused and competitive pricing strategy.

A substantial majority of our U.S. generic sales are made to retail drug chains and wholesalers, which continue to undergo significant consolidation and globalization. Our portfolio selection, breadth of products offerings and our global network capabilities, have provided mutual strategic advantages to our customers.  We are committed to the success of our customers and work closely with them as important business partners….

### Rest of the World Markets

Our ROW markets include all countries other than the United States and those included under Europe.  Our key ROW markets are Russia, Japan and Canada…. Russia is characterized by rapid growth and relatively high sales of branded generics and OTC products….

Our ROW strategy is to be selective as to where we do business, focusing on the countries and segments where we can achieve a significant position.  Over time and with the right opportunities, we intend to expand our presence in markets such as Russia, China, Brazil and India….

### Key markets highlights

In Russia, which is primarily a branded generic market, we market a diverse portfolio of products.  We are currently one of the largest pharmaceutical companies in Russia, playing a role in the commercial, retail, hospital and state funded segments.

The Russian government seeks to encourage the use of generic products in order to reduce the cost of pharmaceuticals and increase patient access, which is influencing our portfolio strategy. The government is further seeking to encourage local pharmaceutical production by providing incentives, and we have recently established a manufacturing facility in Yaroslavl, Russia.

96.     In the 2014 Form 20-F, Teva once again announced positive results driven by the generics segment.  Fourth quarter 2014 profit for the generic segment increased $47 million, or 9%, as compared to 4Q 2013.  For the full year 2014, profit from the generic segment increased $480 million from 2013.

97.     Though Defendants attributed success to cost savings and other benign factors, in Q4 2014 alone, Teva made as much as $219 million in Inflated Profit, or ***four times*** the fourth quarter increase in profits Defendants boasted; Teva made Inflated Profit of nearly $700 million for the full year 2014, or 144% of the reported YOY increase in generic profit for the whole Company. All of these results would have been reflected internally in the Work Plan, the Scorecards, and the LBE reports distributed to Defendants.

98.     The following table reflects Teva's overall Inflated Profit for 2014:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Inflated Profit | $120 | $160 | $193 | $219 | $693 |

99.     Without mention of the Price Fixing Effort, Desheh bragged about the profits from Teva's generic division. On the February 5, 2015 earnings call, he claimed "the most notable contribution" to Teva's growth and profits "was generated by our Generic business, improving profitability by more than 500 basis points," contributing "nearly $500 million" and comprising 31% of the Company's total profit.  Unaware that the profits came from the Price Fixing Effort, analysts focused on this success.  Piper Jaffray wrote that "profitability of the generics business [is] continuing to improve."  Barclays focused on the trajectory of generics' success: "profitability

for generics improved to 21.9% from 16.8% in 2013…. The company anticipates another 400 basis point improvement in 2015 … a key priority."

100.    Notably, and consistent with the Defendants (and other Teva executives) having misled investors by attributing Teva's improved profits to sources other than the Price Fixing Effort, throughout 2014 Defendants had also claimed that some portion of Teva's increasing profitability in generics was attributable to a purported $2 billion "cost cutting" program that had first been adopted in late 2012.  However, only a fraction of that cost cutting program actually fell to Teva's bottom line as profit.  As Defendants eventually disclosed on a December 2014 investor call, by then Teva had generated only $150 million in cumulative profit from the program since its inception.  After that call, Defendants stopped emphasizing cost cutting and mentioned it only rarely again.

**The First Half Of 2015 – Teva ADS Price Soars to**
**Become "Currency" for "Transformational" Actavis Acquisition**

101.    Teva implemented another 14 price increases in January 2015 (Appendix A), nine of which were increased together with other manufacturers.  Each of these was again subject to the same rigorous internal review and approval process that included Defendants and other Teva executives.  The Inflated Profits were captured in the daily and weekly Scorecards and intra-quarter LBE reports that Griffin, Cavanaugh, and Olafsson circulated to Vigodman and Desheh to track whether forecasts were being met. By the end of the first quarter of 2015, the 14 price increases undertaken in that quarter would generate as much as $48 million in Inflated Profit; the Price Fixing Effort overall would generate as much as $228 million in the quarter.

102.    The Inflated Profits boosted the ADS price to nearly $60, and Defendants' motivation to use the ADS as "currency" for a "transformational" transaction was coalescing into reality. As J.P. Morgan noted on February 5, 2015: "We believe that Teva is looking at assets of

all sizes, and will not rule out transformational M&A if the opportunity presents itself." On March 10, Susquehanna took note that "TEVA is increasingly focusing attention on its financial capacity and appetite for M&A." By April 16, Barclays reported on Teva's "willingness" to perform a "'transformational' acquisition in the generics space." That day, Leerink wrote that Teva had an "urgency to diversify via M&A."

103.    Though not disclosed at the time, by late 2014 Defendants had actually approached Allergan, although Allergen was not ready to make a deal then. Vigodman would later admit, on July 27, 2015, that Actavis "was basically the highest priority" for an acquisition. Indeed, Olafsson told employees assembled at an August 2014 meeting soon after arriving at Teva (from Actavis), that he had never joined a company that did not eventually acquire his previous employer. (FE-1) His prescience would prove true soon enough.

104.    With Allergan rejecting Teva's advances, Defendants (and other Teva officers and directors) planned a hostile offer for Mylan, Teva's long-standing rival. On April 21, 2015, Defendants filed a Form 6-K with the SEC, announcing Teva's unsolicited offer to acquire all of the outstanding shares of Mylan. Mylan's board quickly rejected the offer, criticizing Teva as a "low quality stock." This rejection intensified Defendants' motive to improve the ADS price.

**First Quarter 2015 Results**

105.    In the face of Mylan's rebuff, on April 30, 2015, Defendants again announced excellent results stemming from Teva's generic segment, pointing to a profit increase of $296 million, or 59%, compared to the first quarter of 2014.  Defendants again misleadingly attributed this increase in profits to a reduction in expenses, as well as a new product launch and higher profitability in Europe. Defendants did not disclose that as much as $228 million in Inflated Profit accounted for 77% of the reported generic profit increase.

106.    On the earnings call, Olafsson announced a "1,000 basis points improvement over a two years period" in "operating profit in the generic segment." He attributed this to "a significant improvement in our cost of goods…. portfolio offering … [including] when we have more of the launches … [and] the cost infrastructure."

107.    In the absence of the truthful and complete reasons for Teva's improved profit, analysts credited Defendants' false statements. J.P. Morgan noted, "Teva continues to make progress on generics profitability … we remain encouraged by the recovery in Teva's generic business."  Cowen and Company noted that Teva's "outperformance was a result of better than expected U.S. generic sales." Buoyed by the fraud, Teva ADSs closed at $60.42 that day, an increase of 33% since the start of Class Period.

108.    As the weeks passed, Defendants (and other Teva executives) continued to laud the vast success in Teva's generic segment in a series of statements:

- On May 13, 2015, at a Bank of America Conference, Desheh declared that Teva's improved generic business was "nothing short of a revolution," explaining that "[i]n 2013 our gross margin of generic business was 41.3%. And it's 46% in Q1 2015. Our operating margin was 16.7%. It is 27%, this is full 10 percentage points," i.e., a $1 billion improvement.

- During a June 10, 2015 Goldman Sachs Global Healthcare Conference, Vigodman explained: "we started 2014 with a clear message, clear focus, getting the house in order first, solidifying the foundation of Teva. You see the profound change in the generic business. These are things that are not confined to numbers, but maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014." He fraudulently attributed all of this success to "cost reduction" and "[f]ull transformation of our operational network."

**$40 Billion Acquisition of Actavis Announced**

109.    As Olafsson had foretold on July 27, 2015, with Teva's ADS price reaching an all-time high of $72, Teva would announce the transformational acquisition it had been seeking: it

had entered into a definitive agreement to acquire Allergan's worldwide generics business, Actavis, for $40.5 billion in cash and equity.

110.     In announcing the deal, Vigodman explained that the rapid and surprising turnaround in Teva's generics segment since before the start of the Class Period was the "precondition" for making the deal. Of course, he concealed that the true "precondition" underlying that turnaround was Teva's implementation of the Price Fixing Effort.

**The Second Half Of 2015 - Motivation Shifts; Paying for Actavis**

111.     Following the announcement of the Actavis deal, Defendants needed to raise over $30 billion in cash to pay for it. Teva did not have the money, and the price tag would amount to roughly 20 years of Teva's recent annual earnings. To pay for the deal, Teva would give Allergan $7 billion in ADS, and raise cash from the Class through a $7 billion secondary public offering of ADS and an initial public offering of Preferred Shares in early December 2015, and $15 billion from an offering of bonds set for 2017.

112.     On July 30, 2015, following the announcement of the Actavis deal, Teva issued more glowing Q2 2015 results driven by generics; specifically, an increase in generics profit of $193 million, or 36%, compared to 2Q 2014, attributed primarily, and misleadingly, to reduced expenses and new product launches. That day, Desheh, boasted about "the impressive improvement in the profitability of our Generic business … up from around 20%, 21% a year ago to between 39.5% to 30% in the first half of 2015," and specifically the "strong focus on U.S. Generics business." Defendants did not disclose that the Price Fixing Effort contributed as much as $236 million in Inflated Profit in the second quarter alone. Without the Price Fixing Effort, generic profit would have declined.

**Third Quarter 2015 Results**

113.     In July 2015, Teva implemented another seven price increases, four of which were executed together with other manufacturers' price increases, following Cavanaugh's and Griffin's review and approval and as would be reflected in the Scorecards, LBEs, and Work Plan circulated to Defendants and other Teva executives. By the end of the quarter, these seven price increases, together with earlier hikes, would generate as much as $218 million in Inflated Profits. Furthermore, given the timing of the increases, the expected profits would be incorporated into the 2016 Work Plan that Olafsson, Cavanaugh, and Griffin would be finalizing for presentation to Vigodman and Desheh later in the summer, following the routine schedule.

114.     Following these increases, on October 29, 2015, Defendants issued Teva's third quarter 2015 results, reporting an increase of $20 million in generics profits compared to the third quarter of 2014, again misleadingly attributing this increase mainly to lower expenses. In reality, the Price Fixing Effort contributed as much as $218 million, ten times the reported improvement in profit.

115.     On the earnings call, Vigodman was exuberant about the "huge opportunities in the United States" for generics. Likewise, Olafsson emphasized that "the Generic business in third quarter continued to drive growth," and that "[w]e really have been improving the profitability over time," pointing to increased margins of "16.8% in 2013, 22.1% in 2014, and year-to-date number is about 28.9%."

116.     Analysts, unaware of the truth, continued to adopt Defendants' misleading narrative. Piper Jaffray wrote, "Margins for the generics business continue to improve…. Though top-line growth for the generics segment has been anemic, margins have continued to expand." Jefferies' analysts highlighted that, "Generic Drug Margins Continue to Improve," noting that "on

the live Q3 presentation, management highlighted the significant improvement in profitability from its core generics business."

**Increased Public Scrutiny on Pricing**

117.    By the fall of 2015, however, Congressional initiatives, law enforcement actions, and public anger toward perceived abuses in drug pricing had taken hold. Legislation was introduced in Congress that would penalize generic manufacturers for increasing prices at a rate higher than inflation. The State AGs and DOJ were continuing their investigations. And, Allergan had received a DOJ subpoena concerning generic pricing on June 25, 2015, which it disclosed in an SEC filing on August 6, 2015.

118.    Given this landscape, during the 3Q 2015 earnings call held on October 29, 2015, analysts posed direct questions to Defendants (and/or other Teva executives) aimed at getting a clear answer as to whether Teva was exposed to the potential legislation. Defendants (and/or other Teva executives) met these specific questions with equally specific denials.

119.    On the call, after a series of questions on the sustainability of Teva's generics success, Vigodman reaffirmed the false premise that Teva had generated its profits solely from sustainable, ordinary business practices, and not price:

> We're very … responsible in everything that portends to prices on the Generics side…. And I would even put it another way, all the improvement you see in our – in margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015, and that's a very important message.

Then, when a Barclays analyst asked for management's thoughts on the proposed legislation's "potential limit to generic drug price increases," Olafsson denied that Teva was exposed:

> In terms of the proposed legislation on pricing control on generics, … we have told you that overall on our whole portfolio, we have a decline in price. The talk about the inflation in generics when you have a big portfolio is really not there.

The only price increases he acknowledged were those "due to some abnormalities in the market," like supply shortages.

120.    Misled, analysts took explicit note. That day, UBS repeated Defendants' denials: "[Management] highlighted that the [generic business] improvement was not driven by price, but by volume, mix, and efficiency." The denials by Defendants (and/or other Teva executives) concealed the Price Fixing Effort, and that Teva had by that point made 71 price increases, none of which were caused by market abnormalities like shortages. Moreover, a huge portion, if not all, of the margin improvement Vigodman touted was driven by as much as $1.6 billion in Inflated Profit reported since the start of the Class Period, including, over $690 million in 2014, and over $680 million in the first three quarter of 2015. All this information was reflected in the Scorecards, LBEs, Work Plan and other reports regularly sent to Olafsson and Vigodman.

121.    Importantly, by this time, Defendants misstatements, which were necessary to maintain the ADS price in order to raise the cash for the Actavis deal, were concealing an ever-increasing risk. Public, regulatory, and law enforcement scrutiny of the industry had begun to undermine Teva's ability to execute and sustain the Price Fixing Effort. Teva was finding it increasingly difficult to increase prices. In 2014, Teva made 32 increases. In 2015, Teva made a total of only 21 hikes; 14 in January, and 7 in July, the final round of significant price increases implemented in a systematic fashion prior to the close of the Class Period. By the end of 2015, Inflated Profits had diminished quarter over quarter for the first time since Q1 2014.

122.    With this context, and with the offering of $7 billion in ADS and Preferred Shares weeks away, Teva attended a November 19, 2015, Jefferies conference. The moderator pressed Desheh about "everyone's favorite topic the last 2 months … *pricing, is it an issue? …. where do you go on pricing*?" Desheh acknowledged the swirl of concern over pricing and legislative

actions but claimed that "***Teva was not associated with any of that***," and specifically, with respect to legislative initiatives to cap price increases, Teva's exposure "is as a small as anybody can have." The opposite was true.

**Teva's False and Misleading Registration Documents**
**for Its Secondary ADS and Preferred Share Offerings**

123.    On November 30, 2015, Teva filed a Registration Statement with the SEC, regarding Teva's Secondary ADS and Preferred Share Offerings, and on December 3 filed two prospectus supplements and issued the Secondary ADS and Preferred Shares. The Offering Documents included numerous false misleading statements attributing Teva's profits to sources other than the Price Fixing Effort. The ADS/Preferred Offerings raised approximately $7.2 billion.

**First Half 2016 – Price Fixing Effort Screeches to a Halt; Pricing**
**Pressure Denied; Subpoenas Concealed; $20 Billion Debt Offering**
**and Close of Actavis Deal**

124.    As 2015 came to a close, the effects of industry-wide pressure on generics pricing spurred by the investigations and scrutiny on pricing practices came to the fore as a number of industry participants reported a new trend of downward pricing pressure. On, January 11, 2016, McKesson, one of Teva's major wholesaler customers, announced that it "now expect[ed] that operating profit from generic pharmaceutical pricing trends will be significantly weaker" through the second half of its fiscal year, ending on March 31, 2016.

125.    The same day, J.P. Morgan held a healthcare conference. With McKesson's announcement in mind, J.P. Morgan asked Olafsson to comment "on how you see generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?" Olafsson responded by fraudulently claiming that Teva was not involved in "big price increases":

> ***There's a lot of headlines of examples of big price increases in generics***. But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – ***there is a decline***. [Emphasis added].

He later fraudulently explained that, because Teva had not taken "big price increases," its generics portfolio was not exposed to price deflation:

> The generic pricing – we need to keep in mind ***there's a lot of talk about inflations in generic pricing***. But what we see is there's – overall on our total portfolio of 270 products, ***there is a slight decrease in pricing***. … on 95% of our portfolio, we experience price decline. And then on 5%, we might be ***flat or a slight increase***….. [Emphasis added].

126.    These false statements belied the truth. Teva had raised prices on 60 drugs, or 22% of the portfolio Olafsson cited, generating by that point as much as $1.7 billion. This would have been reflected on the daily Scorecards and intra-quarter LBE reports Defendants (and other Teva executives) received. More to the point, the drugs that were driving Teva's profits were massively inflated, making Teva particularly vulnerable to the pricing pressure that other industry players reported.

**Fourth Quarter and Full Year 2015 Results**

127.    On February 11, 2016, Teva filed with the SEC its Form 20-F for the fiscal year ended December 31, 2015 (the "2015 Form 20-F"). The 2015 Form 20-F was signed by Desheh, and Defendants Vigodman and Desheh signed Teva's consolidated balance sheet included with this Form 20-F. Defendants Vigodman and Desheh also signed the SOX certifications attesting to the financial condition and results of operations of the Company as contained in, and which was attached to, the 2015 Form 20-F.

128.    The Company's 2015 Form 20-F states that its management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2015 and concluded that its internal controls were effective.

129.    The Company's 2015 Form 20-F also states that Defendants Vigodman and Desheh evaluated the effectiveness of the Company's disclosure controls and procedures as of December 31, 2015 and concluded that its disclosure controls and procedures were effective.

130.    The Company's 2015 Form 20-F discussed its business strategy, stating in relevant part:

**Strategy**

In 2014, we began a process of re-defining and re-focusing our business strategy to better leverage our strengths and differentiate ourselves in the pharmaceutical market.  We seek to capitalize on our advantages — including the largest generic medicines business in the world, a focused specialty business, a unique OTC business and our robust R&D and API capabilities — to provide patients with integrated, outcome-focused solutions.  Underlying our strategy is our heightened focus on profitable and sustainable business.

The key elements of our strategy consist of the following:

•       Solidifying our foundation and driving organic growth….
•       Transforming our generics business….
•       Focusing on key growth markets….
•       Maintaining Copaxone® and other key specialty products….
•       Solidifying leadership positions in our core therapeutic areas….
•       Pursuing strategic business development initiatives….

131.    The Company's 2015 Form 20-F also discussed its strategy in the United States and other markets, including Russia, stating in relevant part:

**United States**

We are the leading generic drug company in the United States.  We market approximately 370 generic products in more than 1,100 dosage strengths and packaging sizes, including oral, injectable and inhaled products.  We believe that the breadth of our product portfolio provides us with a strategic advantage, particularly as consolidation continues among purchasers, including large drugstore chains, wholesaling organizations and buying groups.  Our growth strategy focuses on a portfolio of products that will provide added value to our customers, payors and patients, utilizing new and advanced technologies.

In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand-name

pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures.  We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio.  We believe we have a focused and competitive pricing strategy.

A substantial majority of our U.S. generic sales are made to retail drug chains and wholesalers, which continue to undergo significant consolidation and globalization. Our portfolio selection, breadth of products offerings and our global network capabilities, have provided mutual strategic advantages to our customers.  We are committed to the success of our customers and work closely with them as important business partners….

**Rest of the World Markets**

Our ROW markets include all countries other than the United States and those included under Europe.  Our key ROW markets are Japan, Canada, Venezuela and Russia….   Russia is characterized by rapid growth and relatively high sales of branded generics and OTC products….

Our ROW strategy is to be selective as to where we do business, focusing on the countries and segments where we can achieve a significant position. Over time and with the right opportunities, we intend to expand our presence in markets such as China, Brazil and India and significantly enhance our existing presence in other high growth markets such as Russia, Mexico, South Korea, Australia and Turkey….

**Key market highlights**

In Russia, which is primarily a branded generic market, we market a diverse portfolio of products. We are currently one of the largest pharmaceutical companies in Russia, playing a role in the commercial, retail, hospital and state funded segments.

The Russian government seeks to increase the share of domestically produced pharmaceutical products by implementing a policy to encourage local production to meet state and local needs. We established a manufacturing facility in Yaroslavl, Russia in 2015 to take advantage of this policy, and we expect this facility to become fully operational during 2016.

132.    2015 Form 20-F's full year disclosures reported Teva's profit in generics in 2015

were up $500 million YOY, concealing over $848 million in Inflated Profit for the year.

133.    On the earnings call that day, Olafsson again touted a "$1 billion improvement in operating profit over 24 months period," pointing to generics profits going from "$1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue. He explained rhetorically: "So how did we do this? *Not by pricing* but by portfolio mix, new products, and efficiency measures."

134.    Olafsson denied even the mere existence of price inflation, let alone having engaged in 71 price hikes: "on pricing…. [W]e and the generic industry overall *don't see price inflation of generics* as it sometimes is portrayed in the media."

135.    In truth, the concealed Price Fixing Effort had generated as much as $1.5 billion in Inflated Profits over the 24 months period Olafsson cited.

136.    But additional price hikes had become more difficult, if not impossible to implement. Accordingly, Teva reported that fourth quarter 2015 profit in generics increased only 1% compared to the fourth quarter of 2014. Analysts, thus, grew more concerned as more firms reported pricing pressure in the fourth quarter. Guggenheim asked: "some of your competitors have talked about pricing pressure in the generics business during the quarter. Curious if you saw that, and if so what might be driving that." Olafsson fraudulently responded:

> let me start on the pricing. *As I mentioned in the beginning, we didn't see anything change in fourth quarter*. We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year.  [Emphasis added].

137.    Misled, Guggenheim expressed relief in its report, stating: "[u]nlike its generic competitors, *TEVA did not experience any increase in pricing pressure this quarter, which highlights the strength of the company's platform*, in our view." Jefferies' analysts also believed Olafsson's false distinction between Teva and other companies reporting pricing pressure: "Mgt noted that smaller generics players may have realized outsized gains from price increases on

43

individual drugs – and are thus now exposed to faster price erosion – and stressed that its portfolio breadth and optimized supply chain/cost structure allow the co to maintain solid profitability."

138.    Based on these false statements, Defendants (and other Teva executives) failed to disclose to investors the true reason for the flattening of the YOY profit growth from generics: Teva's Price Fixing Effort had begun to falter. The 60 drugs on which Teva had increased price were facing renewed pricing pressure. As such, the quarterly change in Inflated Profit had begun to decrease, rather than increase by as much as $70 million since the second quarter of 2015, or by 30%. This trend would continue throughout the Class Period.

139.    The following table reflects Teva's overall Inflated Profit for 2015:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Inflated Profit | $228 | $236 | $218 | $166 | $848 |

**Pricing Concerns Increase, Defendants Go on the Offense**

140.    As investors became increasingly concerned about the pricing environment, Defendants and other Teva executives continued to affirmatively deny any vulnerability to pricing pressure. At a March 8, 2016 conference, a Cowen analyst asked Olafsson to "discuss what you're seeing" on "generic pricing." Olafsson said that "[Teva] *never* saw" price increases and that "inflation *never* really happened in the generics business." He added, "overall the pricing hasn't changed that much," and was "*stable,*" and there had been no "big changes in the pricing environment" since 2015. In reality, Teva's Inflated Profit had fallen 24% in the fourth quarter 2015, from $218 million to $166 million, compared to the prior quarter.

**First Quarter 2016 Results**

141.    As the public and law enforcement scrutiny intensified, the Price Fixing Effort faltered, and Inflated Profits declined from pricing pressure. Teva was unable to make significant additional price hikes, implementing only five during the entire course of 2016, all on April 6 of that year, and all on drugs that Teva had hiked before and in markets where Teva possessed a monopoly. See Appendix A.

142.    Because of declining profits, Defendants were under significant stress to finance the Actavis acquisition. They needed to raise the $20 billion in additional cash required to close the Actavis deal through a bond offering. On May 9, 2016, on the Q1 2016 earnings call, Defendants set a new date for the $20 billion offering, September 2017.

143.    That day, Teva also announced its first quarter 2016 financial results, reporting profit from generics $215 million less than in the first quarter of 2015. Defendants misleadingly attributed the decline to higher expenses, lower sales, lower European profit, and fewer product launches. As pricing pressure sapped the impact of the Price Fixing Effort in 1Q 2016, Teva generated $104 million less in Inflated Profits compared to the first quarter of 2015, accounting for half of the generics division's reported profit decline. The "hole" created by the drop in Inflated Profit would have been reflected in the Scorecards, LBEs and Work Plan. (FE-1, FE-2)

144.    Similarly, even as additional generic drug manufacturers accurately reported poor results due to pricing pressure, Defendants and other Teva executives continued to deny that pricing pressure had any impact on Teva. On the May 9, 2016 earnings call, Olafsson noted "the number of companies citing a tougher pricing environment or price deflation seems to have grown at an almost incredible rate." However, he again denied that Teva had exposure to price deflation, and blamed other manufacturers' woes on those firms' business models:

> Throughout the ***ongoing debate*** this year about the level of generic price erosion in the United States, Teva has been very consistent and clear with investors. ***Teva has***

*not seen any fundamental change or worsening in the pricing environment*…
What this boils down to is each individual company's business model.… *Nothing has happened in the last two quarters that has changed the pricing environment*.
[Emphasis added].

145.    Olafsson instead blamed Teva's decline in generic profits entirely on issues other than pricing, most prominently, the lack of new product launches. He misleadingly asserted that Teva's prior success had come from sustainable sources such as "portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products … and sales force effectiveness."

146.    The empirical facts internal to Teva and available to Olafsson through the Scorecards, LBE reports, Work Plans, and the Oracle database would have shown otherwise. Like its competitors, price deflation was substantially damaging Teva's profits. Since the fall of 2015, Teva's Inflated Profit plummeted from as much as $236 million in 2Q 2015, to $218 million in 3Q 2015, to a mere $124 million in the first quarter of 2016. *See* Figure 1 at ¶ 8.

147.    Deceived analysts credited Olafsson's false denials. J.P. Morgan wrote, "Reassuring Generics Outlook Ahead of [Actavis] Deal Close … Teva does not see any major changes in the price environment." Jefferies wrote "Generic pharmaceutical bellwether TEVA has not witnessed a deterioration in the pricing environment, according to mgt. This directly contrasts with what has been stated by a number of competitors over the past few months."

148.    With Teva's debt offering scheduled to occur in the fall, and thus needing to keep investors optimistic about Teva's prospects, Defendants continued their unrelenting flow of misleading statements and denials that Teva was seeing any increase in pricing pressure:

- <u>May 10, 2016 (Olafsson)</u> "I know many of the competitors in the generic space … are talking about a lot of pricing pressure, but it shouldn't be. There is nothing that has happened over the last two quarters which has changed fundamental the market."

- June 3, 2016 (Vigodman) "So we are very consistent. Our message was conveyed, and we will continue to convey. What we see is a 4% to 5% erosion. That's what we see. That's not something which is different from what we said during 2015. By the way, we continue saying it in 2016."

- June 8, 2016 (Olafsson) "[R]eally, the environment hasn't changed. When we signed that [Actavis] deal in July [2015], we talked about 4% price erosion in the US generic business. And we are still talking about the same number, what we see in the base business."

149.    The undisclosed truth was that the rapid deterioration of the Price Fixing Effort continued into the second quarter of 2016. Inflated Profits would decline 52% YOY.

150.    Only days after Olafsson's June 8 statements, undisclosed to shareholders, on June 21, 2016, Teva received a subpoena from the DOJ seeking information relating to generics pricing. And on July 12, 2016, Teva received a subpoena from the Connecticut AG. Teva did not make any further price increases for the duration of the Class Period.

**Subpoenas Concealed; Notes Offering Is Accelerated**

151.    The day immediately after receiving the subpoena from the Connecticut AG, on July 13, 2016, Defendants announced that Teva was accelerating its $20 billion debt offering from the September timeframe it had announced just weeks earlier. Defendants filed the Registration Statement with the SEC that very day.   To support this surprise announcement, Olafsson, Vigodman, and Desheh gave bullish guidance to investors for the end of 2016 through 2019. Again, with industry reports of pricing pressure in mind, a Citigroup analyst asked Olafsson on an investor call that day: "can you comment on the generics pricing assumptions that you have ***baked into your forecast***?" Olafsson responded: "we are assuming and now forecasting for the guidance for the remainder of the year ***same pricing assumption*** as we have had for the first half of the year," because "***we saw no change in the pricing***. We saw a stable environment … from first quarter into second quarter."

152.    But far from being "stable," the pricing environment for Teva's own generics portfolio had been deteriorating. Inflated Profit was down $122 million, or 52%, for the second quarter as compared to the same period in 2015. Teva was unable to offset this price deterioration with additional price increases. The pricing assumption Teva "baked into" the guidance was contemporaneously false and disprovable.

153.    Moreover, Teva's Price Fixing Effort faced a brand new, and concealed, challenge. Defendants (and other Teva executives) made no mention of this or the DOJ subpoenas until after the Notes Offering was complete and the Actavis deal was closed.

154.    Without the true facts, investors were falsely reassured that Teva had somehow immunized itself from the downward industry trend. Piper Jaffray noted, "management stated that it did not see further pricing pressure on the overall generics business," which "may ease recent worries regarding the near-term trajectory of the business." Morgan Stanley wrote that "pricing and LT Guidance [was] encouraging … *[m]gmt sees US pricing environment as unchanged*."

**The $20 Billion Debt Offering**

155.    On July 18, 2016, Teva launched the $20 billion bond offering to finance the Actavis transaction, approximately $15 billion of which were U.S. dollar denominated. The offering was made pursuant to the Notes Offering Materials, which incorporated several of the false and misleading quarterly and full year financial disclosures. Despite dozens of pages of disclosures about other investigations and litigations, neither the Notes Offering Materials, nor the documents incorporated by reference therein, disclosed the DOJ and Connecticut AG subpoenas.

**Third Quarter 2016 – Disclosure of Declining Performance and Subpoenas; Generics Day**

**Second Quarter 2016 Results**

48

156.    On August 4, 2016, Teva announced disappointing second quarter 2016 results and disclosed for the first time the receipt of the DOJ and State AG subpoenas. The financial disclosures reported $115 million less in generic profit in 2Q 2016, than in the second quarter of 2015, a decrease attributed mostly to increased expenses, the loss of exclusivity on certain products, and lower sales on products for which Teva had not taken price increases. This misleading attribution concealed that Teva earned as much as $122 million less in Inflated Profit for 2Q 2016 YOY. On the disclosure of the poor results and the subpoenas, the price of Teva Securities declined.

157.    Defendants (and other Teva executives) scrambled to mitigate the bad news, making a series of false statements to reassure investors that Teva was still immune to the swelling pricing pressure. On the earnings call, the Citigroup analyst again asked whether decreased U.S. generic revenues had impacted Teva's views on pricing stability. Likewise, Olafsson once again falsely claimed that "the pricing is stable to the same degree as before … very stable from the first quarter."  This was belied by facts that Olafsson was presented with on the daily Scorecards, and in the LBEs and Work Plan, that he shared with the Defendants, which would have revealed dramatically decreasing Inflated Profit.

158.    When a J.P. Morgan analyst asked whether Teva might increase prices following the Actavis acquisition, Olafsson implied that Teva had never increased prices to drive profits, and that opportunities to do so were ephemeral and limited to times of shortage, stating, "***pricing comes with shortages in the market*** … if there's some kind of dysfunction in the market, there might be a ***small pricing opportunity that usually comes in and comes out***." The undisclosed truth was that Teva had made 76 price increases on 60 drugs, and none had anything to do with shortages. And now, with those inflated prices under pressure, the Inflated Profit was declining.

159.    The false statements mollified unaware analysts. J.P. Morgan wrote, "[Teva's] US generics business [was] modest[ly] below expectations but generic pricing environment remains stable." Morningstar analysts similarly wrote that Teva's "Management also noted underlying price erosion remains consistent in the mid-single digits at approximately 4%."

160.    The table below reflects the change in Teva's profits as reported in the first half of 2016, as well as the change in Inflated Profits for the same period:

| 2016 ($ millions) | Q1 | Q2 | Half Year |
|---|---|---|---|
| Reported YOY Change in Generics Profit | -$215 | -$115 | -$330 |
| (Unreported) YOY Change in Inflated Profit | -$104 | -$122 | -$227 |

**Teva's Generics Day**

161.    On September 9, 2016, Teva held its "Generics Day" for investors, during which Defendants and other Teva executives touted the supposed opportunities of the combined Teva/Actavis business. Olafsson issued more misleading, categorical claims that Teva had never inflated its prices for generics drugs: "[t]here is no inflation in the generic pricing"; "***people that say that … there's a big generic price inflation, are simply wrong***." He falsely reiterated that price increases occurred only with market abnormalities like shortages: "When price increases are taken, there's some kind of abnormality in the business. There are shortages."

162.    Olafsson then falsely explained that Teva had a purported "secret sauce" that immunized the Company from pricing pressure. In truth, Teva had no "secret sauce"; it was suffering from pricing pressure on its drug portfolio which in reality had "big generic price

inflation" from years of large price hikes made pursuant to the Price Fixing Effort. The pricing

pressure on that portfolio would have been reflected in the Scorecards, LBEs and Work Plan.

### THE TRUTH EMERGES AND POST-CLASS PERIOD EVENTS

**Fourth Quarter 2016 – Teva Reported as Target of Investigations;
Disastrous Results; DOJ and State AG Charges; Executives Fired**

**Bloomberg Article: DOJ Charges and State AGs Loom**

163.    On November 3, 2016, *Bloomberg*, the leading real-time news source for Wall

Street and investors, published an article titled, "U.S. Charges in Generic-Drug Probe to Be Filed

by Year End," revealing for the first time that "according to people familiar with the matter," "U.S.

prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal

investigation into suspected price collusion" as the "antitrust investigation by the Justice

Department, begun about two years ago, now spans more than a dozen companies and about two

dozen drugs," and "the first charges could emerge by the end of the year." Moreover, "Connecticut

Attorney General George Jepsen … is seeking to lead a group of states … seeking damages." The

article specifically mentioned Teva as one of the companies.  This article stated in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a
> sweeping criminal investigation into suspected price collusion, a fresh challenge
> for an industry that's already reeling from public outrage over the spiraling costs of
> some medicines.
>
> The antitrust investigation by the Justice Department, begun about two years ago,
> now spans more than a dozen companies and about two dozen drugs, according to
> people familiar with the matter.  The grand jury probe is examining whether some
> executives agreed with one another to raise prices….
>
> Though individual companies have made various disclosures about the inquiry,
> they have identified only a handful of drugs under scrutiny, including a heart
> treatment and an antibiotic.  Among the drugmakers to have received subpoenas
> are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd.  Other
> companies include Actavis, which Teva bought from Allergan Plc in August,
> Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun
> Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International

Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries
Ltd.

\* \* \*

Shares of all companies named in the investigation fell on the news…. Teva slipped
9.5 percent to $39.20….

\* \* \*

Generic drug companies are also contending with a civil price-fixing investigation
by Connecticut Attorney General George Jepsen. Jepsen is seeking to lead a group
of states to probe the industry, which could result in cases seeking damages,
according to people familiar with the matter. A spokesman for the Connecticut
Attorney General's office declined to comment.

The first subpoenas in the generics investigation were issued by Connecticut in July
2014, while the Justice Department followed in November, according to regulatory
filings by the companies. The investigations initially focused on mid-sized U.S.
companies and have since extended to the biggest manufacturers and U.S.
subsidiaries of overseas companies.

164.    Accordingly, Teva was now for the first time reported as a potential target of

criminal and civil liability. On this news, the prices of Teva Securities declined. Between the close

of trading on November 2, 2016 and the close of trading on November 3, 2016, Teva's ADS price

fell $4.13 or 9.53% to close at $39.20; the Preferred Share price fell $56.50 or 7.36% to close at

$711.00; and the prices of Teva's 2023, 2026, and 2046 Notes fell $12.93 or 1.31%, $11.19 or

1.15%, and $27.94 or 3.02%, respectively.

**Disastrous Third Quarter Results; Continued Denials**

165.    On November 15, 2016, Teva reported its third quarter 2016 results, its first post-

Actavis financial report, disclosing disappointing numbers, particularly from Teva's legacy

generics business. With revenues from Actavis removed, Teva's U.S. generics revenues declined

$277 million YOY from the third quarter of 2015. Defendants attributed the decline to causes

such as divestments and lost sales from certain drugs. In truth, as much as $121 million, or 44%,

of the overall YOY decline, was attributable to a YOY decline in Inflated Profit as the Price Fixing

Effort collapsed. This decline would, again, have been reflected in the Scorecards, and the "hole" between forecasts and actual revenues long ago captured in the LBEs, and circulated to Olafsson, Desheh, and Vigodman.

166.   Olafsson, however, falsely insisted that "like previous quarters, ***there hasn't been any fundamental change in the US drug pricing***." Indeed, Olafsson doubled down when a Wells Fargo analyst expressly asked whether the reported increase in price erosion to 7% was a "result of having to tame previous price increases, or give back some of those?" In response, Olafsson stated "No." He instead claimed the number increased because of divested drugs, and thus that it was an anomaly limited to the quarter. In reality, the increase in erosion was causing a dramatic decline in Inflated Profit. Figure 1. A puzzled J.P. Morgan analyst pressed him, observing that "anyone that look[s] at the industry as a whole, it feels like this [is] a broader issue than [a] one-off market disruption." Olafsson adamantly insisted "there hasn't again been any fundamental change" in pricing.

167.   The false statements comforted some analysts otherwise troubled by the poor U.S. generic results. Deutsche Bank wrote: "management continue[d] to expect mid-single digit price erosion in 4Q and over the longer term."

168.   Other analysts responded negatively to the new information concerning the Company's disappointing financial results. That day, in a report titled, "Are The Wheels Coming Off? Sure Feels That Way," PiperJaffray lowered its price target from $57 per share to $43 per share, noting that "it appears to us that Teva painted an overly sanguine picture of its generics business at its investor event in September [during the Generics Day]," and describing Q3 2016 as a "credibility-damaging quarter," because, in the face of Olafsson's explanation that the price erosion would be limited, it was "difficult for us to take that assertion at face value." Also that day,

Deutsche Bank wrote "TEVA reported 3Q revenue that was below our estimate on lower generic sales … the company saw higher than expected price erosion in 3Q …" and, as a result, lowered its price target for the Company from $68 per share to $54 per share on "lower growth assumptions for generics." Likewise, in a November 16, 2016 report, Morgan Stanley lowered its price target for the Company from $63 per share to $42 per share, as a result of the lower than expected generics growth and worse than expected price erosion.

169.    On this news, the prices of Teva Securities continued to decline. Between the close of trading on November 14 and 15, 2016, the ADS price fell $3.43 or 8.36% to close at $37.60; the Preferred Share price fell $38.01 or 5.22% to close at $689.99.

**Olafsson is Fired**

170.    Less than three weeks later, on December 5, 2016, Teva unexpectedly announced Olafsson's "retirement." His replacement, Dipankar Bhattacharjee, immediately took over as CEO, Global Generic Medicines Group. In truth, Olafsson, only 48 years old, was fired. He is now the CEO of Hikma Pharmaceuticals PLC, and a director of other companies.

171.    Analysts readily saw through the implausible reason for Olafsson's departure, concluding that he had been terminated due to the poor performance of Teva's generics division. In truth, the sudden change in performance was the materialization of the risks associated with the Price Fixing Effort; Inflated Profit suddenly dropped; law enforcement was now pursuing Teva; a price-inflated generics portfolio was increasingly susceptible to pricing pressure; and Teva could not plug the hole in its financial results with price increases.

172.    On this news, on December 6, 2016, the prices of Teva Securities continued to decline. Between the close of trading on December 5 and on December 6, 2016, the ADS price fell

$2.01 or 5.43% to close at $35.03; the Preferred Share price fell $26.26 or 4.00% to close at $630.75; the price of Teva's 2046 Notes fell $17.01 or 1.95%.

**DOJ Criminal Charges; State AGs Sue Teva**

173.    On December 14, 2016, the DOJ announced it had charged (by information) Glazer and Malek, the former CEO and the former President, respectively, of Heritage, a competitor of Teva's, for their roles in conspiracies to fix prices, rig bids, and allocate customers, including manipulating the market for Glyburide from 2013 through the end of 2015. The connection between Teva and these charges was clear; Teva controlled over 75% of the market for Glyburide during the Class Period.

174.    The next day, December 15, 2016, the Connecticut AG announced that he and 19 other State AGs had filed a federal lawsuit for antitrust violations against Teva USA and five other major drug companies, alleging that Teva conspired on Glyburide. The State AGs' complaint cited emails, calls, and documents that evince explicit collusion between Teva and Heritage's principals, Malek and Glazer (the "States AG Action 1").

175.    The States AG Action 1 has been amended to include 13 additional drugs, seven of which implicate Teva, and 47 State AGs, and the AGs from the District of Columbia and Puerto Rico. That complaint is based in part on the cooperation of Glazer and Malek, who have settled with the State AGs in exchange for cooperation. The State AGs are now investigating conspiracies regarding upwards of 200 drugs and will file additional complaints in the future. Malek and Glazer have also pleaded guilty to Federal criminal charges, admitting that they participated in "a conspiracy to suppress and eliminate competition by allocating customers and fixing and maintaining prices for glyburide, from in or about April 2014 and continuing until at least December 2015," in violation of the Sherman Act.

176.    On the news of the DOJ charges and the filing of the State AGs' complaint, the prices of Teva Securities continued to decline. Between the close of trading on December 13, and December 16, 2016, the ADS price fell $1.15 or 3% to close at $36.51, and the Preferred Share price fell $28.00 or 4% to close at $645.00; the price of the Company's 2046 Notes also declined $17.54, a drop of 2.5%.

**January – August 2017**

177.    In view of Olafsson's departure, on January 6, 2017, Teva provided 2017 guidance a month early, announcing a significant reduction, and surprising analysts. Vigodman attributed the reduction to previously unannounced poor performance, and an "EBITDA gap of $1.2 billion emanating from our US generics business." Teva's legacy generics business "explain[ed] the majority of the gap." On this news, the price of Teva Securities plummeted.

178.    Vigodman failed to disclose that the EBITDA "gap" was actually attributable largely to the collapse of Teva's Price Fixing Effort, and the resulting steep decline in Inflated Profit. In 2016, Teva had generated only as much as $420 million in Inflated Profit, compared to $848 million in 2015. In each quarter of 2016, Inflated Profit declined at least 45% YOY. In 2016, Teva made only five modest (~25%) price increases, on drugs that had already been hiked.

179.    As a result of this new negative information, the prices of Teva Securities continued to decline. Between the close of trading on January 5 and January 6, 2017, the ADS price fell $2.86 or 7.53% to close at $35.10; the Preferred Share price fell $47.00 or 6.91% to a close at $633.00; and the prices of Teva's 2026 and 2046 Notes declined $10.96 or 1.17% and $17.75 or 2.01%, respectively.

180.    The following chart reflects the YOY reduction in Inflated Profit on a quarterly basis from 2015 to 2016:

| Inflated Profit ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| 2015 | $228 | $236 | $218 | $166 | $848 |
| 2016 | $124 | $114 | $97 | $86 | $421 |

181. Vigodman for his part, continued to claim that Teva's profitability since 2014 was "accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure," and "not by price."

**Vigodman is Terminated**

182. On February 6, 2017, Teva announced Vigodman's termination, effective immediately. Without a permanent replacement, Teva appointed Yitzhak Peterburg, its Chairman of its Board since January 2015, as Interim President and CEO. Investors reacted negatively on this news, and the price of Teva Securities dropped significantly. Once again, the reality was that Vigodman was fired; the Price Fixing Effort had collapsed, along with all the success that Vigodman had boasted about for years.

183. Analysts tied Vigodman's abrupt departure to the Company's poor financial performance in its generics business since no later than Q2 2016, as well as sustained difficulties for the generics business ahead. For example, in a February 6, 2017 report titled "CEO Transition Adds Further Uncertainty to Story," J.P Morgan reported "we view today's update as a disappointment, with arguably the two most important executives at Teva stepping down (Erez and Siggi Olafsson, CEO of generics) within the last several months at a time of significant fundamental challenges. With Teva facing headwinds across both its generics (incremental competition, pricing headwinds) and branded business … we continue to believe a near-term

recovery in the company's business is unlikely." Similarly, that day, Wells Fargo concluded that "more investors will be uneasy with the uncertainty of an unexpected and abrupt CEO departure."

184.    On this news, the prices of Teva Securities continued to decline. Between the close of trading on February 6 and on February 7, 2017, the ADS price fell $2.16 or 6.29% to close at $32.19; the Preferred Share price fell $29.00 or 4.57% to close at $605.00; Teva's 2026 Notes fell $13.69 (1.51%); the 2046 Notes fell $32.33 (3.76%).

185.    On February 13, 2017, Teva announced its full year 2016 and fourth quarter 2016 results. Defendants disclosed that, without the Actavis revenue, Teva would have reported a $233 million YOY decline in quarterly U.S. generics revenues but failed to disclose that as much as $80 million of that YOY decline resulted from the decline in Inflated Profit.

**186.**    As to the full year 2016, without Actavis, Teva would have reported a YOY U.S. generic revenue decline of $1.4 billion for the full year 2016, attributed to a loss of exclusivity, lower sales of certain drugs, and the loss of revenues from divested product, when in fact as much as $427 million of the yearly decline resulted from the decline in Inflated Profit.

**Desheh Finally Out; $6.1 Billion Charge Announced**

187.    Weeks later, on June 8, 2017, Teva announced the nomination of four new directors to its Board, in an attempt to assure investors that the Company was attempting to redeem itself and regain lost credibility. By June 21, 2017, Desheh was also out, leaving Teva for another job.

188.    On August 3, 2017, with Desheh, Vigodman, and Olafsson – the principal architects of Teva's Price Fixing Effort – finally gone, and with new Board members in place, Teva took a $6.1 billion charge against its U.S. generics business, a permanent reduction in the entire business's valuation and a dollar-for-dollar hit to the Company's bottom line. In addition, after at least thirty years of maintaining its shareholder dividend, Teva announced a 75% reduction in its

payout. In reporting a dismal loss of $5.94 per share, Teva also drastically revised the guidance issued in January (which already revised the July 2016 guidance); this guidance reduction was a direct result of the complete collapse of the Price Fixing Effort, and evaporation of the Inflated Profits, which by this point amounted to just $53 million per quarter, with no reason to believe that the erosion would abate.

189.    On this news, the credit rating agencies, concerned about Teva's ability to service over $30 billion in debt, downgraded Teva to just one notch above "Junk" rated debt. Investors fled Teva Securities, and the price of Teva's ADS fell dramatically.

190.    As investors digested the news, the prices of Teva Securities dropped. Between the close of trading on August 2 and the close of trading on Monday, August 7, 2017, the price of Teva's ADS fell $12.66 or 40.51% to close at $18.59; the Preferred Share price fell $184.50 or 32.92% to close at $376.00; the price of the 2018, 2019, 2021, 2023, 2026, and 2046 Notes fell $7.76 (.78%), $12.45 (1.25%), $30.10 (3.05%), $38.72 (3.95%), $40.88 (4.20%), and $57.51 (6.34%), respectively.

**Recent Events**

191.    On May 10, 2019 Attorney General William Tong for the State of Connecticut filed its second lawsuit - the States AG Action 2 – relating to the Price Fixing Effort. The May 12, 2019 press release relating to this lawsuit lists 114 drugs listed in the States AG Action 2 as subject to price-fixing and market allocation agreements, and states in relevant part:

**Second Lawsuit Filed in Ongoing, Expanding Investigation**

(Hartford, CT) – Attorney General William Tong led a 44-state coalition in announcing a lawsuit against Teva Pharmaceuticals and 19 of the nation's largest generic drug manufacturers alleging a broad conspiracy to artificially inflate and manipulate prices, reduce competition and unreasonably restrain trade for more than 100 different generic drugs. The lawsuit, filed in U.S. District Court for the District of Connecticut, also names 15 individual senior executive defendants at the

heart of the conspiracy who were responsible for sales, marketing, pricing and operations. The drugs at issue account for billions of dollars of sales in the United States, and the alleged schemes increased prices affecting the health insurance market, taxpayer-funded healthcare programs like Medicare and Medicaid, and individuals who must pay artificially-inflated prices for their prescriptions drugs.

***The complaint alleges that Teva***, Sandoz, Mylan, Pfizer ***and 16 other generic drug manufacturers engaged in a broad, coordinated and systematic campaign to conspire with each other to fix prices, allocate markets and rig bids for more than 100 different generic drugs***. The drugs span all types, including tablets, capsules, suspensions, creams, gels, ointments, and classes, including statins, ace inhibitors, beta blockers, antibiotics, anti-depressants, contraceptives, non-steroidal anti-inflammatory drugs, and treat a range of diseases and conditions from basic infections to diabetes, cancer, epilepsy, multiple sclerosis, HIV, ADHD, and more. In some instances, the coordinated price increases were over 1,000 percent.

The complaint lays out an interconnected web of industry executives where these competitors met with each other during industry dinners, "girls nights out", lunches, cocktail parties, golf outings and communicated via frequent telephone calls, emails and text messages that sowed the seeds for their illegal agreements. Throughout the complaint, defendants use terms like "fair share," "playing nice in the sandbox," and "responsible competitor" to describe how they unlawfully discouraged competition, raised prices and enforced an ingrained culture of collusion.

The lawsuit seeks damages, civil penalties and actions by the court to restore competition to the generic drug market.

**"We have hard evidence that shows the generic drug industry perpetrated a multi-billion dollar fraud on the American people. We have emails, text messages, telephone records, and former company insiders that we believe will prove a multi-year conspiracy to fix prices and divide market share for huge numbers of generic drugs. These are drugs that people in this country rely on every day for acute and chronic conditions and diseases from diabetes and cancer to depression and arthritis. We all wonder why our healthcare, and specifically the prices for generic prescription drugs, are so expensive in this country—this is a big reason why. This investigation is still in its early stages. We will not stop until these companies and the individuals who orchestrated these schemes are held accountable,"** said Attorney General William Tong.

***The complaint is the second to be filed*** in an ongoing, expanding investigation that the Connecticut Office of the Attorney General has referred to as possibly the largest cartel case in the history of the United States. ***The first complaint, still pending in U.S. District Court in the Eastern District of Pennsylvania, was filed in 2016 and now includes 18 corporate defendants***, two individual defendants, and 15 generic drugs. Two former executives from Heritage Pharmaceuticals, Jeffery

Glazer and Jason Malek, have entered into settlement agreements and are cooperating with the Attorneys General working group in that case. [Emphasis added in italics, only]

192.    In a *Forbes* June 12, 2019 article discussing the States AG Action 2 and titled "Move Over, Martin Shkreli: This Pharma Exec Is Accused Of Fixing Prices On 107 Drugs", it lists some of the pharmaceutical companies named in this lawsuit and charts the number of drugs alleged of collusion ranking each drug company.  ***Teva by far tops the list with 107 drugs***, followed by Mylan with only 36 drugs.  This article states in relevant part:

> In the new lawsuit, the states accuse Maureen Cavanaugh, the highest-ranking Teva executive named, of conspiring to raise prices on 107 generic drugs.
>
> * * *
>
> According to state attorneys, Cavanaugh oversaw a broad conspiracy at Teva that by 2012 involved multiple companies. There were three other key people involved in the effort, according to the lawsuit: David Rekenthaler, a Teva vice president of sales, who is also accused of conspiring to raise the prices of 107 drugs; Nisha Patel, a foot soldier who was hired by Teva's Philadelphia-area marketing department in 2013 and is alleged to have fixed the prices of 99 different drugs; and another, yet-to-be-identified marketing executive.
>
> Patel's role in the scheme was to identify which drugs Teva could raise prices on and tap into her longstanding industry relationships to make it happen, according to the suit. She kept all of her relationships with competitors on a spreadsheet and ranked them. Her alleged price-fixing communications took place by phone and via texts and social media. Patel relayed information about drug price increases and distributor allocations by a competitor to Cavanaugh, who approved the price increases, the states claim.
>
> Such price fixing has had a significant impact, not only for patients but also for the schemes' beneficiaries. According to the attorneys for the states' case, the cartel's price increases in the summer of 2013 created a windfall of $937 million in additional quarterly revenue for Teva alone. Patel received a $37,734 bonus that year, plus some 9,500 Teva stock options.
>
> According state attorneys, Cavanaugh held discussions with subordinates to go over price arrangements with competitors and at least once, in a bit of theatrics, put her hands over her ears, pretending not to hear what was being said.

Success in 2013 led Patel and others to come up with an even grander scheme for concerted price increases, all blessed by Cavanaugh, state government lawyers claim. This led to the April 4, 2014, price hike of 22 drugs. In the following year, Teva's stock climbed 20%.

On June 21, 2017, the feds showed up at Patel's home with a search warrant and seized her phone. Patel then used a different phone to alert Rekenthaler, who had left Teva to work at Apotex, another drugmaker. Rekenthaler immediately called Cavanaugh and spoke to her several times before calling his lawyer, the states allege.

Despite the sordid details and allegations laid bare in the lawsuit, Cavanaugh, et al. have been behaving as though they are Teflon Dons.

* * *

Likewise, Cavanaugh's career continues to flourish. She is now chief commercial operations officer at Lannett, a small Philadelphia area generic-drug maker with a history of boosting prices. Lannett has also has been accused by state attorneys general of price fixing and denies wrongdoing.

"[Cavanaugh] fundamentally used to run the majority of the generics business at Teva," boasted Lannett CEO Tim Crew in a speech to Wall Street investors soon after hiring her in April 2018.

## FORMER EMPLOYEE ALLEGATIONS

193.     Several former Teva employees provided information in the Securities Class Action on a confidential basis further evidencing that Defendants breached their duties when making the alleged materially false and misleading statements and omissions. The former employees' accounts corroborate one another and the additional facts alleged herein.

194.     Senior Product Operations Manager [or FE-1] started at Teva in 2005 and, until 2011, FE-1 worked in new generic drug forecasting. From 2011 to July 2014, FE-1 was a manager, responsible for forecasting and analysis of a product group, and from July 2014 through April 2016 was a Product Manager and then Senior Product Manager responsible for supply chain and inventory management of Teva's base-line generics business. In FE-1's most recent role, FE-1

reported to Bryan Bart who, in turn, reported to Galownia, Senior Director of Marketing. According to FE-1, based on personal knowledge:

> (i) Teva stored drug-by-drug pricing, sales, and revenue data on the Company's Oracle ERP System; (ii) the Company's long-range "Work Plan" forecasting 3-5 years of revenue on a granular level, and prepared annually following a predetermined scheduled, was reviewed and approved by Teva's U.S and Israeli executives; (iii) daily or weekly "Scorecards" that tracked generic drug revenues and informed Teva executives of any "holes" or "red flags" were distributed to Teva's top U.S. executives, including Griffin, Cavanaugh, Olafsson, and Oberman; (iv) quarterly Latest Best Estimates ("LBEs") comparing results to Work Plan forecasts were sent to U.S. and Israeli executives; (v) Teva increased prices when other companies did, when it had a monopoly, and when there was a shortage; (vi) Olafsson claimed that every company he joined acquired his previous employer; (vii) Nisha Patel ("Patel") was Teva's Director of Strategic Customer Marketing from April 2013 to August 2014 and Director of National Accounts from September 2014 to December 2016, and Patel was on maternity leave on or about August to December 2013; and (viii) that compensation structure for Teva's national account managers was not tied to individual performance.

195.   Senior Director of Trade Relations [or FE-2] worked at Teva from 2006 until August 2012. During his tenure, FE-2 was in charge of sales for the branded, generics, and injectables groups. FE-2 later, and until leaving Teva, oversaw the branded drug national account managers, reporting to the Head of U.S. Brands. FE-2 also remained involved and knowledgeable about Teva's U.S. generics. According to FE-2, based on personal knowledge:

> (i) Teva aligned its generic and branded segments under the "One Teva" motto; (ii) Galownia evaluated Teva's generics drug portfolio on a "constant and ongoing" basis to find opportunities to increase prices; (iii) Galownia was "just the guy doing the evaluation," as the decision to increase prices was made by senior executives, including Cavanaugh and Griffin, who would conduct their own evaluations of the costs and financial benefits of each price increase on a drug- by-drug basis, a process in which Christine Baeder, VP Commercial Operations, was also involved; (iv) Cavanaugh and Griffin reported directly to Oberman, and would later report to Olafsson; (iv) the process for increasing price could take up to 60 days, required formal notice to customers, and was done in batches; (v) it was critical to ensure that price increases would "stick," i.e., competitors would not undercut Teva's price increases; (vi) "everyone would have known," including, Oberman, and later Olafsson, if a large price increase generated significant profit, something which Cavanaugh, Griffin, Oberman, and later Olafsson, would track closely, if not daily; (vii) executives used price increases to "fill the hole," when actual revenue did not

meet forecasts; (viii) each year the finance and operations teams created a budget that included revenue forecasts; and (ix) the senior managers including Griffin, Cavanaugh, and Oberman, received reports on whether revenues were meeting forecasts up to four times per quarter;

196.    Associate Manager of Customer Marketing [or FE-3] worked at Teva from September 2014 until May 2016 and was a member of the pricing team. FE-3 reported to a person who reported to Galownia, who reported to Baeder and, for a time, to Cavanaugh. FE-3 was responsible for evaluating requests for proposals and assessing market pricing for generic drugs. According to FE-3, based on personal knowledge:

> (i) members of the Pricing Group could only lower prices of generic drugs after undertaking an extensively researched and documented analysis; (ii) when prices were increased, the Pricing Group was "told" to increase the price in a meeting or via email, often from Galownia; (iii) Galownia did not have the authority to raise prices, decisions to raise prices came from higher-level management; (iii) customers were informed of price increases; (iv) even a small change in price (e.g., $0.25) could have a "huge impact" on revenues; (v) a shared Excel file, kept on a shared electronic drive, contained pricing information and was readily accessible to the Pricing Group and top Teva executives; (vi) the Company stored pricing and revenue data "down to the NDC code" on the Oracle system; and (vii) executives, including Cavanaugh, Oberman, and Olafsson, had access to the Oracle ERP System, and were routinely filled in on sales numbers.

197.    Manager of Customer Operations [or FE-4] was employed at Teva from April 2008 to April 2014 and was responsible for metrics for the phone system and managing the process for customer calls to Teva regarding generic drugs. FE-4 reported directly to Baeder until 2012, and later to Michelle Osmian. According to FE-4, based on personal knowledge:

> (i) in the early part of 2013, at a quarterly marketing group "all- hands" meeting that FE-4 attended, along with additional pricing, sales, finance, and customer service employees at Teva's North Wales U.S. headquarters, Galownia informed the attendees that Teva was implementing a strategy to increase the prices of generic drugs; (ii) Galownia could not approve price increases, as Cavanaugh, or an executive above her made these decision; (iii) after a price increase, Teva would send letters to customers informing them of the increase; the letters were also emailed to Teva employees whose work was impacted by price increases; (iv) Teva regularly raised prices on generics from 2013 onward and was "getting more aggressive with pricing" by raising prices more frequently up until the time of FE-

4's departure in April 2014; and (v) consumer complaints would rise following price increases, and the complaints were logged and sent to Baeder on a monthly basis.

## THE RELEVANT OFFERINGS

### The ADS/Preferred Offerings

198.    On November 30, 2015, Teva filed with the SEC a Form 6-K and press release, announcing that it was commencing two concurrent public offerings totaling approximately $6.75 billion. These offerings consisted of approximately $3.375 billion of its ADS and approximately $3.375 billion of its Preferred Shares, and were announced pursuant to a prospectus and related prospectus supplements constituting part of Teva's shelf registration statement on Form F-3 filed with the SEC on November 30, 2015 (the "ADS/Preferred Registration Statement").      Each ADS represents one ordinary share of Teva, and each Preferred Share will automatically convert on December 15, 2018 into 13.3333 to 16 ADS, subject to anti- dilution adjustments. Likewise, on November 30, 2015, Teva also filed with the SEC, pursuant to Rule 424(b)(5), the preliminary prospectus supplement for the ADS Offering and the preliminary prospectus supplement for the Preferred Offering, each dated November 30, 2015.

199.    On December 3, 2015, Teva filed with the SEC a Form 6-K, announcing the pricing of the ADS/Preferred Offerings. That same day, Teva also filed with the SEC, pursuant to Rule 424(b)(5), the final ADS Prospectus (the "ADS Final Prospectus") and final Preferred Prospectus (the "Preferred Final Prospectus"), and, pursuant to Rule 433, a free writing prospectus and pricing term sheet, all dated December 2, 2015.

200.    The ADS Offering and the Preferred Offering are referred to collectively as the "ADS/Preferred Offerings." The ADS/Preferred Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of the ADS/Preferred

Registration Statement, including the ADS Final Prospectus and the Preferred Final Prospectus, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "ADS/Preferred Offering Materials."

201.   On December 8, 2015, Teva closed the ADS/Preferred Offerings and issued 54 million ADS at $62.50 per ADS and 3,375,000 Preferred Shares (7.00% mandatory convertible preferred shares, nominal (par) value NIS 0.10 per share) at $1,000.00 per share. The Company's net proceeds, after estimated underwriting discounts, commissions, and offering expenses by Teva, were approximately $3.29 billion from the ADS Offering and approximately $3.29 billion from the Preferred Offering, for a total of approximately $6.58 billion.

202.   Certain underwriters of the ADS/Preferred Offerings exercised their options to purchase additional ADS and Preferred Shares to cover overallotments; Teva issued an additional 5.4 million ADS and an additional 337,500 Preferred Shares at the time of such purchases, on January 6, 2016. As a result, Teva received an additional $329 million in net proceeds for the ADS Offering and an additional $329 million in net proceeds for the Preferred Offering, for an aggregate of approximately $3.62 billion for the ADS Offering and an aggregate of approximately $3.62 billion for the Preferred Offering. As a result of the ADS Offering and the Preferred Offering, Teva raised a total of approximately $7.24 billion.

**The Notes Offering**

203.   On July 12, 2016, Teva filed with the SEC a Form 6-K and, under Rule 433, a free writing prospectus dated July 12, 2016, each of which announced a conference call and webcast to provide a preliminary outlook for 2016-2019. On July 13, 2016, Teva filed with the SEC its Post-Effective Amendment No. 1 to its shelf registration statement on Form F-3 (Registration Nos. 333-201984, 333-201984-09), superseding the original base prospectus dated February 9, 2015

(the "Notes Registration Statement") and, under Rule 433, a free writing prospectus in the form of an investor presentation titled "2016-2019 Preliminary Financial Outlook" dated July 13, 2016.

204.    On July 15, 2016, Teva filed with the SEC, under Rule 424(b)(5), a preliminary prospectus supplement for the Notes Offering dated July 18, 2016. Then, on July 19, 2016, Teva filed with the SEC, pursuant to Rule 424(b)(5), its final Notes Prospectus (the "Notes Final Prospectus") and, under Rule 433, two free writing prospectuses, all dated July 18, 2016.

205.    The ADS/Preferred Offerings and the Notes Offering are referred to collectively as the "Offerings." The Notes Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of the Notes Registration Statement, including the Notes Final Prospectus, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "Notes Offering Materials," and, collectively with the ADS/Preferred Offering Materials, the "Offering Materials."

206.    On July 21, 2016, Teva consummated, through Teva Finance, its special purpose finance subsidiary, the offering of an aggregate of $15 billion of debt securities comprised of (i) $1,500,000,000 of 1.400% Senior Notes due 2018; (ii) $2,000,000,000 of 1.700% Senior Notes due 2019; (iii) $3,000,000,000 of 2.200% Senior Notes due 2021; (iv) $3,000,000,000 of 2.800% Senior Notes due 2023; (v) $3,500,000,000 of 3.150% Senior Notes due 2026; and (vi)

207.    $2,000,000,000 of 4.100% Senior Notes due 2046 (collectively, the "Notes" and the "Notes Offering"). The payment of principal and interest was unconditionally guaranteed by Teva. After underwriting discounts and estimated offering expenses payable by the Company, Teva's net proceeds from the Notes Offering were approximately $14.9 billion.

**Teva Filings Incorporated into the Offering Materials**

208.    The ADS/Preferred Registration Statement, the ADS Final Prospectus, and the Preferred Final Prospectus each incorporated by reference various documents that Teva had previously been filed with the SEC. Specifically, each of those Final Prospectuses incorporated by reference Teva's 2014 20-F, Q1 2015 6-K, Q2 2015 6-K, and Q3 2015 6-K. The incorporated 2014 20-F and Q1, Q2, and Q3 2015 Forms 6-K contained material misstatements and omissions concerning (i) the Price Fixing Effort and the benefits and risks stemming therefrom; (ii) material trends that were not disclosed under Item 5 of Form 20-F; and (iii) the purported competitiveness of the U.S. generics market and Teva's relationship to that market, as well as other topics discussed below.  The statements and omissions in the 2014 20-F, the Q1, Q2 and Q3 2015 6-Ks and the reasons why they are materially misleading are set forth in ¶¶ 217-346.

209.    The Notes Final Prospectus incorporated by reference various documents that had previously been filed with the SEC. Specifically, the Notes Final Prospectus incorporated by reference the 2015 Form 20-F and the Q1 2016 6-K. The incorporated 2015 Form 20-F and Q1 2016 6-K contained material misstatements and omissions concerning (i) the Price Fixing Effort and the benefits and risks stemming therefrom; (ii) the purported competitiveness of the U.S. generics market and Teva's relationship to that market; and (iii) material trends that were not disclosed under Item 5 of Form 20-F. The statements and omissions contained in the 2015 Form 20-F and the Q1 2016 6-K and the reasons why they are materially misleading are described above in ¶¶ 217-346.

**The Offering Materials Contained Material Misstatements and Omissions**

210.    The Offering Materials incorporated Teva's 2014 and 2015 Form 20-Fs, as well as the Company's Q1, Q2, and Q3 2015 6-Ks, and the Company's Q1 2016 6-K. Accordingly, the Offering Materials contained material misstatements and omissions.

**Material Misstatements and Omissions Concerning the Price
Fixing Effort and the Benefits and Risks Stemming Therefrom**

211.    The Offering Materials contained material misstatements and omissions concerning the attribution of the sources of Teva's generic segment's revenues and profit during the Class Period. The statements and omissions contained in the 2014 20-F, the Q1, Q2 and Q3 2015 6-Ks and the reasons why they are materially misleading are described in ¶¶ 235-346.

212.    In sum, the various financial disclosures regarding the sources of Teva's generic revenues and profits contained within the incorporated filings were materially misstated because they failed to disclose the Price Fixing Effort, pursuant to which Teva implemented price hikes on a number of Teva's generic drugs (as more fully described herein), generating a significant amount of Inflated Profit as a result of those price hikes that was unsustainable, while attributing the source of those profits to other sources and failing to disclose that they were caused by concealed price hikes.

213.    Moreover, as to the incorporated 2015 Form 20-F and the Q1 2016 6-K, those filings also failed to disclose that, starting in the latter part of 2015, Teva was increasingly unable to successfully execute the Price Fixing Effort. Specifically, the Company could no longer maintain the profits from the price increases as a result of the materialization of the risks concealed by the failure to disclose the Price Fixing Effort. Those materialized risks included: (i) increased public, legislative, and regulatory scrutiny of generic drug increases that undermined Teva's ability to sustain Inflated Profit from price increases and/or implement further price increases; (ii) increased legislative and law enforcement scrutiny that resulted in legal actions being taken against Teva; (iii) increased competition from other generic manufacturers who undercut Teva's raised prices as they themselves faced increased scrutiny; and (iv) significant disruption caused by the

termination of the senior management who was responsible for the strategy, and the attendant resources required to locate and hire suitably qualified replacements.

**Material Misstatements and Omissions Concerning Known
Trends Required to be Disclosed Pursuant to Item 5 of Form 20-F**

214.  Incorporating Teva's 2014 and 2015 Form 20-Fs, the Offering Materials contained material misstatements and omissions in that they violated SEC Item 5 of Form F-20 by failing to disclose two known trends. (¶¶ 219-225).   Defendants failed to disclose the trend that Teva's financial success was materially dependent on the Price Fixing Effort and the attendant price increases on generic drugs that generated significant amounts of Inflated Profit. These price increases generated as much as $2.3 billion in profit for Teva over the Class Period. Yet, the existence of this trend and the related risks and uncertainties surrounding its source and sustainability were concealed. Moreover, beginning in February 2016, Defendants failed to disclose the known trend that increased pricing pressure was causing Teva's Inflated Profit generated from the price increases to decrease precipitously, from $218 million in Q3 2015, to $166 million in Q4 2015, to $124 million in Q1 2016, with all then- known financial information indicating future profit deterioration and price erosion.

**Material Misstatements and Omissions Concerning
Competition in the U.S. Generics Market**

215.  Incorporating Teva's 2014 and 2015 Form 20-Fs, the Offering Materials contained material misstatements and omissions in that they, among other things, purportedly (i) warned investors that one of the primary risks that Teva faced was the "intense" competition in the U.S. generic drug market, and that this competition would force the price of generic drugs down; and described how Teva's competitive advantage was a "competitive pricing strategy" and the ability

to launch new generics. These statements and omissions were materially misstated for all of the reasons described above in ¶¶ 226-34.

**FALSE AND MISLEADING STATEMENTS AND OMMISSIONS**

216.    During the Class Period, Defendants and other Teva executives made three types of false and misleading statements or omissions on conference calls with investors and in SEC filings:

- <u>Item 5</u>. Defendants violated their statutory duty to disclose material trends under Item 5 of Form 20-F. Defendants failed to disclose the material trend of generating profit as part of the concealed Price Fixing Effort. They also concealed the trend of declining Inflated Profit, and that they could no longer make price increases as the strategy unraveled.

- <u>False Statements Regarding Competition</u>.  These statements falsely indicated that Teva was participating in competitive and functioning markets for generic drugs. To the contrary, Teva made dozens of price increases in tandem with its competitors. Teva and these companies deliberately did not compete on price.

- <u>False and Misleading Pricing Statements.</u>  These statements concealed Teva's Price Fixing Effort and the profits it generated. Later, the statements concealed that the Price Fixing Effort fell apart as Teva was unable to make more price increases or sustain Inflated Profit. These statements were particularly misleading as the 34 Act Defendants touted, and investors were highly attuned to, the sources of the generic segment's purported success.

217.    The alleged false and misleading statements and omissions below that were made in Teva's financial disclosures filed with the SEC and were attributable to Defendants and other Teva executives as follows: Desheh was responsible for and signed each Form 20-F and 6-K. Vigodman was responsible for each Form 20-F and 6-K filed during his tenure as Teva's CEO. Olafsson was responsible for the reporting for Teva's generics segment in each Form 20-F and 6-K from the third quarter of 2014 through the third quarter of 2016. Oberman was responsible for the financial reporting for Teva's U.S. generics segment in Teva's Form 20-F for 2013, and Teva's 6-Ks for the first three quarters of 2014.

71

**Defendants Violated Their Statutory Duty to Disclose Pricing Trends**

218.   During the Class Period, Defendants were under a statutory duty of disclosure pursuant to Item 5 of Form 20-F ("Item 5"), interpreted by the SEC and courts to require the same disclosures as Item 303 of Regulation S-K ("Item 303"). Item 303 (and Item 5) require that a foreign issuer like Teva must, in the Management Discussion and Analysis ("MD&A") section of its Forms 20-F, describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or, unfavorable impact on net sales or revenues or income from continuing operations.  The failure to disclose a material trend or uncertainty in violation of Item 303 is an omission that is actionable under the securities laws.

219.   According to the SEC's interpretive release regarding Item 303, disclosure is necessary where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations. Even if Defendants were not certain about the likely effect of the event or trend on their future revenues, Defendants were still required under Item 303 to disclose the manner in which that then-known trend, event, or uncertainty might reasonably be expected to materially impact Teva's future revenues.

220.   SEC Staff Accounting Bulletin No. 104 explains this disclosure duty further, requiring that management disclose in the MD&A section the impact of artificial or collusive price increases, demanding that: "Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease."

221.   During the Class Period, under Item 303, Defendants failed to disclose at least two trends related to the pricing of Teva's generic drugs. First, Defendants failed to disclose the trend

that Teva's financial success was driven in a material way by the Price Fixing Effort. These price increases, as discussed, generated as much as $2.3 billion in Inflated Profit for Teva over the Class Period. Yet, the Price Fixing Effort and the Inflated Profits it generated were risky and unsustainable as the Price Fixing Effort was susceptible to actual competition, as well as public scrutiny, and scrutiny by legislatures, regulators and criminal investigators.

222.    Second, starting no later than the beginning of 2016, Defendants failed to disclose the by-then known trend that the Price Fixing Effort was beginning to fail. Teva could not maintain the Inflated Profits as industry-wide pricing pressure, which Defendants consistently denied, was reducing the inflated prices on Teva's generic drug portfolio. Teva was also finding it increasingly difficult, if not impossible, to make additional price increases because of the scrutiny from the public, Congress, and the DOJ and State AGs investigations; and indeed, Teva effectively could not make any price increases after the DOJ subpoena was served on June 21, 2016.

223.    SEC Release No. 33-8350 provides MD&A disclosure guidance that is a nearly perfect analogy to the facts here, requiring that:

> if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the reasons are also material and determinable. The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.

224.    Instead, in violation of its duties under Item 303, Teva only disclosed trends that did not bear on the issue of price inflation (through price increases), or price erosion. Teva's failure to disclose the pricing trends was particularly misleading given that (i) price increases were a core but concealed business strategy; (ii) management concurrently denied that pricing had impacted Teva's bottom line and that the Company made price increases simply for profit, (iii) management

consistently minimized the positive impact of price increases on Teva's profits, (iv) management consistently denied that price increases had resulted in price inflation, and (v) management denied that price deflation was materially affecting Teva, even as its revenues from the former price increases cratered.

**Defendants' False and Misleading Statements that Teva**
**Operated in a Competitive Market with Respect to Price**

225.    Throughout the Class Period, on conference calls and in Teva's SEC filings, Defendants and other Teva executives made materially false and misleading statements concerning purported "intense" or "fierce" competition on price in the U.S. market for generic drugs. These statements gave investors the false impression that the markets for generic drugs were functioning as intended. Given that their products are undifferentiated commodities, the only way that generics manufacturers can compete is on the price of their products. Such competition is the very purpose of the generics market, which was created to drive the price of generic drugs towards their marginal cost of production, opening access for patients to life-saving medicines.

226.    Defendants' statements about supposed competition on price by generics manufacturers were false and misleading because Teva was not in fact competing on price. Instead, Teva and its competitors, on at least 48 occasions, raised their prices in tandem, often in very large amounts of well over 100%, rather than use lower prices to increase market share. Teva would also raise the price of drugs on which it had a monopoly, while other generics manufacturers stayed on the sidelines instead of entering the market. Teva was profiting from a lack of competition, not from thriving in a competitive market environment. The markets for generic drugs were not functioning competitively; rather than compete, generic drug manufacturers would deliberately and intentionally choose not to.

**False Statements on Conference Calls**

**July 25, 2015 Conference Call**

227.    On Teva's investor call to discuss the Actavis acquisition, Olafsson responded to a question concerning the competitive landscape of the generic drug market, stating:

> *the U.S. generic market is very competitive … [T]here's fierce competition on most of the portfolio, if not all of the portfolio.*

228.    On that same conference call, Vigodman added:

> we promise to do everything in our power to basically take the company to be able to continue the improvement that we have been witnessing here. *We believe in competition*, and we'll do what is needed in order to win in all the markets we operate.

**October 29, 2015 Earnings Call**

229.    On the earnings call relating to Teva's Q3 2015 financial results, Olafsson similarly falsely stated:

> So on the pricing, I think *pricing is obviously based on the competition*. We have talked about that the overall pricing trend is down.

**November 19, 2015 Conference Call**

230.    Desheh, on an additional investor conference call, again falsely stressed that Teva was fiercely competing in generics markets:

> Generic prices. There is – there are no – I don't believe that there are many examples for competitive environment, real competition, like we see in generic market in the United States … So *it is a highly competitive environment with players coming from all over the world with a very fierce price competition*. The price of generic went down 50% over the past 10 years .… So we're playing a competitive game. We're playing it fairly. *We of course play by the book and by the rule* … And we are in short playing in a very competitive market.  [Emphasis added].

231.    These statements were false and misleading.  Contrary to Olafsson's July 27, 2015 statement, by that time there was not "fierce competition on most of … if not all of" Teva's generic drug portfolio. Since July 2013, Teva had made, pursuant to the Price Fixing Effort, 61 price

increases without any competitor competing on price. At least 48 of those price increases were made in tandem with Teva's supposed competitors. Vigodman's July 27, 2015 statement that "we believe in competition" was also false as a result, and the fact that Defendants had adopted and participated in the Price Fixing Effort, the success of which depended on a lack of competition. Olafsson's October 29, 2015 declaration that "pricing is obviously based on competition" was false because, by then, the opposite was true: pricing for the drugs subject to the Price Fixing Effort was based on a distinct lack of competition. Desheh's November 19, 2015 statements that Teva was "playing a competitive game…by the rule" in the generics markets was false and misleading for all the reasons that the other statements were. Each of these statements was particularly misleading given the importance of the concealed price increases to Teva's bottom line, and because the profits from this concealed source were in fact the centerpiece of Teva's supposed turn-around and its success.

**False Statements in Teva's SEC Filings**

232.    In each of the Forms 20-F that Teva filed for the years 2013, 2014, and 2015, Defendants made substantively identical false and misleading statements (adopted by reference in each quarterly filing) that (i) warned investors that "intense" competition was a primary risk Teva faced in the U.S. generic drug market, and that competition would force the price of generic drugs down, as would be expected; and (ii) described how Teva's competitive advantage was a "competitive pricing strategy" and the ability to launch new generics:

> ***Our generic drugs face intense competition***. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

***In the United States, we are subject to intense competition*** in the generic drug market from other domestic and foreign generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. ***Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio***. We believe we have a focused and competitive pricing strategy.  [Emphasis added].

233.    Each of these statements was materially false and misleading because, while Defendants represented that the U.S. generic drug market was working effectively as designed by forcing rival generic drug manufacturers to compete for market share by underbidding each other on price, the opposite was true. Teva had made dozens of price increases over this time, including dozens in tandem with competitors. The statements to the effect that that "price typically declines, often dramatically" because of competition, resulting in "margin pressure," and that Teva's means to combat the purported effects of competition were through launches and a "competitive pricing strategy," were false and misleading because they concealed that in 2013, 2014, and 2015 Teva implemented the Price Fixing Effort and undertook, respectively, 18, 31, and 18 systematic increases of generic drug prices to generate billions in Inflated Profits, by deliberately taking advantage of markets that lacked competition.

**False and Misleading Statements and Omissions Regarding Pricing**

234.    Defendants made numerous statements to conceal their Price Fixing Effort and its effects. Those false and misleading statements fall into four general categories:

(a)    Statements in SEC filings that attribute the YOY changes in Teva's generic segment profit and U.S. generic revenues to sources other than the YOY changes in Inflated Profit from collusive price hikes, which are misleading half-truths. Once Defendants spoke

on these subjects, they had a duty to fully and accurately describe the source of Teva's profits;

(b)     Flat denials that Teva had engaged in and derived material financial benefit from collusive price increases;

(c)     False claims of limited price hikes asserting that Teva only raised prices on a select few generic drugs when there was a shortage or other abnormality in the market of that drug, when in fact none of the dozens of price increases the Company made were accompanied by a shortage; and

(d)     Denials of pricing pressure even as Teva could not maintain the Inflated Profit from price increases or implement new price increases.

**Fourth Quarter and Full Year 2013 False and Misleading Financial Disclosures**

235.     On February 6, 2014, Teva filed a press release disclosing its fourth quarter 2013 ("Q4 2013") financial results (the "Q4 2013 Press Release") and held an investor earnings conference call (the "Feb. 6, 2014 Earnings Call"). On February 10, 2013 Defendants filed Teva's annual report with the SEC on Form 20-F (the "2013 20-F"), reporting Teva's full-year 2013 financial results.

**Q4 2013 Press Release**

236.     The Q4 2013 Press Release announced U.S. generics revenues of $1.2 billion for the fourth quarter, a YOY increase of $144 million, or 14%, with the attribution that the increase:

> *[r]esulted mainly from the exclusive launches of [niacin ER and temozolomide] … in the third quarter of 2013, and launches of [duloxetine and tobramycin] … in the fourth quarter of 2013, as well as higher sales of budesonide inhalation.* [Emphasis added].

237.     The statements were false and misleading because, having attributed the source of the revenue increase, Defendants had a duty to disclose, but concealed the full truth that the Price

Fixing Effort, whereby Teva made at least 18 systematic price hikes in July and August 2013, contributed materially to the results. These price increases generated as much as $147 million in Inflated Profit in Q4 2013, comprising the entire YOY increase in U.S. generic revenues.

**2013 20-F**

238.    The 2013 20-F disclosed a YOY decline in generic profit of $400 million, or 20%, "primarily" attributed to:

> "lower revenues and lower gross profit, which were partially offset by a reduction in selling and marketing expenses," and "by sales of higher profitability products in the United States."

239.    The statements were false and misleading because, while Defendants attributed the sources offsetting the decline, they had a duty to disclose but concealed the full truth that the Price Fixing Effort, whereby Teva made at least 18 systematic price hikes in July and August 2013, contributed materially to the results. These price increases generated as much as $250 million in Inflated Profit in 2013 and, without that Inflated Profit, Teva would have reported a $650 million YOY decline in generic profit, or a 32% decrease, rather than the 20% decline reported by the 2013 20-F. The contribution of the Inflated Profit was significant, particularly in comparison to the attributed reduced S&M expenses, which declined only $26 million compared to 2012.

**First Quarter 2014 False and Misleading Financial Disclosures**

240.    On May 1, 2014, Teva held an investor earnings conference call ("May 1, 2014 Earnings Call"). On May 2, 2014, Teva filed its first quarter 2014 (the "Q1 2014") financial statements on Form 6-K with the SEC (the "Q1 2014 6-K").

241.    The Q1 2014 6-K disclosed a YOY increase in generic profit of $117 million, or 31%, which was purportedly "primarily" due to:

> "[H]igher revenues, higher gross profit and a reduction in selling and marketing expenses," **with higher gross profit attributed to "the change in the composition**

*of revenues in the United States and Europe, mainly products launched during the first quarter of 2014 and in the United States in the second half of 2013*." [Emphasis added].

242.    During the May 1, 2014 Earnings Call, Desheh attributed the growth in U.S. generic revenues to "new product launches":

> Teva's generics division "experienced significant growth in the United States market, with *17% year-over-year growth, to a total of $1 billion with a number of new product launches*."  [Emphasis added].

243.    The statements were false and misleading because, having attributed the sources of the increases, Defendants had a duty to disclose but concealed the full truth that the Price Fixing Effort, whereby Teva made at least 18 systematic price hikes implemented in July and August 2013, contributed materially to the results. The price increases generated as much as $120 million in Inflated Profit in Q1 2014 that accounted for all of the increase in generic profit, and nearly all of YOY growth in U.S. generic revenues. The Inflated Profit amounted to nearly three times the $42 million YOY reduction in S&M expenses.

**Second Quarter 2014 False and Misleading Financial Disclosures**

244.    On July 31, 2014, Teva filed its second quarter 2014 ("Q2 2014") financial statements on Form 6-K with the SEC ("Q2 2014 6-K") and held an investor earnings conference call ("July 31, 2014 Earnings Call").

245.    The Q2 2014 6-K disclosed a YOY increase in generic segment profit of $156 million, or 41%, "primarily" attributed to:

> "[A] significant reduction in selling and marketing expenses, higher revenues and higher gross profit," which was attributed to "*higher revenues in the United States, specifically of products launched during the first half of 2014* and in the second half of 2013, and higher revenues in Canada as well as … the change in the composition of revenues in Europe."  [Emphasis added].

246.    On the July 31, 2014 Earnings Call, Desheh similarly attributed the "better results" in Teva's generic segment to:

> *The launches of "generic Xeloda in March and generic LOVAZA this quarter in the U.S. market."* [Emphasis added].

247.    The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price Fixing Effort, whereby Teva made at least 30 systematic price hikes since July 2013, 12 of which were made in April 2014, contributed materially to the results. These price increases generated as much as $160 million in Inflated Profit in Q2 2014 that comprised all of the YOY increase in generic profit and amounted to more than one and a half times the $101 million YOY reduction in S&M expenses Defendants attributed the generic profit increase

**Third Quarter 2014 False and Misleading Financial Disclosures**

248.    On October 30, 2014, Teva filed its third quarter 2014 ("Q3 2014") financial statements on Form 6-K with the SEC (the "Q3 2014 6-K") and held an investor earnings conference call (the "Oct. 30, 2014 Earnings Call").

249.    The Q3 2014 6-K disclosed a YOY increase in generic profit of $160 million, or 40%, which was purportedly "primarily" from:

> "[H]igher gross profit and a significant reduction in selling and marketing expenses," *with higher gross profit attributed to "lower expenses related to production, higher revenues from our API business as well as higher gross profit due to the change in the composition of revenues*." [Emphasis added].

250.    During the Oct. 30, 2014 earnings call, Vigodman also attributed Teva's results to new products:

> "I think overall, we have a good revenue of the new launches this year – capecitabine, the generic Lovaza, Omega-3 and entecavir.  Entecavir was a new launch for us in the quarter. *I think all these three products have been very significant contributors to the year*." [Emphasis added].

251.    The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price Fixing Effort, whereby Teva made at least 50 systematic price hikes since July 2013, 20 of which were made in Q3 2014, contributed materially to the results. These price increases generated as much as $193 million in Inflated Profit in Q3 2014, a YOY increase of $90 million. That YOY increase of as much as $90 million accounted for over half of the YOY increase in generic profit and was more than the entire $81 million YOY reduction in S&M expenses to which Defendants attributed the generic profit increase.

**October 30, 2014 Earnings Call**

252.    By this time, Congress had sent a letter to Vigodman requesting information regarding price increases, Lannett and Impax had both disclosed subpoenas from the Connecticut AG, and articles had highlighted increased drug prices on certain drugs Teva did not sell. In this context, on the Oct. 30, 2014 earnings call, the UBS analyst asked "could you talk about Generics a little bit in the U.S. … whether there were price increases in some of your base business and whether that impacted some of" Teva's financial performance?

253.    Vigodman denied that Teva was engaged in any price increases, particularly any that had resulted in hundreds of millions of dollars in Inflated Profit:

> I think that pricing – I've said it before, ***there's never a price increase on the base business as a whole***. Like any other business, if there's a pricing opportunity that comes in the market, we look for that. But the base business itself has been eroding overall because of the consolidation of the customers.  [Emphasis added].

Vigodman then explained that the market was functioning under normal conditions, i.e., that prices increase only where there are shortages or market dynamics:

> ***When there's an opportunity, when there is a shortage in the market, we obviously look for pricing like any other business. But overall, as I've said many***

82

***times before, the base business itself is slowly eroding, the overall of the base
business***.  [Emphasis added].

254.    Vigodman's statements were false and misleading because, far from price increases

only occurring when there are shortages or market dynamics so dictate, Teva had adopted the Price

Fixing Effort. Vigodman concealed that Teva had increased prices on 50 drugs and that those

concealed increases—the very subject of the UBS analyst's question—resulted in as much as $720

million in Inflated Profit reported since the start of the Class Period, and as much as $193 million

in Q3 2014 alone, on drugs for which there were no shortages.

**December 11, 2014 False and Misleading Statements**

255.    On December 11, 2014, Teva held a guidance call to discuss Teva's 2015 business

outlook (the "Dec. 11, 2014 Guidance Call"). On the call, and in light of increased reports of price

hikes on generic drugs, the Morgan Stanley analyst asked: "with respect to generic inventory in

the channel, both for Teva and for other generic manufacturers, I'm assuming that wholesalers

have been seeing extraordinary price increases in recent years and has been buying inventory ahead

of tremendous price increases?"

256.    Olafsson flatly denied even the existence of price increases, and minimized the

possibility that Teva had engaged in large price increases:

> So first let me correct. ***I have to disagree that they have experienced tremendous
> price increase. I think, overall, the pricing in the U.S. of generics has been flat to
> a slight down.*** There has been a lot of press about price increases on individual
> molecules and this has been a hot political issue ***selecting a few products***.
> [Emphasis added].

257.    The statements were false and misleading because, in responding to a direct

question regarding price hikes, Olafsson had a duty to disclose but concealed the full truth that the

Price Fixing Effort, whereby Teva made at least 50 systematic price hikes since July 2013, with

32 in 2014, contributed materially to the results. Far from a limited issue involving "a few

products," by Q3 2014, Teva's dozens of increases generated a total of as much as $720 million in pure profit, which would increase to as much as $943 million by the end of 2014. Olafsson's statement that pricing had been "flat to a slight down" across the U.S. generics market concealed the full truth that Teva's business model since 2013 had generated 30% of Teva's overall profit from drastic price increases on generics drugs.

**Fourth Quarter and Full Year 2014 False and Misleading Financial Disclosures**

258.    On February 5, 2015, Teva filed a press release with the SEC that reported the Company's fourth quarter 2014 ("Q4 2014") and full year 2014 ("FY 2014") financial results (the "Q4 2014 Press Release"). Also that day, Teva filed its 2014 20-F with the SEC (the "2014 20-F") reporting the Company's FY 2014 financial results and held an investor earnings conference call (the "Feb. 5, 2015 Earnings Call"). The false statements in the 2014 20-F are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus, and the Preferred Final Prospectus.

**Q4 2014 Press Release**

259.    The Q4 2014 Press Release disclosed a YOY increase in generic profit of $47 million, or 9%, attributed "primarily" to: "[O]ur lower S&M expenses and lower R&D expenses." The statement was false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price Fixing Effort, whereby Teva made at least 50 systematic price hikes since July 2013, 32 of which were made in 2014, contributed materially to the results. These price increases generated as much as $219 million in Inflated Profit in Q4 2014, a YOY increase of as much as $72 million. That $72 million YOY increase accounted for the entire YOY increase in generic profit. In contrast, Defendants attributed

the increased generic profit to a $113 million YOY reduction in S&M expenses, and an $8 million YOY reduction in R&D expenses.

**2014 20-F**

260.     The 2014 20-F disclosed a YOY increase in generic profit of $480 million, or 29%, attributed to:

> "*lower S&M expenses and higher gross profit,*" which was purportedly "*mainly a result of higher revenues in the United States, specifically of products launched during 2014* and in the second half of 2013, and higher revenues in Canada, which led to higher gross profits, as well as higher gross profit from API sales to third parties." [Emphasis added].

261.     The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price Fixing Effort, whereby Teva made at least 50 systematic price hikes since July 2013, 32 of which were made in 2014, contributed materially to the results. These price increases generated as much as $693 million in Inflated Profit in 2014, a YOY increase of as much as $443 million, which increase accounted for nearly the entire YOY increase in generic profit, and was more than the entire $337 million reduction in S&M expenses to which Defendants attributed the increase in generic profit.

262.     The table below reflects Teva's improved profits as reported in 2014, as well as the YOY change in Inflated Profits for the same period:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $117 | $156 | $160 | $47 | $480 |
| (Unreported) YOY Change in Inflated Profit | $120 | $160 | $90 | $72 | $443 |

**First Quarter 2015 False and Misleading Financial Disclosures**

263.    On April 30, 2015, Teva filed its first quarter 2015 ("Q1 2015") financial statements

on a Form 6-K with the SEC (the "Q1 2015 6-K") and held an investor earnings conference call

(the "April 30, 2015 Earnings Call"). The false statements in the Q1 2015 6-K are also incorporated

by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin

signed, the ADS Final Prospectus and the Preferred Final Prospectus.

264.    The Q1 2015 6-K disclosed a YOY increase in generic profit of $296 million, or

59%, attributed "primarily" to:

> "*higher gross profit and lower selling and marketing expenses as well as lower research and development expenses,*" *with higher gross profit purportedly "mainly a result of the launch of esomeprazole in the United States* during the quarter and improved profitability of our European business." [Emphasis added].

265.    On the April 30, 2015 Earnings Call, Olafsson similarly concealed the impact of

the Price Fixing Effort when discussing the sources of the improvements in generic profitability

since the beginning of 2014. On the call, the Bank of America analyst asked, "[H]ow much more

potential exists to increase generic segment margins purely from organic gains and operational

efficiency?" Olafsson claimed that the "1,000 basis points improvement over a two years period"

in "operating profit in the generic segment" was attributable to:

> [P]robably three or four things. *First of all, … significant improvement in our cost of goods… the next thing is the portfolio offering … [including] exclusive complex generics of offering … [as] when we have more of the launches, it will drive up the market. The third thing is the cost infrastructure*. [Emphasis added].

266.    The statements were false and misleading because, having attributed the source of

the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price

Fixing Effort, whereby Teva made at least (mostly collusive) 64 systematic price hikes since July

2013, 14 of which were made in January 2015, contributed materially to the results. These price

increases generated as much as $228 million in Inflated Profit in Q1 2015, a YOY increase of as

much as $108 million, which increase accounted for over a third of the YOY increase in generic profit. The Inflated Profit increase also amounted to more than double the $43 million YOY reduction in S&M expenses, and nine times the $12 million YOY reduction in R&D expenses, to which Defendants attributed the increased generic profit. Olafsson's statements on the call were also misleading because they concealed that the Price Fixing Effort was a fundamental part of Teva's improvement. By the end of Q1 2015, Teva had generated as much as $1.1 billion in Inflated Profit on the price increases since July 2013.

**June 11, 2015 False and Misleading Statements**

267.    As investors, analysts, and Defendants were focused on Teva's outstanding offer to acquire Mylan, during a June 11, 2015 Goldman Sachs conference, Vigodman touted "the profound change in the generic business," since 2014, stating:

> These "are things that are not confined to numbers, but maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014," and attributing this success solely to ***"[t]he execution of the cost reduction program***: $600 million net savings, 2014; $500 million, 2015," and a "[f]ull transformation of our operational network," claiming that "[w]e closed or divested 11 plants during the last 12 months[;] [w]e centralized procurement…. ***So everything that was done during 2014 was based on organic … moves only***." [Emphasis added].

268.    The statements were false and misleading because, having attributed the source of the profit increase, Vigodman had a duty to disclose but concealed the full truth that the Price Fixing Effort, whereby Teva made at least 64 (mostly collusive) systematic price hikes since July 2013, which generated over $1.1 billion in Inflated Profit by the close of Q1 2015, contributed materially to the results. Strikingly, the excess profit of as much as $1.1 billion generated by the price increases accounted for all the improved operating profit that Vigodman touted.

**Second Quarter 2015 False and Misleading Financial Disclosures**

269.    On July 30, 2015, Teva filed its second quarter 2015 ("Q2 2015") financial statements on a Form 6-K with the SEC (the "Q2 2015 6-K"), and held an investor earnings call regarding the financial results and the Actavis transaction (the "July 30, 2015 Earnings Call").  The false statements in the Q2 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

270.    The Q2 2015 6-K disclosed a YOY increase in generic profit of $193 million, or 36%, attributed "primarily" to:

> "[H]igher gross profit as well as lower selling and marketing expenses," while claiming that **higher gross profit was "mainly a result of higher gross profit in the United States, due to the launches of aripiprazole in the second quarter of 2015 and of esomeprazole during the first quarter of 2015, and lower production expenses**."  [Emphasis added].

271.    The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price Fixing Effort, whereby Teva made at least 64 (mostly collusive) systematic price hikes since July 2013, contributed materially to the results. These price increases generated $236 million in Inflated Profit in Q2 2015, a YOY increase of $76 million, which increase accounted for 39% of the YOY increase in generic profit, and amounted to over one and a half times the $53 million YOY reduction in S&M expenses to which Defendants attributed the increased generic profit.

**Third Quarter 2015 False and Misleading Financial Disclosures**

272.    On October 29, 2015, Teva filed its third quarter 2015 ("Q3 2015") financial statements on a Form 6-K with the SEC (the "Q3 2015 6-K") and held an investor earnings call (the "Oct. 29, 2015 Earnings Call"). The false statements in the Q3 2015 6-K are also incorporated

by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin

signed, the ADS Final Prospectus and the Preferred Final Prospectus.

273.    The Q3 2015 6-K disclosed a YOY increase in generic profit of $20 million, or 4%,

attributed "primarily" to:

> *"[L]ower selling and marketing expenses, partially offset by lower gross profit,"*
> *which in turn was partially offset "by higher gross profit of our API business."*
> [Emphasis added].

274.    The statements were false and misleading because, having attributed the source of

the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price

Fixing Effort, whereby Teva made at least 71 (mostly collusive) systematic price hikes since July

2013, seven of which had been implemented in July 2015, contributed materially to the results.

These price increases generated as much as $218 million in Inflated Profit in Q3 2015, a YOY

increase of $25 million, which accounted for all the YOY increase in generic profit.

275.    During the Oct. 29, 2015 Earnings Call, Vigodman disavowed that any of the

improvement in Teva's results over the previous years were driven by generic pricing:

> *We're very – and are very responsible in everything that portends to prices on the*
> *Generics side and on the Specialty side. And I would even put it another way, **all***
> ***the improvement you see in our – in margins is not driven by price. It is driven***
> ***by quantities and by mix and by efficiency measures. Not by price, 2014, 2015,***
> ***and that's a very important message**.*  [Emphasis added].

276.    The statements were false and misleading because, by this time, Teva had increased

prices on at least 71 drugs since July 2013 as part of its Price Fixing Effort, often by well over

100%, generating over $1.6 billion in Inflated Profit over that time, including as much as $690

million in 2014 and as much as $680 million in the first three quarter of 2015 alone. Thus, the

Inflated Profit contributed significantly to improving Teva's generic profit margin, as that Inflated

Profit was devoid of any material corresponding costs, directly contradicting Vigodman's statements.

277.    In light of recent legislative proposals that would penalize generic manufacturers for raising prices above the rate of inflation, an analyst from Barclays asked for management's thoughts on "the potential limit to generic drug price increases." Olafsson minimized the extent and effect of Teva's practice of increasing prices and implied that Teva was not dependent on such profit and, thus, was immune to the effects of the proposed legislation:

> In terms of the proposed legislation on pricing control on generics, first of all we don't really know what it's going to be. But let me give you an example. So Teva has the largest portfolio on the U.S. market. ***We are offering approximately 275 products. And we have told you that overall on our whole portfolio, we have a decline in price. The talk about the inflation in generics when you have a big portfolio is really not there. 95% of our portfolio is declining due to the consolidation of the customers I talked about. There might be 5% of the portfolio that is either flat or increasing in pricing due to some abnormalities in the market***. [Emphasis added].

278.    The statements were false and misleading because, by this time, Teva had made at least 71 (mostly collusive) systematic price hikes, seven of which Teva implemented on July 29, 2015, and many of which were increased by more than 100%. The 60 drugs subject to these price increases made up 22% of Teva's generic drug portfolio, and none of these price increases were due to "some abnormalities in the market" like a shortage or an increase in demand. By the end of Q3 2015, Defendants' Price Fixing Effort had generated over $1.6 billion in Inflated Profit.

**November 19, 2015 False and Misleading Statements**

279.    On November 19, 2015, Jefferies held a conference, at which Desheh was pressed by the Jefferies analyst, who asked, "[L]et's talk about everyone's favorite topic the last 2 months, pricing and specialty pharmacy. Could you just give us your 20,000 foot view on pricing, is it an issue? Your particular products, where do you go on pricing?"

280.    Desheh minimized the extent of Teva's policy and practice of making price increases and its financial dependence on profit therefrom:

> Now there's a lot of noise around pricing issues. Some of it's coming from politicians who are driving agenda, which is very, very legitimate. ***Our exposure to all these things is very minimal .... And Teva was not associated with any of that. So we're playing a competitive game. We're playing it fairly. We of course play by the book and by the rule.*** And we believe that our exposure to any initiative on price reduction in the United States is as a small as anybody can have. [Emphasis added].

281.    The statement was false and misleading because Teva was critically dependent on Inflated Profit from price increases, and the ability to make additional price increases to increase profits, to fill any holes in its financial projections. Thus, Defendants' Price Fixing Effort was greatly exposed to any initiative that addressed generic drug pricing, such as those which would grant Medicare the ability to negotiate prices, which could lead to price deflation. Without the benefit of the Price Fixing Effort, Teva could not generate additional Inflated Profit or fill financial holes, while Teva's past practice of generating massive profits through inflated prices left it very exposed to any efforts that would cause price deflation of those already-increased drugs. Relatedly, these statements implied to investors that Teva was not engaging, and had not engaged, in any practice of increasing prices, which was simply untrue.

**Teva's Registration Documents for Its Secondary ADS and**
**Preferred Share Offerings Contained False and Misleading Statements**

282.    On November 30, 2015, Teva filed a Registration Statement on Form F-3, signed by Vigodman, Desheh, and Griffin, with the SEC (the "ADS/Preferred Registration Statement"), as well as two preliminary prospectus supplements, filed pursuant to Rule 424(b)(5), which disclosed certain details regarding Teva's intention to offer additional ADS and newly created Mandatory Convertible Preferred Shares ("Preferred Shares") to the public. On December 3, 2015,

Teva filed two prospectus supplements with the SEC (referred to hereafter as the "ADS Final Prospectus" and the "Preferred Final Prospectus," respectively).

283.    The ADS/Preferred Registration Statement, the ADS Final Prospectus, and the Preferred Final Prospectus each incorporated by reference the 2014 20-F, Q1 2015 6-K, Q2 2015-K, and Q3 2015 6-K. The incorporated 2014 20-F and Q1, Q2, and Q3 2015 6-Ks contained false and misleading financial disclosures, as discussed above.

**January 11, 2016 False and Misleading Statements**

284.    At a January 11, 2016 J.P. Morgan conference, a J.P. Morgan analyst asked Olafsson, "McKesson this morning announced some maybe challenging pricing on the generics side or an expectation of that going forward. Could you just comment a little bit on how you see generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?"

285.    In answer to this question, Olafsson responded:

The generic pricing – we need to keep in mind there's a lot of talk about inflations in generic pricing. But what we see is there's – ***overall on our total portfolio of 270 products, there is a slight decrease in pricing. It's low single digit, but year on year we see a low single-digit decrease because on 95% of our portfolio, we experience price decline. And then on 5%, we might be flat or a slight increase***. So, overall, we see that in the business. There's a lot of headlines of examples of big price increases in generics. But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – there is a decline.  [Emphasis added].

286.    The statements were false and misleading because they minimized the impact of price increases – which by the end of Q3 2015 had generated as much as $1.7 billion in Inflated Profit – on Teva's bottom line since July 2013, and, thus, Teva's potential exposure to price deflation that its competitors and wholesalers were already reporting. By this time, Teva had increased the prices of 60 of its generic drugs, three of which Teva had recently increased the

prices on July 29, 2015, and many of which were increased by more than 100%. These drugs made up 22% of Teva's generic drug portfolio, flatly contradicting Olafsson's claim that 5% of Teva's generic portfolio "might be flat or a slight increase." The context is particularly important because McKesson was one of Teva's major wholesalers and, thus, would presumably be experiencing issues in pricing similar to those faced by Teva.

**Fourth Quarter and Full Year 2015 False and Misleading Financial Disclosures**

287.    On February 11, 2016, Teva filed with the SEC a press release reporting the Company's fourth quarter 2015 ("Q4 2015") and full year 2015 ("FY 2015") financial results ("Q4 2015 Press Release"). The same day, Teva filed its Form 20-F for the fiscal year ended December 31, 2015 with the SEC (the "2015 Form 20-F") reporting the Company's FY 2015 financial results, and held an investor earnings conference call (the "Feb. 11, 2016 Earnings Call") The false statements in the 2015 Form 20-F are also incorporated by reference into the Notes Registration Statement that Vigodman, Desheh, and Griffin signed, and the Notes Final Prospectus.

**Q4 2015 Press Release**

288.    The Q4 2015 Press Release disclosed a YOY increase in generic profit of $7 million, or 1%, attributed "primarily" to:

> ***"[T]he reduction in S&M expenses, partially offset" by, in part, "lower sales*** of budesonide (Pulmicort®) in the United States." [Emphasis added].

289.    The statements were false and misleading because Defendants explained that profits were offset by reduced sales, while they had a duty to disclose but concealed the full truth that Inflated Profit had declined from as much as $219 million in Q4 2014 to $166 million in Q4 2015, a decline of $53 million or 24%. This decline occurred because the Price Fixing Effort was unsustainable and under increasing investigation by governmental agents and, thus, Teva's ability to make further increases was reduced.

**2015 Form 20-F**

290.    The 2015 Form 20-F disclosed a YOY increase in generic profit of $500 million, or 24%, attributed "primarily" to:

> "[***L***]***ower S&M expenses and higher gross profit***," which was purportedly "***mainly a result of higher revenues from new products launched in the United States*** during 2015, lower other production expenses and higher gross profit from API sales to third parties."  [Emphasis added].

291.    The statements were false and misleading because, having attributed the source of the profit increase, Defendants had a duty to disclose but concealed the full truth that the Price Fixing Effort, whereby Teva made at least 71 (mostly collusive) systematic price hikes since July 2013, contributed materially to the results. The price increases generated as much as $848 million in Inflated Profit in 2015, a YOY increase of $155 million that amounted to 31% of the YOY increase in generic profit.

292.    The table below reflects Teva's improved profits as reported in 2015, as well as the YOY change in Inflated Profits for the same period:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $296 | $193 | $20 | $7 | $516 |
| (Unreported) YOY Change in Inflated Profit | $108 | $76 | $25 | -$53 | $155 |

**February 11, 2016 Earnings Call**

293.    In his opening statements, Olafsson touted "2015 was a very good year for Teva Generics," while explicitly denying that pricing had played ***any*** role in that supposed success, stating:

> We continued improving the operating profit of the generic business, coming from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating

profit in 2015, or 28% of revenue. This is $1 billion improvement in operating profit over 24 months period. ***So how did we do this? Not by pricing but by portfolio mix, new products, and efficiency measures***. [Emphasis added].

294.    The statements are false and misleading because they are directly contradicted by the empirical data showing that Teva had, in 2014 and 2015, made as much as over $1.5 billion in Inflated Profit from price increases – more than the $1 billion improvement touted by Olafsson.

295.    Later in the call, and repeated in his slide presentation, Olafsson minimized Teva's participation in price increases, and thus their impact on the Company's bottom line:

> Briefly, on pricing. ***As I've previously stated, we and the generic industry overall don't see price inflation of generics as it sometimes is portrayed in the media. On the contrary, for 2015, we saw a mid- single-digit price decline for the overall business***. [Emphasis added].

296.    The statements are false and misleading because Teva had taken at least 71 price increases since July 2013, many for over 100% or more. The Inflated Profit from the increases implemented as part of Defendants' Price Fixing Effort was a necessary foundation of Teva's purported financial success over that time.

297.    Olafsson denied that Teva was seeing any change in its pricing environment:

> ***In the US, our largest market, we saw approximately 4% price erosion…. We expect to see the same in 2016. Nothing today points to a significant change in the generic pricing environment***. [Emphasis added].

298.    A Guggenheim Securities analyst asked: "some of your competitors have talked about pricing pressure in the generics business during the quarter. Curious if you saw that, and if so what might be driving that." Olafsson responded:

> As I mentioned in the beginning, ***we didn't see anything change in fourth quarter. We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year***. [Emphasis added].

The slides Olafsson presented during the call echoed these statements:

Also ***do not see the sharp drop in prices other competitors have seen recently***[;] Mid-single digit decrease in 2015[.]  [Emphasis added].

299.     The statements were false and misleading because, while Defendants claimed not to have seen any changes in the pricing environment, (i) internally, Teva's profits from price increases had decreased precipitously, from as much as $236 million in Q2 2015, to $218 million in Q3 2015, to $166 million in Q4 2015, a decline of $70 million, or 30%, in two quarters, and (ii) Teva was increasingly unable to implement further price increases, as it had in the past.

**March 8, 2016 False and Misleading Statements**

300.     During a March 8, 2016 Cowen conference, Olafsson touted the increased profitability of Teva's generics segment, attributing it to sources other than price increases:

> In terms of growing the profitability, from 2013 to 2015, we grew the operating profit of the generic business from 17% in 2013, and we exited for the full year of 2015 we were at 28.1%. So it's about 1,100 basis points we improved the profitability on approximately $10 billion in revenue. So it was a significant improvement over a 24-month period*. **Part of that was due to the improvement in our cost of goods sold, very important in consolidation of plants and looking for the money there. But also part of it was due to portfolio selection and the cost infrastructure***.  [Emphasis added].

301.     The statements were false and misleading because, once Olafsson chose to speak on this subject and having attributed the source of the profit increase, Olafsson had a duty to disclose but concealed the full truth that Teva had by then generated over $1.7 billion in profit from price increases on dozens of generic drugs from 2013 through 2015, pursuant to the Price Fixing Effort; far more than the $1.1 billion in improved generic profit touted by Olafsson.

302.     Later on the call, a Cowen analyst asked Olafsson: "Can you discuss what you're seeing," in generics pricing, "what you're observing, and then maybe in the context of what you're hearing from others, both US and ex-US?" In response, Olafsson declared:

> So we came out in our fourth quarter results, and told the market that we had seen approximately 4% price decline in the US market in 2015.… ***I think overall the***

*pricing hasn't changed that much. There was a lot of talk about inflation in generic pricing. But we never saw that…. [I]nflation never really happened in the generic business.… I don't see any big changes in the pricing environment. It's relatively stable. 4% is worse than maybe two years ago. But it's similar to what we saw in 2014.* [Emphasis added].

303. The statements were false and misleading because the truth was that the Price Fixing Effort, whereby Teva had inflated the prices on 60 base-business generic drugs from July 2013 through Q1 2016, had generated well over $1.7 billion in Inflated Profit from the beginning of the Class Period through the end of 2015. The Inflated Profit generated by the Price Fixing Effort, however, had drastically fallen. Thus "the pricing" had changed and was not like it had been in 2014; Teva implemented at least 32 (mostly collusive) price increases that year alone, while, in 2016, it would make only five, all of which were on prices of drugs that had been previously increased.

**First Quarter 2016 False and Misleading Financial Disclosures**

304. On May 9, 2016, Teva filed its first quarter 2016 ("Q1 2016") financial statements on Form 6-K with the SEC (the "Q1 2016 6-K"), and held an investor earnings call (the "May 9, 2016 Earnings Call") (collectively, May 9, 2016 Statements"). The false statements in the Q1 2016 6-K are also incorporated by reference into the Notes Registration Statement that Vigodman, Desheh, and Griffin signed, and the Notes Final Prospectus.

**Q1 2016 6-K**

305. The Q1 2016 6-K disclosed a YOY decline in generic profit of $215 million, or 27%, attributed "primarily" to:

*[L]ower gross profit, as well as higher R&D expenses," while lower gross profit was purportedly "mainly a result of lower sales of high gross profit products in the United States*, higher production expenses and lower gross profit in our European markets. [Emphasis added].

306.     The statements were false and misleading because, having attributed the source of the profit decline, Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $228 million in Q1 2015 to $124 million in Q1 2016, a decline of $104 million or 46%. That YOY decline in Inflated Profit comprised as much as 48% of the YOY decline in generic segment profit and was more than four times the $25 million YOY increase in R&D expenses to which Defendants attributed the results. It further concealed that the Price Fixing Effort was unsustainable, as the Inflated Profit was drastically declining, and Teva was increasingly unable to make more hikes.

**May 9, 2016 Earnings Call**

307.     In his opening remarks, Olafsson explained away the decline in generic profit margin by blaming it on issues other than pricing:

> When compared to first quarter 2015, the ***operating profit declined by 360 basis points, fully explained by the exclusive launch of generic Nexium, esomeprazole, in the first quarter 201[5]***. Excluding the exclusivity period of esomeprazole in first quarter, the profit margin of the generic segment was 24.4%.  [Emphasis added].

308.     The statements were false and misleading because they excluded entirely the decline in Teva's Inflated Profit from the unsustainable Price Fixing Effort, including the steep decline of $42 million in Inflated Profit from Q4 2015 to Q1 2016, and the $104 million YOY decline compared to Q1 2015. That YOY decline comprised 48% of the decline in YOY generic profit that Olafsson attributed to a decline in sales of generic Nexium, reflecting that Defendants could no longer maintain the Inflated Profit generated by the increases implemented since July 2013, nor could they make further price increases.

309.     Also on that call, Olafsson, while asserting he would "do my best to provide you with as much color as possible," claimed that Teva was immune from downward pricing trends:

> ***Teva has not seen any fundamental change or worsening in the pricing
> environment*** – something we have been consistent about telling investors all year.
> Teva experienced approximately 4% price erosion in the United States last year,
> and our guidance for this year is that it will remain the same.… From where I sit
> today, there is nothing that changes my mind about that. ***Nothing has happened in
> the last two quarters that has changed the pricing environment***. What this boils
> down to is each individual company's business model… [Emphasis added].

The slides presented by Olafsson during the conference call echoed Olafsson's statements:

> "***What has changed in the US pricing environment since Q4 2015?  The short
> answer is…nothing[.]… There is no change in the pricing environment[.] It all
> comes down to each company's business model…. Why is Teva generics
> performance better than most Gx companies? Portfolio optimization …. [and]
> [n]ew products***…." [Emphasis added].

310.    The statements were false and misleading because, far from not seeing "any
fundamental change or worsening in the pricing environment," Teva's Price Fixing Effort of
generating billions in profits from price increases was collapsing. In Q3 2015 Teva earned as much
as $218 million in Inflated Profit from price increases, while in Q1 2016 it earned $124 million;
and while, in 2015, Teva made 21 price increases on generic drugs, in 2016 it would implement
only five, all of which were on prices of drugs which had previously been increased.

311.    During the May 9, 2016 earnings call, Olafsson also offered the supposed reasons
why Teva's generics division had achieved success over several years, and thus was differently
positioned compared to its competitors who were reporting increased pricing pressure:

> We have taken a significant step to transform our generic business, solidify our
> foundation, increase our profitability, and to better position us to generate
> sustainable long-term growth. ***These many steps have included portfolio
> optimization, strengthening our capabilities in R&D, and manufacturing of
> complex products, regaining a leading position in submission on first-to-files,
> enhancing our go-to-market, and sales force effectiveness capabilities, and
> much, much more***. These are the very capabilities that companies must possess in
> order to thrive at the global level. We have created a unique and differentiated
> platform, positioned to extract significant value in the global growing generic
> space.  [Emphasis added].

312.    The statements were false and misleading because, while attributing Teva's supposed past success to other factors, Olafsson had a duty to disclose but concealed the full truth that Teva had generated as much as $1.9 billion in Inflated Profit from (mostly collusive) price hikes reported since the start of the Class Period. The Inflated Profit, however, had begun to dry up due to the unsustainability of the Price Fixing Effort, and the materialization of the risks concealed Defendants – recently reported by Teva's competitors – namely the risk of increased pricing pressure due to increased public, Congressional, and regulatory scrutiny of generic drug price increases, which would result in increased competition and the inability to take further price increases.

**False and Misleading Statements on Conference Calls in
the Build Up to the $20 Billion Debt Offering**

313.    On May 10, 2016, Olafsson participated in a Bank of America conference, and claimed that Teva was immune from pricing pressure:

> [T]here's nothing I have seen which shows a worsening pricing environment. We saw a price erosion in the US last year of approximately 4%. …
>
> I know many of the competitors in the generic space, and in the specialty space, are talking about a lot of pricing pressure, but it shouldn't be. ***There is nothing that has happened over the last two quarters which has changed fundamental the market. And I feel that we are blaming the environment on individual company's business model more than anything else*** because as long as you have the right portfolio, you have had the right investment in R&D, you really have a strong opportunity. [Emphasis added].

During a June 3, 2016 Sanford C. Bernstein conference, in response to an analyst question regarding pricing pressure, Vigodman stated Teva was not facing increased pricing pressure:

> So we are very consistent. Our message was conveyed, and we will continue to convey. ***What we see is a 4% to 5% erosion. That's what we see. That's not something which is different from what we said during 2015. By the way, we continue saying it in 2016.*** I think our results in Q1 demonstrated that.  [Emphasis added].

Then, during a June 8, 2016 Goldman Sachs Global Healthcare Conference, Olafsson conveyed a similar response to a question from a Goldman Sachs analyst regarding pricing pressure:

> But really, the environment hasn't changed. When we signed that deal in July, **we talked about 4% price erosion in the US generic business. And we are still talking about the same number, what we see in the base business**.  [Emphasis added].

314.    The statements were false and misleading because Teva was experiencing a drastic decline in Inflated Profit from price increases, the inability to make additional price increases, and, in the past two quarters, the acceleration of the deterioration of the pricing environment. Thus, the Price Fixing Effort was proving to be unsustainable, with Inflated Profit declining by $104 million in Q1 2016 as compared to Q1 2015, as the risks concealed by Defendants' strategy began to materialize, namely increased pricing pressure and the inability to take further price increases due to increased public, legislative, and regulatory scrutiny of generic drug price increases, which resulted in increased competition.

**False July 13, 2016 Guidance Assumption**

315.    In a July 13, 2016 call held by Defendants (and other Teva executives) to announce the acceleration of Teva's debt offering, including the Notes Offering, to the end of July, which, on the May 9, 2016 investor call, had been scheduled to occur in September 2016 or in Q4 2016, a Citigroup analyst asked about pricing: "[C]an you comment on the generics pricing assumptions that you have baked into your forecast? Following on that, Siggi, maybe you could just comment on the generics pricing environment, more broadly, that you are currently seeing in the marketplace."

316.    In response Olafsson indicated that Teva had still not seen any change in the pricing environment, and that this stable pricing was baked into the assumptions underlying Teva's guidance and projections:

Our assumption and what we assume is basically approximately 5% organic growth that we see year on year.… *In terms of generic pricing in the second quarter, we saw no change in the pricing. We saw a stable environment, as we talked about, from first quarter into second quarter. Obviously, in second quarter, as we have highlighted to investors, there was no significant new launches that we saw in Teva, which obviously impacts the overall generic numbers. The pricing has remained stable.… Our assumption for the rest of the year is basically assuming the same pricing erosion*. It is difficult to say; but as I'm sitting here today, with the information I have in hand, we are assuming and now forecasting for the guidance for the remainder of the year *same pricing assumption as we have had for the first half of the year*. [Emphasis added].

317.    These statements were false and misleading at the time because Teva's price erosion assumption was not based on "stable" pricing in which there was "no change" in the second quarter or the "first half of the year." In truth, Teva was at that time experiencing a drastic decline in Inflated Profit from price increases, the inability to make additional price increases, and, over the past year, the acceleration of the deterioration of the pricing environment. Teva generated $10 million less in Inflated Profits from the first quarter of 2016 to the second quarter of 2016, which was part of a trend of steep decline. Teva generated $122 million less Inflated Profit in the second quarter 2016 than it had in the second quarter of 2015. In the first two quarters of 2015, Teva made as much as $464 million in Inflated Profit. In the first two quarters of 2016, Teva made $238 million. In the first half of 2015, Teva had made 14 price increases. In the first half of 2016, Teva only made five, generating less than $12 million by the end of the Class Period.

**The False and Misleading Registration Statement and Prospectus**

318.    On July 13, 2016, Teva filed with the SEC a Post-Effective Amendment No. 1 to Form F-3, which was signed by Vigodman, Desheh, and Griffin, (the "Notes Registration Statement"). On July 19, 2016, Teva filed with the SEC, pursuant to Rule 424(b)(5), its final prospectus for the Notes Offering (the "Notes Final Prospectus). The Notes Registration Statement and the Notes Final Prospectus incorporated by reference the 2015 Form 20-F and the Q1 2016 6-

K. The incorporated 2015 Form 20-F and Q1 2016 6-K contained false and misleading financial disclosures, as described above (2015 Form 20-F ¶¶ 128-133, 214, 291-292; Q1 2016 6-K ¶¶ 214, 305-307).

**Second Quarter 2016 False and Misleading Financial Disclosures**

319.    On August 4, 2016, Teva filed its second quarter 2016 ("Q2 2016") financial statements on Form 6-K with the SEC (the "Q2 2016 6-K") and held an investor earnings conference call (the "Aug. 4, 2016 Earnings Call").

320.    The 2016 6-K disclosed a YOY decline in generic profit of $115 million, or 16%, attributed "primarily" to:

> "[L]ower gross profit," which in turn was purportedly "***mainly a result of loss of exclusivity on certain products as well as increased competition on other products in the United States … and higher production expenses***…"  [Emphasis added].

321.    During the Aug. 4, 2016 Earnings Call, Desheh attributed the poor performance of the Company's generic segment to factors other than a decrease in Inflated Profit:

> ***Revenues of our US generics business was impacted by competition to our Aripiprazole, Esomeprazole, and Budesonide which were the major drivers of our generic business in the US in the second quarter last year***.  [Emphasis added].

322.    The statements were false and misleading because, having attributed the source of the profit decline, Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $236 million in Q2 2015 to $114 million in Q2 2016, a decline of $122 million or 52%. That YOY decline in Inflated Profit comprised nearly all the YOY decline in generic profit. The statements further concealed that the Price Fixing Effort was unsustainable, as the Inflated Profit was drastically declining, and Teva was increasingly unable to implement further hikes.

323.    Also during that call, and in response to a Citigroup analyst's inquiry regarding pricing stability, Olafsson denied seeing any change in the pricing environment:

> [T]he pricing is stable to the same degree as before. ***We saw approximately in the US, 4% price erosion in the business, in a way very stable from the first quarter***. And the global pricing impact we saw in the business, in the generic business was approximately 5%. So we are pleased with the environment.  [Emphasis added].

Olafsson then reiterated the same false and misleading sentiment later in the call:

> So overall, the business itself is fairly stable. As I mentioned in the beginning, ***we are seeing exactly the 4% price erosion…. 4% price erosion in the US.***  [Emphasis added].

324.    The statements were false and misleading because, in Q2 2016, Teva suffered a $122 million YOY reduction in Inflated Profit from price increases compared to Q2 2015, and Teva was increasingly unable to implement further price hikes, implementing only five, immaterial increases during 2016, compared to 21 in 2015, and 32 in 2014, during the height of the strategy.

325.    In response to a question from a J.P. Morgan analyst regarding whether Teva could implement price hikes following the Actavis acquisition, Olafsson stated:

> I think the ***pricing comes with shortages in the market. If you have an exclusive product, if there's some kind of dysfunction in the market, there might be a small pricing opportunity that usually comes in and comes out. But overall, the size, and being a combined company doesn't play into that***.  [Emphasis added].

326.    These statements were false and misleading because they minimized Teva's Price Fixing Effort when, in reality, Teva took 76 (mostly collusive) price increases on 60 drugs, most of which were for 100% or more, that were not associated with any such shortage or dysfunction. This left Teva very exposed to the pricing pressure facing the industry at the time.

**In the Third Quarter 2016, Defendants Continue to Deny**
**Price Inflation and Increased Pricing Pressure in Statements to Investors**

327.    On September 7, 2016, Desheh participated in a Wells Fargo conference where he was asked by the Wells Fargo analyst, "Teva has said during this whole, the last couple years, that

you're not really seeing the same generic erosion, pricing erosion that some of the other companies have mentioned or blamed.  Is that still the case?"  Desheh responded by claiming that Teva was not experiencing increased pricing pressure:

> Now, with talking about prices of the base business, product that we've been selling more than two years already, the prices are very stable there.… [Y]ou don't see -- there you don't see the erosion. Where we see erosion is … [when] you have six months exclusivity, you start with the high price, and then obviously more competitors go into the market and the price goes down. But when we look at the base, there's no – ***there's no pressure on prices***.  [Emphasis added].

328.    On Teva's September 9, 2016 Generic Medicines Business Overview call with analysts, the slides presented echoed that Teva was not experiencing a change in pricing pressure:

> ***Price erosion is nothing new[.]…*** Diverse portfolio and competitive cost structure allows for long-term value creation.  [Emphasis added].

329.    The statements were false and misleading because, while Desheh claimed that Teva's base business was experiencing "no pressure on prices," and the slides claimed that "price erosion is nothing new," Teva was suffering massive declines in Inflated Profit and the inability to implement further hikes due to increased pricing pressure that was itself the materialization of the risks concealed by Defendants. Most recently, in Q2 2016, Teva suffered a massive $122 million YOY reduction in Inflated Profit from price increases compared to Q2 2015, and Teva implemented only five immaterial hikes in 2016, compared to 21 in 2015, and 32 in 2014, demonstrating the unsustainability of the Price Fixing Effort.

330.    During the September 9, 2016 call, Olafsson categorically denied Teva had increased prices on its generic drugs:

> ***There is no inflation in the generic pricing***, which I will talk about.  [Emphasis added].

Later during that same call, in response to a Bank of America analyst's question regarding the impact of specialty drug pricing on generics, Olafsson responded:

[S]o first of all, we need to differentiate generics from branded pricing. And ***people that say that the generic – there's a big generic price inflation, are simply wrong***. [Emphasis added].

Olafsson even claimed that Teva had a "***secret sauce***" that immunized the Company from price fluctuations.

331.    These statements were false and misleading because each of these statements minimized (i) Teva's practice of making price increases pursuant to the Price Fixing Effort, often by raising the price over 100% above the pre-inflation price, on 60 drugs or 22% of its portfolio; (ii) the importance of the Inflated Profit from those price increases to the Company, (iii) the unnatural price inflation in Teva's book of generic drugs caused by those increases and the attendant risks associated with such inflation; and (iv) that Teva was at the time experiencing a dramatic drop in Inflated Profit from those price increases and an inability to implement further increases as a result of the materialization of the risks concealed by Defendants.

332.    During the September 9, 2016 call, Olafsson also responded to a question as to whether Teva would be taking price increases following the Actavis acquisition, stating:

So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases. Simply, it doesn't work like that in generics. ***When price increases are taken, there's some kind of abnormality in the business. There are shortages.*** [Emphasis added].

333.    The statements were false and misleading because they implied that because Teva only increased prices in limited circumstances, it was not exposed to price deflation. The truth was that Teva had raised the prices of 60 drugs, or 22% of its portfolio, via 76 (mostly collusive) price increases frequently by more than 100% of the original price, and thus had enormous price inflation in its portfolio; none of the price increases related to shortages.

**Third Quarter 2016 Post Class Period Continuing**
**False and Misleading Financial Disclosures**

334.    On November 15, 2016, Teva filed its third quarter 2016 ("Q3 2016") financial statements on Form 6-K with the SEC (the "Q3 2016 6-K") and held an investor earnings conference call (the "Nov. 15, 2016, Earnings Call").

335.    The Q3 2016 6-K disclosed a YOY increase in U.S. generic revenue of $261 million, or 25%, attributed to increased revenues from Actavis. But, after removing Actavis' $538 million in U.S. generic revenues that quarter, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $277 million, or 27%. In discussing the increased revenues that were due to Actavis, Teva disclosed that those revenues were:

> partially offset by loss of revenues following our divestment of certain products in connection with the acquisition, a decline in sales of budesonide … due to increased competition and the loss of exclusivity on esomeprazole.

336.    The statements were false and misleading because, having attributed the sources offsetting the increased revenues from Actavis, Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $218 million in Q3 2015 to $97 million in Q3 2016, a decline of $121 million or 56%. That YOY decline in Inflated Profit comprised as much as 44% of the YOY decline in U.S. generic revenue from Teva's legacy business, excluding the impact of Actavis. It further concealed that the Price Fixing Effort was unsustainable, as the Inflated Profit was drastically declining, and Teva was increasingly unable to implement further hikes.

337.    During the Nov. 15, 2016 Earnings Call, a Credit Suisse analyst asked, "[Y]ou mentioned that 7% erosion this quarter, but you said you're confident it will still remain in the mid single-digits going forward…. [W]hat's going to happen in the coming quarters [that] will be different than what you saw this quarter?" Olafsson responded:

> Let me start on the drug pricing, so overall, like previous quarters, there hasn't been any fundamental change in the US drug pricing. And what we saw in the difference

between the 5% or mid single- digit we guided for going into it, versus exiting at
7%, was the impact of the pricing impact on the divested product.

Olafsson doubled down on this explanation when pressed by an incredulous analyst from J.P.
Morgan, who asked how Teva was sure that the decline was not the same pricing pressure seen
throughout the market. Olafsson reiterated:

> [W]here I sit here today, experiencing the market, there hasn't again been any
> fundamental change.

338.    The statements were materially false and misleading because Teva was in fact
experiencing a sustained and material decline in the pricing environment, particularly with regard
to the drugs whose price Teva had previously raised pursuant to the Price Fixing Effort, in direct
contradiction to Olafsson's specific denials. These flat denials in answer to specific questions on
the matter, in the face of contrary empirical evidence that Teva had inflated prices on 60 drugs,
profited by as much as over $2.1 billion since the start of the Class Period, and was now suffering
from drastic YOY reductions in Inflated Profit generated from those price hikes and an inability
to implement more, were particularly misleading.

339.    During the same Nov. 15, 2016 Earnings Call, a Wells Fargo analyst asked whether
the stated 7% price erosion experienced that quarter was a "result of having to tame previous price
increases, or give back some of those?" Olafsson denied the existence of a pricing trend beyond
that caused by Actavis-acquisition related divestitures:

> No, basically, the main reason … was that we had to divest a very good portfolio
> of products that had limited competition, so we had to divest it. What our customers
> did, as they do, is that there is a new player in the market that took over those
> products, and that became a pricing pressure on roughly about 60 molecules of --
> and these were one of our top -- the top molecules we had in our portfolio. So there
> was an instability that happened in the market during the month of August, when
> the new owners were taking market share. It didn't change the fundamental of the
> market. It didn't change the structure of the market, or the chemistry of the market,
> but we saw the impact on the divested molecule significantly more than we saw for

on the rest of the portfolio which gave us a 7% versus 5%, which we assumed going into the quarter.

340.    The statements were false and misleading because the Inflated Profit from price hikes had declined drastically, contributing just $97 million in Q3 2016, a YOY reduction of $121 million, or 56%. The sharp decline in Inflated Profit was a result of the materialization of the risks that Defendants concealed as they implemented their Price Fixing Effort, namely increased pricing pressure resulting from increased public, legislative, and regulatory scrutiny of generic drug pricing, which in turn resulted in increased competition and the inability to implement further price hikes. Those were not single-quarter issues related to divested products, as suggested by Olafsson, but a long-term trend with no end in sight.

**The January 6, 2017 Post Class Period Guidance Call**

341.    During a December 8, 2016 Citi Global Healthcare Conference, Vigodman announced that Teva would provide 2017 guidance early in January 2017. During the call, Vigodman claimed Teva's past success was not due to Inflated Profit from price hikes, stating:

> Since the start of 2014, one of our greatest priorities has been to increase the profitability of our generics business. In the first three years of this great effort, we have been able to improve significantly the margins of Teva's standalone generics business. This has been accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure.

342.    The statement was false and misleading because, having attributed the source of the profitability increases, Vigodman had a duty to disclose but concealed that the Price Fixing Effort, whereby Teva made at least 76 (mostly collusive) systematic price hikes since July 2013, many of which were in excess of 100% of the prior price, contributed over $2.2 billion to Teva's profit from the start of the Class Period through the end of 2016.

**Fourth Quarter and Full Year 2016 Post Class Period Continuing False and Misleading Financial Disclosures**

343.    On February 13, 2017, Teva filed with the SEC a press release ("Q4 2016 Press Release") reporting the Company's fourth quarter 2016 ("Q4 2016") and full year 2016 ("FY 2016") financial results, and held an investor earnings conference call (the "Feb. 13, 2017 Earnings Call"). Two days later, on February 15, 2017, Teva filed its Form 20-F for the fiscal year ended December 31, 2016 with the SEC (the "2016 20-F") reporting the Company's FY 2016 financial results (collectively, the "Q4 and FY 2016 Statements").

**2016 20-F**

344.    The 2016 20-F disclosed a YOY decline in U.S. generic revenues of $200 million, or 5%. When removing the impact of Actavis' $1.168 billion in U.S. generic revenues, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $1.4 billion, or 29%. Per the 2016 20-F this decline purportedly:

> "resulted mainly from the loss of exclusivity on esomeprazole … and aripiprazole …, a decline in the sales of budesonide … due to increased competition, loss of revenues following our divestment of certain products in connection with the Actavis Generics acquisition and the decline in sales of capecitabine."

345.    The statements were false and misleading because, having attributed the source of the increased revenues, Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $848 million in 2015 to $421 million in 2016, a decline of $427 million or 50%. That YOY decline in Inflated Profit comprised 31% of the YOY decline in U.S. generic revenue from Teva's legacy business, excluding the impact of Actavis. Even giving Teva the benefit of Actavis' 2016 revenues, the YOY decline in Inflated Profit was more than double the $200 million YOY decline in U.S. generic revenues. It further concealed that the Price Fixing Effort was unsustainable, as Inflated Profit was drastically declining, and Teva was unable to implement more hikes.

### ADDITIONAL ALLEGATIONS OF DEFENDANTS' BREACHES OF DUTY

346.    Together with the above-alleged facts, Defendants breaches of duty are further evidenced by the following:

**Defendants Ignored Red Flags**

347.    Contemporaneous red flags alerted Defendants to the possibility that their statements were false and misleading. At a minimum, Defendants failed to review or check information that they had a duty to monitor under these circumstances.

348.    <u>Congressional Inquiry</u>.  On October 2, 2014, Congress sent Vigodman a personal letter seeking answers to "the underlying causes of recent increases in the price of [Teva's] drugs." This should have placed Defendants on alert to discover whether Teva had taken price increases and to what extent. Despite this, on October 30, 2014, Vigodman, when faced with an analyst question on the subject, denied that Teva derived revenues from price increases. Similarly, Congress invited Teva to testify at a November 20, 2014 hearing on whether "there was a rational economic reason as to … huge price increases." Again, this should have sparked an internal inquiry from Teva's executives. Yet, on December 11, 2014, when faced with the assertion from an analyst that wholesalers were seeing large price increases, Olafsson denied that Teva was involved in those practices.

349.    <u>The State AG and DOJ Investigations</u>. The fact that the DOJ and the State AGs began investigations into Teva's competitors related to their pricing practices should have triggered an internal inquiry at Teva into the facts of its own pricing practices, including the dozens of price increases that Teva made in tandem with its competitors.

350.    <u>GAO Report</u>.   On September 12, 2016, the GAO, which Congress had commissioned over two years earlier, publicly released its report on "Generic Drugs Under Medicare," documenting its audit of Medicare Part D data from June 2015 to August 2016. The

GAO found hundreds of unexplained "extraordinary price increases," defined as the price of a particular drug increasing over 100% within a 12-month period, and that some drug prices increased more than 1,000%. Teva had numerous drugs that showed extraordinary price increases in the GAO report. The GAO report should have sparked an internal inquiry from Teva's executives.

**The Price Fixing Effort as Alleged in the CAC**

351.    Teva engaged in a series of anticompetitive conspiracies as to particular drugs. Plaintiff makes this allegation based on information identified in the State AGs allegations in their Consolidated Amended Complaint against Teva and others ("CAC"), filed June 18, 2018, and also based on investigations completed in the Securities Class Action.

352.    The States AGs identify evidence culled from their long-running investigation, which began in 2014, including documents obtained pursuant to multiple subpoenas and cooperation by defendants who have settled with the State AGs and pled guilty to federal antitrust violations. That investigation remains ongoing. Connecticut's AG, George Jepsen, who initiated and led the State AGs' investigation, has publicly emphasized that the CAC's allegations have a strong basis in direct evidence. In an October 31, 2017 interview with CNBC, held after the States filed their proposed CAC, Jepsen emphasized that the CAC's now-expanded allegations rested on compelling evidence: "We've uncovered – through emails, text messages, and telephone patterns, plus cooperating witnesses – a very compelling case of systematic and pervasive price fixing within the industry."

**Teva Colluded with Other Manufacturers to Fix Prices**

353.    <u>Parallel Price Increases</u>.  Investigation by Lead Counsel in the Securities Class Action identified 17 sudden and aberrational price increases undertaken by Teva that show strong

indicia of collusion. These price increases, the details of which are reflected in Appendix B, relate to 16 drugs (the "Collusive Drugs"), collectively generated as much as $1.23 billion dollars in Inflated Profit for Teva.

354.    In each instance, the drug's major manufacturers, including Teva, enacted large price increases at or around the same time, raising prices to exactly, or nearly exactly, the same level. For some, Teva was the first to raise prices, and others followed; other times, Teva followed another manufacturer's lead. This investigation identified, in addition to these lock-step price increases, corroborating indicia of collusion, detailed below, including: (i) motive and opportunity to increase prices; (ii) price increases against apparent self-interest; and (iii) interfirm communications.

355.    Motive and Opportunity.  Companies and individuals involved in generic drug pricing, sales, and marketing are, as in any other industry, motivated to increase the profit earned on their products. In the generic drug industry specifically, the natural profit motive may bend toward a motive to collude, due to the cold realities of marketing products that are, despite their scientific sophistication, a commodity. Because federal law requires generic drugs to be "readily substitutable," price is the only meaningful mechanism by which generic drug manufacturers may differentiate their products, a circumstance which over time, and absent collusion, drives prices down to a point just above the manufacturers' marginal costs of production. Each of the Collusive Drugs is a long-established generic in a mature market in which prices had leveled off to a steady equilibrium. The manufacturers of the Collusive Drugs, therefore, had a common motive to increase their profits by conspiring to raise prices in tandem, overriding the natural downward pressure on prices.

356.   In the context of this motive, each Collusive Drug's market is characterized by factors that, as a matter of economics, present the opportunity to collude, including:

- High Concentration.  The market for each Collusive Drug was an oligopoly by a handful of manufacturers who collectively controlled substantially all of the market.

- High Barriers to Entry.  Entering a generic pharmaceutical market requires significant lead time for development and regulatory approval. The cost is significant; the process of obtaining regulatory approval alone can cost millions. Further, there is financial risk that the recoupment of any investment could be delayed or never happen. Regulatory approval, known as an "ANDA" approval, could be denied or delayed for months or years due to technical failures or other factors. According to the GAO and others (including Teva), during the Relevant Period the FDA was significantly "backlogged," and thus potential market entrants could have to wait years for approval. It has been reported that in 2015 ANDA approvals often took 40 months or more.

- Demand Inelasticity.  The Collusive Drugs are all important, and in many cases absolutely critical, to the end-consumer's health and well-being. As a general matter, demand for such drugs is inelastic, i.e., the quantity demanded does not vary significantly as price changes, as the consumer cannot simply walk away as prices rise. Another factor contributing to demand inelasticity is that health insurance plans typically will pay for medications regardless of price, so long as the drug is on the plan's approved list. Lead Counsel undertook statistical analysis of the market for each of the Collusive Drugs, and confirmed inelasticity for each drug and empirically observed that volume did not change as the price increased.

- Lack of Alternative Products.  Doctors choose to prescribe specific drugs to their patients for reasons related to the specific pharmacological distinctions among the drugs in a particular class and, consequently, they cannot simply substitute one product for another when price varies. This is true of the Collusive Drugs. For instance, Pravastatin is one of several generic statins, but unique for its relatively low level of binding to blood plasma proteins, which may have life-altering implications for certain patients.

- Inherent Fungibility of Generic Drugs. Each manufacturer's version of each of the Collusive Drugs is, by nature, interchangeable with any other manufacturer's. By law, all generic drugs must be readily substitutable for another generic of the same brand drug.

357.     Price Increases Against Self-Interest. There was no reasonable commercial or economic justification for the price increases in the Collusive Drugs. In no case was a shortage reported during the Class Period for any of the Collusive Drugs, nor any sudden significant increase in demand. Thus, absent a collusive understanding among competitors, a manufacturer that acted alone to enact significant price increases ran a tremendous risk of losing all, or most, of its market share if competitors undercut the suddenly-inflated price. As an empirical fact, each manufacturer was able to substantially increase, and maintain increases on, the prices for the Collusive Drugs within a short period of time; no competitor sought to seize increased market share by undercutting the other market participants with even a slightly-smaller price increase. Without a deliberate strategy, such price increases would have been against Teva's self-interest.

358.     The "risk" Teva would have undertaken without collusion was particularly acute with respect to the six Collusive Drugs for which Teva was the first to increase the price, namely Ketoconazole (cream and tablets), Nystatin, Theophylline, Diclofenac, Propranolol, and Estradiol. Appendix B. The fact that Teva was so often willing to expose its market share to predation by other manufacturers whose prices sat many multiples below Teva's plausibly supports that, in reality, there was no risk at all; Teva had reached a collusive understanding that other market participants would themselves raise prices soon thereafter, and/or that Teva's "fair share" of the market would remain untouched despite its extraordinary price increase.

359.     Inter-Firm Communications.  The State AGs' CAC describes evidence showing Teva engaged in extensive direct communication with other manufacturers. For example, the State AGs allege that over 1,500 communications occurred between certain of Teva's "senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs" and employees at 15 other manufacturers between July 1, 2013 and July 30, 2014.

360.    Furthermore, investigation completed by Lead Counsel in the Securities Class Action identified a multitude of trade shows and conferences that afforded individuals responsible for Teva's generic drug prices an opportunity to interact with their counterparts at other manufacturers during the relevant period, many of which occurred in close proximity to price increases that Teva and/or another manufacturers implemented on the Collusive Drugs. A list of such events, indicating attendance by Olafsson, Oberman, Cavanaugh, Galownia and Patel is attached hereto as Appendix C. In all instances identified in Appendix C, representatives of at least one other manufacturer – and typically many more – also attended.

361.    Trade shows and conferences provided opportunities for one-on-one meetings with between Teva personnel, including several of the Defendants, and those of other manufacturers. For instance, at both the 2013 and 2014 annual meetings of the National Association of Chain Drug Stores ("NACDS"), Teva reserved a "strategic exchange" bungalow. NACDS advertised "strategic exchange" bungalows as "opportunities to meet and discuss strategic issues with key trading partners." In essence, Teva paid for a secluded area where its personnel could meet privately with others, including other manufacturers.

362.    <u>Government Investigations Corroborate an Inference of Collusion</u>. Corroborating the inferences drawn from the investigation by Lead Counsel in the Securities Class Action, the State AGs' CAC alleges, based on specifically-described communications, seven drug markets where Teva conspired to fix prices and/or allocate markets, namely the markets for: Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline.    Nystatin and Theophylline – two drugs where the States uncovered evidence that Teva, in coordination with Heritage, agreed to "take the lead" on price increases,

116

overlap with the set of drugs where the investigation by Lead Counsel in the Securities Class Action found strong indicia of collusive price-fixing.

363. The State AGs focus many of their drug-specific collusion allegations on the communications of Malek, Heritage's President. In dealing with Teva, Malek coordinated market allocation and price increases with a particular Teva employee, with whom he had a preexisting relationship. This employee joined Teva in April 2013 and was on maternity leave from August through December 2013. On information and belief, this employee is Nisha Patel ("Patel"), Teva's Director of Strategic Customer Marketing from April 2013 to August 2014 and Director of National Accounts from September 2014 to December 2016. Patel was on maternity leave from August through the end of 2013, (FE-1), and her tenure at Teva, based on publicly available social media sites, aligns with that of Malek's Teva contact. Patel had responsibilities relating to pricing prior to her shift to National Accounts. (FE-1, FE-3) The following is a brief timeline of those interactions, and their anticompetitive outcomes:

- July 2013. After three calls between Malek and Patel spanning more than 43 minutes, Nystatin appeared on an internal Teva list of "potential" price increases, despite a Nystatin price increase having met internal resistance the prior month, when Teva first considered the prospect. Patel went on maternity leave soon afterwards.

- February 7, 2014. After several contacts between Patel and Malek, Nystatin again appeared on an internal Teva spreadsheet as a candidate for a price increase

- April 4, 2014. Teva increased WAC for Nystatin and Theophylline.

- April 15, 2014. Malek and Patel had a 17-minute conversation, during which they discussed price increases and/or market allocation as to at least the seven drugs referenced above. Patel and Malek determined that, as Teva had raised WAC on Nystatin and Theophylline days earlier, Teva would "take the lead" on implementing price increases for those drugs, and other competitors would follow. Heritage would lead on the other five.

- <u>April 16-17, 2014</u>.  Multiple Teva employees communicated with Zydus, a competitor in the market for Acetazolamide

- <u>May 1-6, 19-22, 2014</u>.  Patel had at least three calls and exchanged at least 30 text messages with the Actavis pricing manager responsible for Glyburide-Metformin.

- <u>May 9, 2014</u>.  A Teva employee responsible for pricing spoke with their counterpart a Mylan, a competitor in the market for Glipizide-Metformin; these employees remained in close communication through 2014.

- <u>July 8, 2014</u>.  Teva refused to bid when a large Heritage customer requested a quote on Nystatin from Teva, in response to Heritage's price increase on the drug.

- <u>By July 9, 2014</u>.  Teva had increased prices on Nystatin, Theophylline, Glyburide, and Glyburide-Metformin, and Heritage had increased prices on all seven drugs Malek and Patel had discussed on April 15. If Teva did not increase prices, it furthered the agreement by refraining from bidding competitively, lowering prices, or, in the case of Leflunomide, leaving the market entirely.

- <u>July 25, 2014</u>.  After a large wholesaler solicited bids from Teva and Aurobindo on Glyburide, Teva spoke with Heritage (and Heritage with Aurobindo) "to ensure uniformity and compliance with the scheme," and resolved that Teva and Aurobindo would decline to provide a bid.

364.    These seven examples of Teva's reaching anticompetitive agreements are drawn just from the limited subset of drugs manufactured by both Teva and Heritage, a relatively small player in the industry. The State AGs have indicated that the CAC's common thread is Heritage, and that they plan to bring separate complaints focused on companies other than Heritage. The States are investigating collusive conduct relating to nearly 200 additional drugs.  (*See* ¶¶ 184-85 discussing the May 10, 2019 States AG Action 2)

365.    The DOJ also continues to actively investigate Teva, as evidenced by its motion to stay discovery in the *Propranolol Antitrust* matter on the ground that the plaintiffs' allegations of price-fixing "overlap[] substantially with one aspect of [DOJ's] criminal investigation." The S.D.N.Y., in sustaining the Propranolol Antitrust allegations over Teva's motion to dismiss,

reasoned that "[t]he presence of an ongoing investigation into the same subject matter as alleged in the pleadings here raises an inference of conspiracy." DOJ intervened similarly in the Generic Pharmaceuticals MDL, seeking stays and asserting that the drugs at issue – including the Collusive Drugs Baclofen, Fluocinonide, Pravastatin, and Propranolol – overlap with the DOJ's criminal investigation, further corroborating the existence of illegal price-fixing as to those drugs.

## THE TRUTH EMERGES RELATED TO RUSSIA, UKRAINE AND MEXICO

### Bribery of Russian, Ukraine, and Mexico Government Officials

366.    On December 22, 2016, the DOJ issued a press release entitled "Teva Pharmaceutical Industries Ltd. Agrees to Pay More Than $283 Million to Resolve Foreign Corrupt Practices Act Charges."  This press release stated the payment was a criminal penalty in connection with the bribery of government officials in Russia, Ukraine, and Mexico.  The DOJ press release states in relevant part:

> Teva entered into a deferred prosecution agreement (DPA) in connection with a criminal information, filed today in the Southern District of Florida, charging the company with one count of conspiracy to violate the anti-bribery provisions of the FCPA and one count of failing to implement adequate internal controls.  Pursuant to its agreement with the department, Teva will pay a total criminal penalty of $283,177,348.  Teva also agreed to continue to cooperate with the department's investigation, enhance its compliance program, implement rigorous internal controls and retain an independent corporate compliance monitor for a term of three years.

367.    From 2006 through at least 2012, Teva, through its employees and agents, together with others, agreed that Teva would make corrupt payments to Russian Official[6], intending that

---

[6]       According to the Statement of Facts attached as Exhibit 2 to the Plea Agreement entered into by the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), and Teva LLC (Russia) ("Teva Russia") (hereinafter, the "Plea Agreement"), the "Russian Official" is a citizen of the Russian Federation whose identity is known to the United States and the Company, was a high-ranking government official in the Russian Federation, who held official positions on government committees.

Russian Official would use his official position and ability to influence the Russian government to purchase brand name Copaxone (chemical name: glatiramer acetate) through tender offers.  The payments were made through the high profit margins that Russian Company[7] earned as Teva's re-packager and distributor of Copaxone for sales to the Russian Ministry of Health pursuant to the central government's drug purchase program.

368.    In addition, between 2001 and 2011, Teva, through its employees and agents, together with others, agreed to pay and provide things of value to Ukrainian Official[8] to corruptly influence the Ukrainian government in approving the registration of Teva pharmaceutical products in Ukraine, which thereby allowed Teva to market and sell its products in the country.

369.    In furtherance of the bribery in Russia and Ukraine, employees and agents of Teva sent emails through the United States.  In furtherance of the improper payments in the Ukraine, Teva caused wire transfers to be made through U.S. financial institutions.

370.    Teva marketed and sold pharmaceutical products in countries with high corruption risks, including, among other places, Mexico.  Despite being aware of red flags and prior corruption-related misconduct at Teva's subsidiary in Mexico, Teva knowingly failed to implement an adequate system of internal accounting controls and failed to enforce the internal

---

[7]    According to the Plea Agreement, the "Russian Company" was a group of companies incorporated in the Russian Federation, the identity of which is known to the United States and the Company.  Russian Company was a distributor, manufacturer and re-packager of pharmaceutical products in the Russian Federation.  Russian Company was owned, controlled and managed by Russian Official. From at least in or about 2003 until at least 2013, Russian Company's controlling shares were held in the name of Russian Official's spouse, who was not involved in Russian Company's business operations.

[8]    According to the Plea Agreement, the "Ukrainian Official" is a Ukrainian citizen whose identity is known to the United States and the Company, was a high-ranking official within the Ukrainian Ministry of Health, who held official positions at government agencies and on government committees from at least 2001 to 2011.  By virtue of his of official positions, Ukrainian Official could take official action on, and exert official influence over, matters related to the registration and pricing of pharmaceutical products in Ukraine.  Ukrainian Official was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, § 78dd-1(9(1)(A).

accounting controls it did have in place, including those requiring adequate due diligence of distributors and other third-party agents, which resulted in improper payments being made in Mexico.

371.    Teva's total profits from the conduct described above in Russia, Ukraine and Mexico, were approximately $221,232,303.

## Russian Federation

372.    The Russian Federation had a socialized public healthcare system that provided universal healthcare to Russian citizens, with the cost of medical care and drug treatments shared between the central, regional and local governments.  In or around late 2007, the Ministry of Health designated seven illnesses and conditions as rare and expensive to treat and created a program whereby the central government would procure and supply to patients the necessary medications for treating these illnesses and conditions.  Among the covered illnesses was multiple sclerosis and treatment by Copaxone.  Since in or around 2008, Russian government purchases of Copaxone were primarily made by the Ministry of Health at usually bi-annual auctions.

373.    Employees of Teva, based in Israel, and employees of Teva Russia, at the direction of Teva Executive[9] and others, sought to increase sales of Copaxone to the Russian government, including by doing business with companies owned and controlled by Russian Official, knowing that he was a high-level Russian government official at the time.

---

[9]       According to the Plea Agreement, the "Teva Executive" is an Israeli citizen whose identity is known to the United States and the Company, was the senior Teva executive responsible for overseeing TIG (defined above) between 2002 and 2010 and left the Company in 2014. Teva Executive was an "officer," "director," "employee," and "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

374.    On or about October 26, 2006, Teva Russia Executive[10] emailed Teva Executive and another senior Teva International Group ("TIG") Manager about a recent meeting with Russian Official, providing them with "an idea of the caliber of the person [by] citing below just a few of his formal titles and personal achievements."  Teva Russia Executive described Russian Official's official position and explained that Russian Official was "the key lobbyist of pharma-related questions and issues" as well as a "key contact person for Knesset," the Israeli parliament. Teva Russia Executive explained that Russian Official was the "owner of the local wholesaling company [Russian Company]" along with several other pharmaceutical companies.  Teva Russia Executive's email further noted that Russian Official's "influence in the industry" could benefit Teva by, among other things, allowing Teva to obtain "more speedy and straightforward registration of products."  Teva Russia Executive cautioned, however, that "the results [of Russia's] 2008 presidential elections can affect the status and scope of [Russian Official]'s influence."

375.    On or about October 26, 2006, Teva Executive replied to Teva Russia Executive that he "support[ed] exploring any kind of initiative which could strengthen our position in Russia."

376.    On or about February 8, 2008, Teva Russia Executive sent Teva Executive an email attaching a report about Russian Company.  In a section of the report detailing Russian Company's "management and corporate governance," Teva Russia Executive explained that "[t]ransparency

---

[10]    According to the Plea Agreement, the "Teva Russia Executive" is a citizen of the Russian Federation whose identity is known to the United States and the Company, was a high-level executive at Teva Russia from in or about January 2006 until he left Teva Russia in or about September 2012.  Teva Russia Executive was an "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

of [Russian Company] should be considered low . . . .  Participation of [Russian Official] and probably some local government officials in the ownership structure is well known."

377.    In or about early October 2008, Teva managers, including Teva Executive, met with Russian Official and a Russian Company executive in Israel.  The meeting had been arranged by Russian Company's Director of Sales and Marketing.

378.    On or about October 7, 2008, Russian Company's Director of Sales and Marketing emailed Teva Executive to follow-up on matters discussed during the meeting.  The email reiterated that Russian Company was "interested to participate in the delivery and distribution of Copaxone," and explained that the Russian government had already "defined" the government's order for Copaxone for 2009.  The email also mentioned possible "future scenarios" that could affect the "decision making" related to Copaxone sales, reminded Teva Executive that Russian Official had had "personal involvement . . . in the introduction of Copaxone and other important healthcare initiatives in Russia," and explained that "it will be beneficial for Teva to grant the distribution of Copaxone to [Russian Company] in full or partially."

379.    In or around October 2008 and January 2009, Teva employees, including Teva Executive, learned that the Russian Company executive was under investigation in Russia for corruption and that Teva's risk insurance provider had decided to stop insuring transactions with Russian Company.

380.    In or around late 2008 or early 2009, after the meeting and email described above, Teva Executive, Teva Russia Executive, and others agreed that Teva would grant Russian Company the right to distribute Copaxone in Russia, intending that Russian Official would use his official position and ability to influence the Russian government in order to increase sales of

Copaxone to the Russian government. From early 2009 until in or about mid-2010, Teva employees explored various possibilities for Russian Company to sell Copaxone.

381.    On or about March 7, 2009, Russian Company's Director of Sales and Marketing emailed Teva Executive with information about a public tender for the purchase of Copaxone that had been announced by the Russian Academy of Medical Sciences ("RAMS").   The email explained that Russian Company's "top management has first-hand relations with RAMS" and that the tender offered "a very good chance to push further up Copaxone positioning in Russia, since RAMS and its President have [a] significant role in influencing the opinion of medical and political stratum in Russia."

382.    On or about March 10, 2009, the senior TIG executive forwarded Teva Executive's email to Teva Russia Executive, who confirmed that Russian Company had "a strong position in this establishment."   Teva Russia Executive explained that he was aware of the issue and was already dealing with a Russian Company employee who "reports directly to [Russian Official]." In or around mid-2009, the Russian government announced a new strategy for the Russian Federation's domestic pharmaceutical industry, known as "Pharma 2020."   The goals of the new strategy involved, among other things, an import phase-out and changes to the procurement of pharmaceutical products, primarily by establishing a preference for domestic products.   These changes started to apply in early 2009 and affected purchases made through the Russian government's annual procurement auction program.   Under the law, as announced, repackaging of a foreign pharmaceutical product inside the Russian Federation could qualify for the domestic preference under Pharma 2020.

383.    In or around mid-2010, Teva reorganized its business and eliminated the TIG business unit.   Teva Russia was put under the newly created EMIA business unit.

384.     In or around mid-2010, Teva Russia employees, including Teva Russia Executive, agreed with Russian Official and others on a plan for Russian Company to be Teva's re-packager and distributor for Copaxone sales to the Russian government.   Russian Company would re-package and distribute Copaxone on behalf of Teva.   As set forth below, Teva hoped that Russian Official would use his political network and official influence to benefit Teva to support maintaining or increasing the amount of Copaxone sold to the Russian government.

385.     In or around early August 2010, a Russian Company employee emailed Teva Russia Executive to request that Russian Company receive a larger discount on sales to a Russian government customer.   On or about August 5, 2010, Teva Russia Executive forwarded the matter to the manager of Teva Russia's Innovative Business Unit, requesting that Russian Company be granted a larger discount. The Teva Russia manager opposed giving Russian Company "any additional concessions," but Teva Russia Executive wrote back, suggesting that Teva Russia should consider the request as "the cost of building a relationship with [Russian Official]," as "this year, there was a substantial increase in the Copaxone requests from the [RAMS]," and Teva Russia "may benefit from [Russian Official's] support in other areas as well."

386.     In or around late August 2010, Teva Russia employees provided a draft of the proposed Copaxone repackaging and distribution agreement between Teva and Russian Company to Teva employees in Israel.

387.     On or about September 12, 2010, a Teva Russia executive emailed the Finance Director for Teva's Copaxone business unit and other Teva managers and executives in Israel to provide the "rationale for the new scheme of Copaxone business in Russia."   The email explained that "this year the Russian Government has been continuing to interfere into pharmaceutical market functioning.   Thus, it has been continuing its pressure on prices especially on those products

that being of high price are paid by the state budget." The email further explained that the focus of this price pressure had been "expensive imported products paid by the government," including Copaxone, and that the Russian government was seeking to "encourage[] competition intensification by both fast track registration of the new competing products (one was registered this summer for MS treatment and we expect it takes part in the MS tender this fall) and supporting fast development and introduction of the local glatiramoids (they call them, of course, 'Copaxone's generics')." In the email, the Teva Russia executive stated that this "and some other new factors produced serious threats for the Copaxone business in 2011." As a result, "partnership with a robust influential local player was identified as the proper solution to the above challenges." The email stated that the partner was "supposed to lobby Copaxone in the state tender." He explained that Russian Company "was found as the right company capable to assure keeping Copaxone's share and its price and even r[a]ising them both up."

388.    In his email to Teva executives, the Teva Russia executive asked for their approval of the proposed Russian Company repackaging and distribution agreement "as soon as possible." The email explained that "if we do not have the supply agreement approved and signed by [the] mid[dle] of this week we will encounter very real threat of losing a 100 million USD Copaxone business in 2011."

389.    On or about September 12, 2010, a Teva Russia manager emailed Teva executives in Israel with additional information supporting Teva Russia's request. The email noted that Russian Company was headed by Russian Official, listed Russian Official's official positions on various government committees, and explained that "the plan" was to use Russian Official's contacts, including at the Ministry of Health, to maintain Copaxone's share of the market,

including by minimizing the risk that a generic version of Copaxone would be approved by the Russian government, thereby reducing Teva's market share.

390.    On or about September 12 and 13, 2010, Teva Russia Executive sent emails to senior Teva executives in Israel requesting them to sign off on the agreement with Russian Company immediately.

391.    On or about September 14, 2010, a Teva Russia senior manager emailed Teva Russia Executive and described a meeting he had just had with Russian Official.  The email said that Russian Official had told him that the Minister of Health "had returned from a vacation and asked in the morning if there was a confirmation that the entire project . . . would take place."  The email explained that Russian Official was concerned that Teva would refuse to approve the agreement with Russian Company, and that Russian Official had threatened that "both the price and the supply volumes would be purposefully 'lowered' if a partnership with him was not established."

392.    On or about September 15, 2010, Teva executives agreed to enter into the Copaxone re-packaging and distribution agreement with Russian Company.

393.    On or about October 7, 2010, Teva Russia's Legal Director initiated the internal process to formally enter into the agreement with Russian Company.  Consistent with Teva's anti-corruption policy as it related to third-party agreements, the Legal Director submitted a completed questionnaire about the Russian Company agreement to Teva for review and approval.   In transmitting the materials, the Legal Director stated that the "deal value is about US $100 million for 2011 sales" and asked for immediate review, calling the deal "rather urgent."  The email and supporting information stated that Russian Official's wife was the owner of the company but did not include the fact that Russian Official ran the business. The email also omitted facts known to

Teva Russia Executive and other Teva Russia employees, including details about the corruption investigation by Russian authorities against the Russian Company executive and information from Russian news media reports on Russian Official's alleged involvement in corruption related to Russian government drug procurement auctions going back to 2006.

394.    On or about October 8, 2010, a Teva Finance Department manager with responsibility for approving compliance-related requests for the EMIA region directed a Finance employee to forward the compliance questionnaire concerning the Russian Company agreement to the Regional Compliance Officer and to Teva Russia's CFO for, among other things, due diligence to be conducted.

395.    On or about October 9, 2010, in response to an inquiry about the status of due diligence on Russian Company, a senior EMIA executive sent an email to another high-ranking EMIA executive explaining that Teva Russia Executive would be leading the due diligence process.    As set forth above, at the time, Teva Russia Executive had been pushing for the agreement between Teva Russia and Russian Company.

396.    On or about October 21, 2010, the EMIA Regional Compliance Officer approved the agreement between Teva and Russian Company.

397.    On or about October 28, 2010, Teva executed the framework agreement with Russian Company, which included granting Russian Company the right to repackage and distribute Copaxone in the Russian Federation as well as an incentive agreement with payments tied to increasing sales targets.    At the same time, Teva entered into the distribution agreement with Russian Company, Teva terminated an agreement with the Russian Company that had distributed Copaxone at several prior Ministry of Health auctions and agreed to pay that company a substantial "bonus" payment as part of the termination.

398.    On or about November 12, 2010, the Russian Ministry of Health awarded Russian Company the contract to supply the Russian government with glatiramer acetate for its tender.

399.    On or about December 13, 2010, a Teva Russia executive communicated via email with a senior manager at Russian Company regarding matters related to the recently awarded contract to supply glatiramer acetate (Copaxone) to the Russian government.

400.    On or about December 30, 2010, Teva Russia Executive emailed a senior EMIA executive about a meeting the executive was scheduled to have with Russian Official.  In preparing the executive for the meeting, Teva Russia Executive explained Russian Official's position and influence in the Russian government and stated that the "state channel is a key one for his businesses."  Teva Russia Executive explained that "the dilemma [Russian Official] faces is how to protect his positions under conditions when state funded business in Russia is becoming transparent."  Among other things, Teva Russia Executive asked the senior EMIA executive to "push [Russian Official] to demand more funding for Copaxone [] in early 2011" and to "obtain his commitment in protecting Copaxone (access to the Minister [of Health] and [Ministry of Health] decision makers, leveraging Senate capabilities)."

401.    On or about January 2, 2011, the senior EMIA executive emailed Teva Russia Executive about his meeting with Russian Official, stating that Russian Official "strongly encourages us to strengthen our influence with Regional Government Neurologist Representatives, to ensure in the future Copaxone volumes are protected."

402.    On or about January 24, 2012, Russian Company was awarded another contract by the Russian Ministry of Health to supply the government with Copaxone.  Teva terminated its repackaging and distribution relationship with Russian Official and Russian Company in the

middle of 2013 as a result of Russian Company's refusal to follow Teva's due diligence procedures.

403.    During the time that Russian Company was Teva's re-packager and distributor for Copaxone, Teva earned profits of approximately $204,167,303 on sales made by Russian Company to the Russian government.

**Ukraine**

404.    Ukraine had a socialized healthcare system, with the national Ministry of Health coordinating the provision of healthcare to its citizens with regional and local counterparts.  Most healthcare services were provided through government-owned healthcare facilities. Pharmaceutical products were regulated by agencies under the Ukrainian Ministry of Health.  In Ukraine, drugs were permitted for marketing and sale in Ukraine only after registration by the state, which included clinical testing and examination as part of the approval process.  In Ukraine, medications for certain socially significant or especially serious illnesses, including multiple sclerosis, were dispensed free by the government.

405.    Ukrainian Official[11] held senior positions within the agencies under the Ukrainian Ministry of Health responsible for registering and approving drugs for marketing and sale in Ukraine.  In those official positions, Ukrainian Official had the ability to influence the Ukrainian government's decision to approve the registration of pharmaceutical products.

---

[11]    According to the Criminal Complaint filed in the action *United States of America v. Teva Pharmaceutical Industries, Ltd.*, Case 1:16-cr-20968-FAM (S.D. Fla.) ("Criminal Complaint"), the "Ukrainian Official" is a Ukrainian citizen whose identity is known to the United States and the Company, was a high-ranking official within the Ukrainian Ministry of Health, who held official positions at government agencies and on government committees from at least 2001 to 2011.  By virtue of his official positions, Ukrainian Official could take official action on, and exert official influence over, matters related to the registration and pricing of pharmaceutical products in Ukraine.  Ukrainian Official was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, 78dd-1(f)(1)(A).

406.    Teva operated directly in Ukraine until in or around 2007, at which time Teva began operating through subsidiaries, including Teva Ukraine[12] in 2010.

407.    In or around August 2001, Teva, through its employees and agents, engaged Ukrainian Official as a third-party "registration consultant" and entered into consulting agreements to pay Ukrainian Official a monthly "consultancy fee."   In addition to the monthly payments, Teva, through its employees and agents, provided Ukrainian Official with cash bonuses, travel expenses and other things of value.   The consulting agreement between Teva and Ukrainian Official was renewed annually, on the same terms, until in or around late 2011.

408.    The payments under the agreements between Teva and Ukrainian Official were made for the purpose of inducing Ukrainian Official to use his official position within the Ukrainian government to improperly influence the registration of Teva pharmaceutical products in Ukraine.

409.    On or about May 26, 2003, an invoice prepared at Ukrainian Official's direction asked Teva "to transfer to me by cash $15,000 as the follow-up fee payment for registration of Insulins in Ukraine."

410.    On or about June 8, 2003, Teva entered into an agreement extending Ukrainian Official's engagement.  The agreement was signed by Teva Executive on behalf of Teva.

411.    On or about May 24, 2004, an invoice prepared at Ukrainian Official's direction asked Teva "to transfer to me by cash $20,000 as the last follow-up payment for registration of Insulins in Ukraine after reception of Registration certificate."

---

[12]    According to the Criminal Complaint, Teva Ukraine LLC ("Teva Ukraine") was a limited liability company incorporated in Ukraine and was a wholly-owned subsidiary of Teva.  Teva Ukraine operated on behalf, for the benefit, and under the control of Teva, and was principally responsible for the sale and marketing of Teva pharmaceutical products in Ukraine. Teva Ukraine was an "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

412.    On or about March 26, 2006, the TIG manager responsible for approving expenses related to the agreement between Teva and Ukrainian Official approved a request that Teva pay for Ukrainian Official's travel expenses to Israel.  The request stated that Ukrainian Official "is a great help to us in the promotion of Copaxone and insulins in the Ukrainian market.  One way we can repay him is by financing his visits to Israel once a year."  The approved request included approximately $4,400 worth of travel expenses for Ukrainian Official and his wife.

413.    On or about October 5, 2006, an invoice prepared at Ukrainian Official's direction asked Teva to "transfer to my [] account $10,000 for the expenses of Copaxone registration in Ukraine."  The Teva employee responsible for making the payment identified the amount as a "Bonus for Copaxone registration."

414.    In or around January 2008, Teva, through Teva Ukraine, sought registration of one of its products from the Ukrainian governmental authority responsible for the registration of pharmaceutical products.  Teva Ukraine's submission was addressed and sent to Ukrainian Official, who was then a high-level official at the governmental authority.

415.    On or about April 24, 2008, Ukrainian Official was appointed by the President of Ukraine to become the Deputy Chairman of a Ukrainian government committee responsible for issues of "price-formation for drugs and other medicinal products, public purchases and drugs registration."

416.    On or about June 29, 2008, an invoice prepared at Ukrainian Official's direction asked Teva to "transfer to my [] account $10,000 for the expenses of Copaxone promotion in the Ukraine."

417.    On or about July 21, 2008, Teva sent a wire transfer totaling $10,000 through an intermediary bank account in New York, which was subsequently paid onward to a bank account in Ukraine held by Ukrainian Official.

418.    On or about May 20, 2009, an invoice prepared at Ukrainian Official's direction requested payment for $16,500 as a "consultancy fee" from Teva for September 2008 through June 2009.

419.    On or about June 25, 2009, Teva sent a wire transfer totaling $16,500 through an intermediary bank account in New York which was subsequently paid onward to an account in Ukraine held by Ukrainian Official.

420.    Teva stopped paying Ukrainian Official at the end of 2009. Thereafter, Teva Ukraine took over payments to Ukrainian Official under the agreement until the expiration of the agreement in approximately March 2011.

421.    From in or around June 2002 through approximately March 2011, Teva and Teva Ukraine paid cash and provided other things of value to Ukrainian Official worth a total of approximately $200,000.

**Teva's Failure to Implement Adequate Internal Accounting Controls in Mexico**

422.    Teva marketed and sold pharmaceutical products in countries with high corruption risks, including, among other places, Mexico.  Despite understanding the nature of the corruption risks presented by doing business in Mexico and awareness of red flags and prior corruption-related misconduct at Teva's subsidiary in Mexico, Teva knowingly and willfully failed to implement an adequate system of internal accounting controls and failed to enforce the internal accounting controls it did have in place, which in turn failed to prevent improper payments from being made in Mexico.

423.    For example, in or around 2011 and 2012, Teva Mexico[13], through its executives, employees and agents, used its third-party distributor, Mexican Company[14], to make payments to physicians and other healthcare providers (collectively, "HCPs").  Some of the HCPs paid by Mexican Company had received payments from Teva Mexico and its predecessor entities in exchange for prescribing Copaxone since at least 2005.  The existence and improper nature of these payments was known to Teva executives who were responsible for developing and approving the Company's anti-corruption internal controls in 2009.

424.    On or about November 6, 2008, Mexican Official[15] emailed a Teva employee responsible for the Copaxone business to complain about Teva Mexico's failure to make certain payments.  Mexican Official wrote, "TEVA Mexico was promises promises & promises and there was never any interest in order to improve our relationship."  Mexican Official said the lack of payment was "really strange when I'm your best client in Mexico."  In the email, Mexican Official noted that he was prescribing Copaxone to approximately 170 patients, making him one of the largest prescribers in the region.  On or about November 12, 2008, the email was forwarded to

---

[13]    According to the Criminal Complaint, Lemery S.A. de C.V., Sicor de Mexico S.A., Teva Pharmaceutical Mexico S.A. de C.V., Lemery Desarrolo y Control S.A. de C.V., Immobiliaria Lemery S.A. de C.V., IVAX Pharmaceuticals Mexico S.A. de C.V., and Vitrium Division Farmaceutica S.A. de C.V. (collectively, "Teva Mexico") were companies incorporated in Mexico and wholly-owned subsidiaries of Teva.  Teva Mexico was principally responsible for the sale and marketing of Teva pharmaceutical products in Mexico.

[14]    According to the Criminal Complaint, "Mexican Company" is a limited liability company incorporated in Mexico whose identity is known to the United States and the Company, was a distributor of pharmaceutical products in Mexico.  In 2011 and 2012, Mexican Company was retained by Teva Mexico to distribute Copaxone to state-owned and state-managed hospitals and healthcare facilities in Mexico.

[15]    According to the Criminal Complaint, "Mexican Official" is a Mexican citizen whose identity is known to the United States and the Company, from at least 2005 to 2012 was a well-known and influential neurologist in Mexico who treated patients suffering from multiple sclerosis.  Mexican Official was employed by an instrumentality of the Mexican government and held senior positions at hospitals and other healthcare facilities owned and controlled by that instrumentality.  Mexican Official was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, § 78dd-l(f)(1)(A).

Teva Executive, who then emailed a senior Teva Mexico executive, "I'd appreciate having your good inputs and trust that [Mexican Official's] problem can be resolved.   After all, [it's] not every day we get a complaint from a professor that has 170 Copaxone patients."

425.   In or around December 30, 2008, the senior Teva Mexico executive emailed Teva Executive and explained, "[t]he growth of Copaxone in this market, until very recently, was not due to scientific/academic support but mostly to other incentives."   These "other incentives," which included payments in exchange for prescribing Copaxone, were paid out of Teva Mexico's Copaxone marketing and promotions budget.

426.   Numerous Teva executives involved in developing, approving and implementing the Company's anti-corruption program, including Teva Executive, were aware that the policies and procedures they approved were not adequate to prevent or detect improper payments to foreign officials.   These executives also understood that the internal controls were not adequate to meet the risks posed by Teva's business and, indeed, had intended such a result.

427.   Teva executives also put in place managers to oversee the compliance function who were unable or unwilling to enforce the Company's anti-corruption policies.   For example, on or about January 17, 2011, at a meeting of the Company's compliance team that oversaw Teva Mexico, while discussing whether the compliance department would approve certain payments, the Regional Compliance Officer expressed an opinion that "Compliance['s] role will be [to] not interfere with the ultimate decision made by Business Heads."   During this same time period, the Regional Compliance Officer also "emphasized that the compliance program, current local policy and Sales and Marketing guidelines were not relevant for the [Latin America] region and were to be ignored."

428.    On or about April 12, 2011, a Teva employee responsible for overseeing the implementation of the anti-corruption controls emailed a senior executive responsible for overseeing compliance in Latin America.  The email explained that a senior Teva executive had "specifically instructed not to implement a robust system that will enable us to monitor and assure that the same doctor wasn't invited to a meal more than three times (for example)" and that the purpose of a system to track payments was "mainly to automate the manual forms."

429.    In or around early 2011, Teva reduced the budget for marketing and promotion of Copaxone in various countries, including Mexico.  As a result, Teva Mexico no longer had sufficient funds to pay the government healthcare providers ("HCPs") to whom it had been making payments.  In or around early 2011, after the reduction in their marketing and promotions budget, employees in the Teva Mexico group responsible for sales of Copaxone agreed to continue the payments to the government HCPs in the form of cash payments made by Mexican Company, which was a Teva Mexico distributor for sales of Copaxone to government institutions.

430.    On or about November 15, 2011, a Teva employee with responsibility for financial controls over Teva Mexico prepared a memorandum detailing perceived deficiencies in the internal accounting controls for Teva operations in Latin America.  The memorandum concluded: "[w]e cannot guarantee that we are not (1) executing payments that would violate FCPA anti-bribery provisions and (2) properly accounting for any such payments under the books and records provision of the FCPA."

431.    In or around January 2012, employees of Teva Mexico met with employees of Mexican Company, and agreed to provide Mexican Company with an additional margin of 2% on sales by Mexican Company to its government customers.  The purpose of the 2% margin was to

pay the government physicians and other healthcare providers ("HCPs") in exchange for their writing prescriptions of Copaxone.

432.   Between on or about February 16, 2012 and March 6, 2012, using the additional margins provided under the agreement with Teva Mexico, a Mexican Company employee delivered cash payments to at least seven HCPs employed by Mexican state-owned or state managed hospitals and healthcare facilities.

433.   On or about March 15, 2012, a Mexican Company employee emailed a Teva Mexico employee with "a report as to how the delivery to the physicians was made." In the email, the Mexican Company employee detailed the time and place of the improper payments, including approximately $30,000 paid to Mexican Official at Mexican Official's office on or about the morning of February 17, 2012.   In total, the Mexican Company employee's email detailed approximately $159,000 in cash payments to the government HCPs.   Teva Mexico described these improper payments, funded through the provision of the additional 2% margin to Mexican Company, as legitimate reductions of revenue in its books and records.

434.   Prior to engaging Mexican Company as a distributor, Teva Mexico conducted no due diligence on Mexican Company, did not have a written distribution agreement in place, did not require Mexican Company to certify its compliance with Teva's anti-corruption policies, and knew there was no legitimate purpose for the increased margin Mexican Company had received on sales to Mexican government customers.

**Plea Agreement with the DOJ**

435.   On December 22, 2016, Teva entered into a Plea Agreement with the DOJ, Criminal Division, Fraud Section on behalf of the United States of America and based upon its

violation of 18 U.S.C. § 371 (Conspiracy to Defraud the United States).  In this Plea Agreement,

Teva pled guilty to conspiracy to violate the FCPA.  The unlawful acts included:

> From 2006 through at least 2012, Teva, through its employees and agents, together with others, agreed that Teva would make corrupt payments to Russian Official, intending that Russian Official would use his official position and ability to influence the Russian government to purchase Copaxone through tender offers. The payments were made through the high profit margins that Russian Company earned as Teva's repackager and distributor of Copaxone for sales to the Russian Ministry of Health pursuant to the central government's drug purchase program.

436.    This Plea Agreement included the admission that Teva did not timely and

voluntarily self-disclose the FCPA violations to the DOJ.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

437.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class consisting of all individuals who purchased or

otherwise acquired Teva ADSs pursuant to the Company's ESPP during the Class Period.

Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant

times, members of their immediate families and their legal representatives, heirs, successors or

assigns and any entity in which Defendants have or had a controlling interest.

438.    The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and

can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds

or thousands of members in the proposed Class.

439.    Record owners and other members of the Class may be identified from records

maintained by Teva or its transfer agent and may be notified of the pendency of this action by

mail, using the form of notice similar to that customary used in securities class actions.

440.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

441.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

442.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    (b)    Whether Defendants' breached their fiduciary duty to the ESPP;

    (c)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

    (d)    whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    (e)    whether Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

    (f)    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

    (g)    whether the prices of Teva ADSs during period set forth herein were artificially inflated because of the Defendants' conduct complained of herein; and

(h)     whether the members of the Class have sustained damages and, if so, what

is the proper measure of damages.

443.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the

wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### (VIOLATION OF SECTION 11 OF THE SECURITIES ACT AGAINST ALL DEFENDANTS)

444.    Plaintiff incorporates by reference and re-alleges each allegation contained above,

as though fully set forth herein.

445.    The Registration Statement, along with other documents it incorporates by

reference was inaccurate and misleading, contained untrue statements of material facts, omitted to

state other facts necessary to make the statements made not misleading, and omitted to state

material facts required to be stated therein.

446.    Teva is the registrant of the Registration Statement.  The Individual Defendants are

responsible for the contents of the Registration Statement based upon their status as directors

and/or officers of the Company and because they signed or authorized the signing of the

Registration Statement on their behalf pursuant to Sections 11(a)(1)-(3) of the Securities Act.

447.    As issuer of the ADSs, Teva is strictly liable to Plaintiff and members of the ESPP

(and the ESPP itself) for the misstatements and omissions.

448.    Teva is strictly liable for the contents of the Registration Statement, and for the

documents it incorporates by reference.  Defendants failed to make a reasonable investigation or

to possess reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

449.   By reasons of the conduct herein alleged, each Defendant named in this Count violated Section 11 of the Securities Act.

450.   Plaintiff and the ESPP have sustained damages.  The value of Teva ADSs has declined substantially subsequent to and due to Defendants' violations.

## COUNT II

## (BREACH OF FIDUCIARY DUTY)

451.   Plaintiff realleges each and every allegation set forth above as if each was set forth in full here.

452.   A fiduciary who breaches any of his or her responsibilities, obligations or duties shall be personally liable to make good to his wards resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

453.   Defendants had a duty to discharge their duties with respect to the Plaintiff and the members of the ESPP (and the ESPP itself) solely in the interests of the participants.

454.   Defendants had the power to control the ESPP.  Defendants oversee the ESPP and are empowered to appoint administrators or to administer the ESPP itself at its option.

455.   By virtue of their position, Defendants were in a superior position vis-à-vis Plaintiff and members of the ESPP to determine the prudence in continued investment in Teva ADSs. Further, Defendants possessed special knowledge and expertise about the Company such that Plaintiff and members of ESPP reposed confidence in their offer of Teva ADSs as part of the Company's overall compensation package.

456.     The wages that Plaintiff and members of the ESPP diverted into the ESPP were the property of Plaintiff and members of the ESPP.  By accepting and maintaining the property of Plaintiff and members of the ESPP, Defendants assumed a fiduciary duty to preserve that property and to keep Plaintiff and members of the ESPP reasonably informed about all facts relevant to their participation in the ESPP.

457.     In breach of the fiduciary duty owed to Teva employees, Defendants failed to inform Plaintiff and members of the ESPP of all of the relevant facts surrounding their investment in Teva ADSs through the ESPP.  Further, Defendants breached their fiduciary duty by allowing investment in Teva ADSs through the ESPP to continue, even though they knew or should have known that the investment was imprudent and likely to result in significant losses for Plaintiff and members of the ESPP.

458.     Defendants' breaches exceeded the scope of their authority as corporate officers and directors.

459.     As a consequence of Defendants' breaches, Plaintiff and the members of the ESPP (and the ESPP itself) suffered enormous losses.

460.     Defendants are individually liable to make good to Plaintiff and the members of the ESPP any losses suffered resulting from each breach.

## COUNT III

## (MISREPRESENTATION AND NON-DISCLOSURE)

461.     Plaintiff realleges each and every allegation set forth above as if each was set forth in full here.

462.    A fiduciary who breaches any of his or her responsibilities, obligations or duties shall be personally liable to make good to his or her wards any losses resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

463.    Defendants had a duty to discharge their duties with respect to the ESPP solely in the interests of the members.

464.    Defendants breached their fiduciary duties in that they made material misrepresentations and nondisclosures to their wards as alleged above.

465.    As a consequence of Defendants' material misrepresentations and misleading omissions, Plaintiff and the members of the ESPP suffered losses.

466.    Defendants are individually liable to make good to Plaintiff and the members of the ESPP any losses suffered as a result of their breaches.

**COUNT IV**

**<u>(BREACH OF CONTRACT)</u>**

467.    Plaintiff realleges each and every allegation set forth above as if each was set forth in full here.

468.    Plaintiff entered into an agreement with Defendants that Defendants would properly manage and monitor the ESPP and safeguard the investments made by Plaintiff and the members of the ESPP and offer the ADSs to the ESPP at their correct and appropriate price.

469.    Plaintiff performed his obligations under the agreement by investing part of his salaries owed by Teva into Teva ADSs.

470.    Defendants breached the agreement by failing to properly manage and monitor the ESPP investments in Teva ADSs and by offering the ADSs to the ESPP when Defendants knew

or should have known that the price assigned to the ADSs was inflated beyond its true value because of Defendants' wrongful acts as set forth herein.

471.    Defendants are individually liable to make good to the ESPP any losses suffered as a result of their breaches.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

(A)    A judgment awarding compensatory damages in favor of Plaintiff and the other members of the ESPP against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, plus pre-judgment and post-judgment interest thereon at the highest rates permissible at law or in equity;

(B)    A judgment awarding Plaintiff and the members of the ESPP their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(C)    In the alternative, an order under Rule 23 of the Federal Rules of Civil Procedure determining that this action is a proper class action, designating Plaintiff as class representative and designating Plaintiff's counsel as Class Counsel; and

(D)    A judgment awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: November 1, 2019

**GAINEY McKENNA & EGLESTON**

By: */s/ Gregory M. Egleston*
    Gregory M. Egleston (ct19709)
Thomas J. McKenna
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

***Attorneys for Plaintiff***